GIRARDI | KEESE
Stephen G. Larson (CA Bar No. 145225)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Phone: 213-977-0211
Fax: 213-481-1554
E- Mail: slarson@girardikeese.com

Attorneys for Defendant
ANGELA MARIA GOMEZ AGUILAR

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 10-1031-AHM |
|---|---|
| Plaintiff, | **DEFENDANT ANGELA MARIA GOMEZ AGUILAR'S NOTICE OF MOTION AND MOTION FOR THE SETTING OF BAIL; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| ENRIQUE FAUSTINO AGUILAR NORIEGA, ANGELA MARIA GOMEZ AGUILAR, LINDSEY MANUFACTURING COMPANY, KEITH E. LINDSEY, and STEVE K. LEE, | |
| Defendants. | Date: January 3, 2011<br>Time: 3:00 p.m.<br>Location: Court Room 14 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Monday, January 3, 2011, at 3:00 p.m., before the Honorable A. Howard Matz, defendant ANGELA MARIA GOMEZ AGUILAR, by and through her counsel of record, Stephen G. Larson, will move this Court to set bail in the above-entitled case.

This Motion is based upon the Application for Review/Reconsideration of Order Setting Conditions of Release/Detention and Request for Hearing filed on December 17, 2010, the moving papers, the attached Memorandum of Points and Authorities, the files

1

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR THE SETTING OF BAIL

and records in this matter, and such further evidence and argument as may be adduced at the hearing on this matter.

DATED: December 22, 2010

Respectfully submitted,

By: _____/s/_____
Stephen G. Larson
GIRARDI | KEESE
Attorneys for Defendant
ANGELA MARIA GOMEZ AGUILAR

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendant Angela Maria Gomez Aguilar ("Mrs. Aguilar") respectfully moves this Court for an order granting bail.

Specifically, Mrs. Aguilar seeks an order permitting her to be released on a $100,000 affidavit of surety, fully secured with deeding of property, to be executed by a responsible third party, and further to reside at her family residence located at Rio Sena #441, Colonia Vista Hermosa, 62290, Cuernavaca, Morelos, Mexico. As further conditions of her release, Mrs. Aguilar will enter into an irrevocable waiver of extradition before this Court and will also submit to any other reasonable conditions of pretrial release as ordered by this Court.

Counsel and Mrs. Aguilar readily recognize that this is an extraordinary request. Ordinarily, pre-trial release outside of the Central District of California would not be sought. This, however, is both an extraordinary case and an extraordinary defendant. Here, there is simply no direct evidence of her criminal involvement in the offenses set forth in the indictment, and the "inferential" or "circumstantial" evidence upon which the government relies is very weak and does not come close to the quantum of proof required for a criminal prosecution. Mrs. Aguilar has now spent over four months in a federal jail, which is an amount of time that exceeds what the government itself has, on more than one occasion, indicated that it might seek in this case.

Moreover, Mrs. Aguilar is neither a flight risk nor a danger to any community, either in the United States or in Mexico.

Finally, as demonstrated by the government's conduct in this case, Mrs. Aguilar was arrested and detained for the primary reason of securing her husband's extradition from Mexico to the United States – that effort was unsuccessful, and Mrs. Aguilar should be released pending trial.

## II. FACTUAL BACKGROUND

On August 9, 2010, Mrs. Aguilar was arrested pursuant to a criminal complaint signed by Judge Charles Eick, alleging that she violated the Foreign Corrupt Practices Act ("FCPA"). In that complaint, the government contended that Mrs. Aguilar signed various checks to make payments for gifts and other offerings to a foreign official in an attempt to improperly procure contracts for an American company.

On September 15, 2010, the government sought and obtained a seven-count indictment charging Mrs. Aguilar with conspiracy to launder monetary instruments and money laundering, and her husband Enrique Faustino Aguilar Noriega ("Mr. Aguilar Noriega) with conspiracy to violate the FCPA, a substantive violation of the FCPA, conspiracy to commit money laundering, and money laundering.

On October 21, 2010, the government sought and obtained a First Superseding Indictment ("indictment") charging Mrs. Aguilar along with Mr. Aguilar Noriega and co-defendants Lindsey Manufacturing, Keith E. Lindsey, and Steve K. Lee. The first six counts of the First Superseding Indictment charged Lindsey Manufacturing, Keith E.

Lindsey, Steve K. Lee, and Mr. Aguilar Noreiga with conspiring to bribe a foreign official and bribing a foreign official in violation of the FCPA. Again, Mrs. Aguilar was charged only in the counts charging conspiracy to commit money laundering and money laundering.

## III. LEGAL STANDARD

As this Court is well aware, the Bail Reform Act "mandates the release of a person pending trial unless the court 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (quoting 18 U.S.C. § 3142(e)). A presumption of detention against the defendant does not arise unless the charged crimes constitute a "crime of violence" as defined by 18 U.S.C. § 3156, or involve allegations of drug distribution or the use or distribution of illegal weapons. *United States v. Gentry*, 455 F. Supp. 2d 1018, 1029 (D. Ariz. 2006).

Therefore, the Court must release a defendant pre-trial on his or her own recognizance, unless the government can demonstrate that such release will not reasonably assure the defendant's appearance at trial, or will endanger the safety of any other person or the community. *United States v. Bright*, 2009 U.S. Dist. LEXIS 5399, at *2 (N.D. Cal. Jan. 15, 2009) (citing 18 U.S.C. § 3142(b)); *see also United States v. Cohen*, 2010 U.S. Dist. LEXIS 83081, at *4 (D. Nev. Aug. 10, 2010) (noting that there is a presumption in favor of release on personal recognizance or on "an unsecured

appearance bond in an amount specified by the court." (quoting 18 U.S.C. §3142(b)). The government must demonstrate the defendant's flight risk by a clear preponderance of the evidence, *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990), and the defendant's danger to any person or the community by clear and convincing evidence, *Hir,* 517 F.3d at 1086.

If the government meets either burden of proof, the Court *must* determine the *least restrictive* further condition or combination of conditions that will satisfy both the appearance and safety requirements. *Bright,* 2009 U.S. Dist. LEXIS 5399, at *2 (N.D. Cal. Jan. 15, 2009) (emphasis in original) (citing *United States v. Motamedi,* 767 F.2d 1403, 1405 (9th Cir. 1985)). All doubts regarding the propriety of release must be resolved in favor of defendants, and only rarely should release be denied. *Townsend,* 897 F.2d at 994.

Accordingly, courts evaluate four factors under 18 U.S.C. § 3142(g) to determine whether there are conditions of release that will reasonably assure both the defendant's appearance, and the safety of any other person and the community:

(i) the nature and seriousness of the offense(s) charged;

(ii) the weight of the evidence against the defendant;

(iii) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, and criminal history; and

   (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

*See Hir*, 517 F.3d at 1086.

  18 U.S.C. § 3142(g) does not rank the importance of each of the four factors, but the nature of the crime charged and the weight of the evidence may assist the court in predicting a defendant's conduct if released. *United States v. Simon*, 2006 U.S. Dist. LEXIS 52979, at *6-7 (D. Nev. 2006). Even if the nature of the charges and the evidence against the defendant clearly and convincingly demonstrate a flight risk or a danger to the community, the government must still meet its burden to show that no conditions can reasonably assure the defendant's appearance or the community's safety before a court will deny bail. *Bright*, 2009 U.S. Dist. LEXIS 5399, at *4 (affirming release of defendant facing charges of drug trafficking and using firearms in furtherance of a drug trafficking crime; even though clear and convincing evidence showed that defendant would likely pose a danger to the community, government had not met its burden to show detention was necessary); *see also United States v. Eshun*, 2010 U.S. Dist. LEXIS 123360, at *5-6 (D. Ariz. Nov. 9, 2010) (denying government's motion for revocation of release for defendant with prior drug conviction facing at least twenty (20) years incarceration on charges of conspiracy to distribute one (1) ton of marijuana and conspiracy to commit money laundering).

  Although the Ninth Circuit has held that the weight of the evidence is the least important factor when considering whether to grant bail, it is nonetheless relevant in

evaluating "the likelihood that the person will fail to appear." *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)). Thus, the weakness of the government's case against the defendant will weigh against a determination that the defendant poses a flight risk. *See Eshun*, 2010 U.S. Dist. LEXIS 123360, at *5-6 (ordering defendant's pretrial release in part because defendant had offered evidence to rebut government's circumstantial evidence of the drug charges against him); *Chen*, 820 F. Supp. at 1211 (granting pretrial release of defendants arrested in connection with "largest heroin seizure in United States history;" although charges were serious and carried substantial penalties, "the weight of the evidence suggests that conviction might be an uphill struggle for the government"); *cf. United States v. Townsend*, 897 F. 2d 989, 993-94 (9th Cir. 1990) (risk of flight exists where, among other factors, the weight of the evidence is enough to alert the defendants to a "reasonable possibility of conviction.")

While a defendant's alienage may be taken into account, citizenship alone is not dispositive on whether the defendant poses a serious flight risk. *Motamedi*, 767 F.2d at 1408. Moreover, "a mere theoretical opportunity for flight is not sufficient grounds for pretrial detention." *Simon*, 2006 U.S. Dist. LEXIS 52979, at *7 (noting that defendant, who was Israeli by birth and a naturalized U.S. citizen, possessed sets of false identities showing that his preparation and intent to flee the United States was far from theoretical; nonetheless, release was warranted because defendant's connections to the community mitigated his flight risk).

As to a defendant alien's character and history, courts should refer to their roots in their home country, and credit any positive evidence of their reputation and good ties back home. *See Townsend*, 897 F.2d at 995 (crediting foreign defendants' substantial ties with their home country and good reputation as businessmen as factors favoring bail)

Where, as here, a defendant alien offers a waiver of extradition from his or her country of citizenship or a country that might conceivably provide refuge, however, courts should weigh this factor in favor of bail, even if other factors might indicate a flight risk. *See Simon*, 2006 U.S. Dist. LEXIS 52979, at *13 (affirming and amending magistrate's release order to include defendant's irrevocable waiver of extradition from Israel, despite defendant's past ties to Israel, evidence of serious intent to flee, and access to substantial cash sources); *cf. Townsend*, 897 F. 2d at 994 (rejecting defendants' offers of waivers of extradition because they did not pertain to "the country that might provide refuge").

## IV. ARGUMENT

Mrs. Aguilar should be released on suitable bond conditions for the following three reasons:

First, there is no direct evidence of her criminal involvement in the offenses set forth in the indictment, and the "inferential" or "circumstantial" evidence upon which the government relies is very weak and does not come close to the quantum of proof required for a criminal prosecution.

There has never been any question that Mrs. Aguilar was "involved" in the numerous "overt acts" that the government claims were part of the money laundering conspiracy – as directed by her husband and other advisors, such as Eduardo Bustani, she signed checks, she signed wire instructions, she signed various other documents, and she permitted her husband, Mr. Aguilar Noriega, to use their shared home email account. This is not in dispute, but this is also not evidence of criminal money laundering.

Count seven of the indictment charges her with conspiracy to commit money laundering in violation of section 1956(h), and count eight of the indictment charges her with laundering of monetary instruments in violation of section 1956(a)(1)(B). The conspiracy count identifies three predicates: Section 1956(a)(1)(B), laundering monetary instruments; section 1956(a)(2), transporting monetary instruments for the purpose of laundering; and section 1957, money laundering. All three sections require the government to prove, beyond a reasonable doubt, that the defendant possessed some degree of knowledge, and there is none of that in the allegations or in the voluminous evidence provided by the government.

According to the Ninth Circuit's *Manual of Model Criminal Jury Instructions*, both section 1956(a)(1)(B), laundering of monetary instruments, and section 1956(a)(2), transporting monetary instruments for the purpose of laundering, are specific intent crimes that require the government to prove, beyond a reasonable doubt, that the defendant knew the property represented the proceeds of a prior, separate criminal

activity; for its part, section 1957 money laundering requires that the government prove that the defendant knew that the transaction involved criminally derived property. Here there is no evidence that Mrs. Aguilar knew that the property or transactions in questions were the proceeds of criminal activity or involved criminal activity.

Counsel for Mrs. Aguilar has met with both government prosecutors and pressed them on this point; in response, government counsel has referenced two, and only two, reports of interview as providing, inferentially, much of the needed evidence: The FBI 302 report of her daughter, Angela Maria Aguilar Gomez ("Angie Aguilar"), her daughter, and Eduardo Bustani, the account manager at Global. *See Declaration of Molly Weber* at ¶ 3. Both clearly explain Mrs. Aguilar's official but largely circumscribed role in handling this account, and both are notable for what they do *not* provide – any evidence that Mrs. Aguilar knew that the money in this account was either the proceeds of or otherwise involved criminal activity. In Angie Aguilar's report of interview, a complete copy of which is attached as *Exhibit A*, Angie describes her mother, who is referenced as "Cepeda" in the report, as a former secretary who "never worked again once she became pregnant" with her daughter, and never remembers her "ever working while [she] was growing up." Even now she believes that her work is limited to organizing "events or parties" that she does "to help a friend every once in a while." Angie recognized her and her mother's signatures on various documents related to the Global account, the investment account which figures in the indictment,

and, like her mother, Angie also signed "some documents giving her power to take money out of her parents' account if something were to happen to them."

Angie also explained the family's personal connection to the subject of the interview report that provides the other major pillar of the government's case against Mrs. Aguilar, that of Eduardo Bustani. According to Angie, Mr. Bustani is the uncle of a close family friend, and the family has known him for years as a result of this relationship; not surprisingly, Mr. Bustani became the broker for the family account at Global.

In Mr. Bustani's report (a complete copy of which is attached hereto as *Exhibit B*), he allegedly indicated that Mrs. Aguilar attended meetings concerning the account (although she "would occasionally leave the meeting and do something else, such as prepare a snack or check on the children"), and knew that the money deposited into the account was derived from Mrs. Aguilar's husband's work as a consultant for U.S. companies doing business in Mexico, an occupation which is neither illegal nor uncommon.

Like Angie's report, this report also provides a wholly innocent basis for Mrs. Aguilar's interest in the Global account, as well as for her understanding as to why she had to sign the checks and wire instructions regarding the account:

> When Bustani met with Enrique and Angela regarding opening the account[,] Enrique told Bustani, 'Angela and I have an agreement; that was going to be her money [presumably if something happened to Enrique].' Enrique said that he had an account in Europe. Enrique said that the Europe account was his, and the Global account was Angela's.

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR THE SETTING OF BAIL        -12-        13241785.2

This came after Mr. Aguilar Noriega had suffered a heart attack, and other family members had died unexpectedly. Moreover, Mr. Bustani understood that the power of attorney was given to both Mrs. Aguilar and her daughter because, "[i]f Angela died, they wanted to make sure the money would go to their daughter." The report indicates several times that Mr. Aguilar Noriega referred to Mrs. Aguilar as his "partner" and a "big whig," but the references also make clear that this was understood as a "joke" and that, to the contrary, she was anything but a partner in their business affairs. A fair reading of the report of interview clearly substantiates that it was Mr. Aguilar Noriega, not Mrs. Aguilar, who completely controlled the Global account and directed the transactions related to the account; although Mrs. Aguilar signed account documents that were filled out for her, she never read them, either before or after signing them, and her interest in the account was only in how the account "performed during the year" in the most general of ways.

Further, the report presents the information from Mr. Bustani in a very skewed manner. Either on account of the interviewing agents failure to ask or failure to report, the report does not present a complete account of what Mr. Bustani would have undoubtedly known if asked. Mr. Bustani is never pressed to provide specifics regarding Mrs. Aguilar's knowledge – it is as if the agent was satisfied with the generality. For example, and by way of proffer by the defense, the report does not convey that the many "meetings" described therein, at which Mrs. Aguilar was present,

were not formal business meetings as such but, rather, informal family gatherings between long-standing friends at the beach or social gatherings at their home. In fact, Mrs. Aguilar remembers attending two meetings with Mr. Bustani that she considered to be business meetings: One meeting at her home with Mr. Bustani and her husband during which she was directed to sign documents necessary to open the account, and another meeting in Mr. Bustani's office lasting approximately forty minutes, during which she was directed to sign papers related to the Ferrari, a transaction she neither initiated nor understood.

Also omitted is a description of *how* Mr. Bustani explained the account to Mrs. Aguilar, an omission made notwithstanding repeated references in the report to Mr. Bustani having somehow "explained" the account. The information Mrs. Aguilar sought was not details concerning the account, but rather, in the most general terms, whether the account was doing good or doing bad, i.e. whether it was making money; Mrs. Aguilar remembers being told by Mr. Bustani that it was way too complicated for her to understand, and that all she needed to know was that things were going well.

The defense further proffers that Mrs. Aguilar never filled out the substance of any of the documents or the checks herself, but rather signed such documents and checks, including the papers related to the Ferrari, as instructed and without reading them, not because she did not want to know, but because she was told, by people she fully trusted (and had every reason to trust), that she should do as they say, that these were mere formalities, and that, in any event, she would not understand them.
DEFENDANT'S NOTICE OF MOTION AND MOTION FOR THE SETTING OF BAIL     -14-     13241785.2

Finally, emails were sent from Mr. Bustani to what the government indicates was Mrs. Aguilar's email account. However, like many couples, Mrs. Aguilar and her husband used this email account as a shared home email address. She neither opened nor read any of the emails regarding the Global account from Mr. Bustani; instead, Mr. Aguilar Noriega accessed, opened and responded to emails, a fact evident from a fair reading of the responsive emails. And this is all the government has: No other subject of an interview report provides any indication that Mrs. Aguilar knew anything about any alleged criminal activity. In fact, most of the alleged principal players do not even know who she is.

In sum, there is simply nothing which substantiates, let alone proves beyond a reasonable doubt, that Mrs. Aguilar knew that the property or transactions in questions were the proceeds of criminal activity or involved criminal activity.

That the case lacks proof beyond a reasonable doubt is not lost on the government. One of the most remarkable statements by government prosecutors to the defense was made on November 30, 2010; after pressing the government about the apparent lack of evidence and reminding them of their obligation to prove their case beyond a reasonable doubt, Mr. Miller stated, "We are confident that we will be able to prove her guilt beyond a reasonable doubt by the time of trial." *See Declaration of Molly B. Weber* at ¶ 3. This is a case in which the government is making assumptions, untethered from facts and evidence. As Mr. Miller told this Court at the most recent hearing: "Certain things *must* have taken place that the government will never know about." (Emphasis added.)

That is not a basis for an indictment, but defendant is profoundly concerned that this is the basis upon which she has spent the last four months, and may well spend the next three months, in a federal jail.

<u>Second</u>, Mrs. Aguilar has now spent over four months in a federal jail, which is more time than the government has indicated that it would seek in this case.

At her initial arrest, Ms. Nicola Mrazek told Mrs. Aguilar's prior counsel, C. Michael Zweiback, Esq., that she would consider recommending pretrial diversion if Mrs. Aguilar "cooperated" and arranged to have her husband surrender to authorities in the United States. Although government prosecutors in subsequent pre-indictment discussions made clear that Ms. Mrazek did not have authority to make such an offer, there was no question that, if Mrs. Aguilar "cooperated" and secured her husband's arrest, she could plead guilty and would likely spend little, if any, time in jail. In fact, as recently as December 8, 2010, well after it was clear that Mrs. Aguilar would not cooperate against her husband, the government inquired (without offering) as to whether Mrs. Aguilar would accept a guilty plea to misprision of a felony with no cooperation and a recommendation of no prison time. A complete copy of said inquiry is attached hereto as *Exhibit C*.

Whether it was the initial discussion of pretrial diversion or the latest inquiry concerning misprision of a felony, it is clear that the government does not view Mrs. Aguilar as someone who merits time in prison. Instead, Mrs. Aguilar is being used as a

pawn by the government to convince her husband to bypass his country's extradition process.

Even if convicted of the charged offenses, the Sentencing Guidelines would not necessarily call for more time than Mrs. Aguilar has already served. The money laundering offenses with which she is charged provide a base offense level of 8. Although there is an enhancement for the amount of funds laundered, there is no evidence that Mrs. Aguilar knew of any such amount, particularly since she blindly signed checks and wire instructions as directed by her husband and other persons without reading them. Furthermore, a four-level reduction for her minimal role, a reduction that the government has recognized in conversations with defense counsel as applicable in her case, and a two or three-level reduction for acceptance of responsibility (should she plead guilty), would produce a relatively low total offense level. With a criminal history category of I (she has absolutely no criminal history), her guideline sentencing range may very well be within a probationary zone, a sentence consistent with the types of sentences meted out by other district judges for similarly situated defendants in these types of cases. Mrs. Aguilar and her counsel are confident in her acquittal at trial; however, even if convicted, we respectfully submit that she may well have served more time now than this Court might impose, and that certainly may well be the case if she is held in custody through the trial date of March 29, 2011.

<u>Third</u>, and finally, Mrs. Aguilar is neither a flight risk nor a danger to any community, either in the United States or in Mexico, and there has been no evidence presented to the defense that suggests otherwise.

As set forth above, Mrs. Aguilar is a kind and gentle woman, a caring and nurturing mother, and a supportive and loving wife. She is a spiritually devout woman who is trusting and completely dedicated to the care of her family. Her daughter Angie is pregnant with her first grandchild, expecting in April, 2011, and she wants no more than to be with Angie and help her during her pregnancy. It is precisely her dedication to her family that has prompted her steadfast commitment not to seek release on bail if, as a condition of that release, she must remain in the Central District of California. Mrs. Aguilar's reasoning is simple: She knows that if she is released to a residence in the Central District, one or more of her adult children will feel compelled, out of love and their sense of duty to care for their mother, to be present with her; she does not want to disrupt their lives and, if that is the only alternative, stoically accepts her plight at the Los Angeles Metropolitan Detention Center.

As demonstrated by the government's conduct in this case, Mrs. Aguilar was arrested and detained for the primary reason of securing her husband's extradition from Mexico to the United States. There is no question that the government was not prepared to bring the indictment when they did – much of what Mr. Miller considers critical discovery in this case was obtained at least one month *after* Mrs. Aguilar was arrested, and was only produced weeks *after* the original November 9, 2010, trial date. The

government is playing catch-up and hoping against hope to come up with something, but they haven't and they won't. In the meantime, they are using Mrs. Aguilar as a means to an end; the defense respectfully requests this Court to put an end to this charade and, at a minimum, permit Mrs. Aguilar to be with her family, as the other co-defendants in this case are with their families, pending trial in this matter.

DATED: December 22, 2010             Respectfully submitted,

By: _____/s/_____
Stephen G. Larson (Bar No. 145225)
GIRARDI | KEESE
Attorneys for Defendant
ANGELA MARIA GOMEZ AGUILAR

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, at Girardi | Keese at 1126 Wilshire Boulevard, Los Angeles, California 90017. I am over the age of 18 and not a party to this action.

On **December 22, 2010**, I served the foregoing document described as **DEFENDANT ANGELA MARIA GOMEZ AGUILAR'S NOTICE OF MOTION AND MOTION FOR THE SETTING OF BAIL; MEMORANDUM OF POINTS AND AUTHORITIES** on the parties in this action by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies the following:

Douglas M. Miller (Assistant United States Attorney)
Email: doug.miller@usdoj.gov

Nicola L. Mrazek (United States Department of Justice Senior Trial Attorney)
Email: Nicola.mrazek@usdoj.gov

Jan L. Handzlik (Attorney for Defendants Lindsey Manufacturing Company and Keith E. Lindsey)
Email: handzlikj@gtlaw.com

Janet I. Levine (Attorney for Defendant Steve K. Lee)
Email: jlevine@crowell.com

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **December 22, 2010**, at Los Angeles, California.

                                              /s/ Molly B. Weber
                                             MOLLY B. WEBER