1   JAN L. HANDZLIK                          JANET I. LEVINE
    (State Bar No. 47959)                    (State Bar No. 94255)
2   GRACIA TSE                               MARTINIQUE E. BUSINO
    (State Bar No. 274293)                   (State Bar No. 270795)
3   GREENBERG TRAURIG LLP                    CROWELL & MORING LLP
    2450 Colorado Avenue, Suite 400 East     515 S. Flower Street, 40th Floor
4   Santa Monica, CA 90404                   Los Angeles, CA 90071-2258
    Phone: (310) 586-6542                    PHONE: (213) 622-4750
5   Fax: (310) 586-0542                      FAX: (213) 622-2690
    EMAIL: handzlikj@gtlaw.com               EMAIL: jlevine@crowell.com
6   EMAIL: tseg@gtlaw.com                    EMAIL: mbusino@crowell.com

7   Attorneys for Defendants Lindsey         Attorneys for Defendant
    Manufacturing Company and                Steve K. Lee
8   Keith E. Lindsey

9   MATTHEW B. HAYES
    (State Bar No. 220639)
10  225 South Lake Avenue, Suite 300
    Pasadena, CA 91101
11  Tel. 626.344.8530
    Fax 626.921.4932
12  EMAIL: mhayes@helpcounsel.com

13  Attorney for Defendants Lindsey
    Manufacturing Company and Keith E.
14  Lindsey

15                    **UNITED STATES DISTRICT COURT**

16          **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

17

18   UNITED STATES OF AMERICA,        )   CASE NO. CR 10-1031(A)-AHM
                                       )
19                      Plaintiff,     )   **DEFENDANTS' MOTION TO**
                                       )   **DISMISS THE INDICTMENT**
20                                     )   **WITH PREJUDICE DUE TO**
                                       )   **REPEATED AND INTENTIONAL**
21          v.                         )   **GOVERNMENT MISCONDUCT;**
                                       )   **DECLARATION OF JAN L.**
22   ENRIQUE FAUSTINO AGUILAR         )   **HANDZLIK; EXHIBITS;**
     NORIEGA, ANGELA MARIA            )   **PROPOSED ORDER (FIELD**
23   GOMEZ AGUILAR, LINDSEY           )   **UNDER SEPARATE COVER)**
     MANUFACTURING COMPANY,           )
24   KEITH E. LINDSEY and             )
     STEVE K. LEE,                    )
25                                     )
26                                     )   Date: June 6, 2010
                                       )   Time: 3:00 PM
27                      Defendants.    )   Place: Courtroom 14

28
     ─────────────────────────────────────────────────────────
          DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
          DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT
     129507416

1   TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE THAT as soon as the matter may be heard, in the

3   Courtroom of the Honorable A. Howard Matz, defendants Lindsey Manufacturing

4   Company ("LMC"), Keith E. Lindsey and Steve K. Lee (collectively, the

5   "Defendants"), by and through their counsel of record, will move to dismiss the

6   First Superseding Indictment ("FSI") with prejudice.

7        This motion is based on the accompanying Memorandum of Points and

8   Authorities, the attached declaration and exhibits, the files and records in this case,

9   and the arguments and evidence to be presented at a hearing on this motion.

10  Defendants have requested a hearing date of June 6, 2011, consistent with this

11  Court's 28-day motion practice requirement.

12

13

14  DATED:  May 9, 2011              Respectfully submitted,

15                                  JAN L. HANDZLIK

16                                  GREENBERG TRAURIG LLP

17                                   /s/  Jan L. Handzlik

18                                  By:  JAN L. HANDZLIK
                                    Attorney for Defendants
19                                  Lindsey Manufacturing Company &

20                                  Keith E. Lindsey

21  DATED:  May 9, 2011              Respectfully submitted,

22                                  JANET I. LEVINE

23                                  CROWELL & MORING LLP

24                                   /s/Janet I. Levine

25                                  By:  JANET I. LEVINE
                                    Attorneys for Defendant
26                                  Steve K. Lee

27

28                                          i

---

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION & SUMMARY OF ARGUMENT .................................... 1

II. BACKGROUND ........................................................................... 4

   A.   False Testimony was Presented to the Grand Jury ............................... 4

      1.   Agent Guernsey Falsely Testified that 90% to 95% of the Funds in Grupo's Account Came from LMC .......................... 4

      2.   In Her Grand Jury Testimony, Agent Guernsey Concealed LMC's Prior Business Dealings with CFE that Occurred Before the Retention of Grupo ......................... 5

      3.   Agent Guernsey Falsely Testified that Steve Lee had Informed the FBI that He "Didn't Want to Know" How Grupo Used its Commission Payments ..................................... 7

      4.   Agent Guernsey Falsely Testified that LMC Corruptly Obtained an Advantage Over Competitors, Even Though There Were No Competitors ....................................... 7

      5.   Agent Guernsey Falsely Testified that LMC Gained an Immediate Advantage With CFE Upon Its Retention of Grupo ..................................................................... 9

      6.   Agent Guernsey Misled the Grand Jury by Testifying that Corruption was the Only Plausible Reason That Grupo's Fees were Higher than Those of Prior Sales Representatives ........................................................... 9

      7.   Agent Guernsey Misled the Grand Jury by Testifying that Grupo Never Performed Outside Services for LMC ........ 11

      8.   Agent Guernsey Falsely Testified that LMC's Funds Were Used to Pay 100% of Nestor Moreno's American Express Bill .............................................................. 12

      9.   Agent Guernsey Falsely Testified that Most of the Funds in Grupo's Account at the Time of the Yacht Purchase Came From LMC ...................................................... 12

     10.   Agent Guernsey Falsely Represented that LMC Committed a Possible Tax Crime by Creating a False Document ............................................................... 13

i

1
2
          11.    Agent Guernsey Falsely Testified that LMC Reclassified its Payments to Grupo in 2006 in an Effort to Deceive The IRS...................................................................................14

3
4
5
    B.    Agent Guernsey's False and Misleading Testimony and the Prosecutors' Role in Presenting it to the Grand Jury was Concealed from the Defense Until Partway Through Trial.................15

6
    C.    Prosecutors Failed to Disclose the Falsities in Agent Binder's Search Warrant Affidavit. ...................................................16

7
8
    D.    The Government's Misconduct Includes Additional Misrepresentations and Further Brady Violations..............................17

9
          1.    The Government's Motion to Admit SBB Evidence was Founded on False Representations. ...........................................18

10
11
12
          2.    The Government Delayed the Production of Certain Brady and Jencks Materials until after their Case-in-Chief. ........................................................................19

13
III.   THE INDICTMENT SHOULD BE DISMISSED WITH PREJUDICE.................................................................................21

14
15
16
    A.    The Government's Presentation of False Testimony to the Grand Jury Constituted Flagrant Misconduct and a Violation of Due Process. .......................................................................21

17
    B.    The Prosecutors Knew that Agent Guernsey had Testified Falsely and Misled the Grand Jury .......................................23

18
19
20
    C.    The Prosecutors' Suppression of Brady Material, including False Statements in Grand Jury Testimony and in Other Sworn Statements, Calls for Dismissal of the Indictment with Prejudice...........................................................................25

21
IV.   CONCLUSION ........................................................................27

22
23
24
25
26
27
28

ii

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bank of Nova Scotia v. United States,*
    487 U.S. 250 (1988)................................................................ 25

*Benn v. Lambert,*
    283 F.3d 1040 (9th Cir. 2002) ........................................ 25, 26

*Brady v. Maryland,*
    373 U.S. 83 (1963)........................................................ passim

*Giglio v. United States,*
    405 U.S. 150 (1972)........................................................ 26, 27

*United States v. Basurto,*
    497 F.2d 781 (9th Cir. 1974) ..................... 21, 22, 23, 24

*United States v. Cathey,*
    591 F.2d 268 (5th Cir. 1979) ............................................. 1

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ......................... 21, 26, 27

*United States v. Fitzgerald,*
    615 F. Supp. 2d 1156 (S.D. Cal. 2009) .......................... 26

*United States v. Price,*
    566 F.3d 900 (9th Cir. 2009) ........................................... 26

*United States v. Samango,*
    607 F.2d 877 (9th Cir. 1979) ..................................... 21, 24

## Other Authorities

8 Moore's Federal Practice p. 6.03(2) (2d ed. 1978)........................ 23

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

## I.   INTRODUCTION & SUMMARY OF ARGUMENT

On April 15, 2011, the Court ordered the production of the complete transcripts of FBI Special Agent Susan Guernsey's ("Agent Guernsey") grand jury testimony.  These transcripts revealed that Agent Guernsey made many materially false representations to the grand jury and deceived the grand jury by omitting material evidence.  Her grand jury testimony, coupled with other troubling revelations, makes it clear that the investigation, prosecution and trial of this case has been fatally infected by prosecutorial misconduct.[1]

From the day the first search warrant was obtained, the investigation and prosecution of this matter has been tainted by materially false representations and testimony, all to the prejudice of Defendants.  The November 14, 2008 affidavit of FBI Special Agent Farrell Binder ("Agent Binder") submitted in support of the warrant to search Lindsey Manufacturing Company ("LMC") contained false representations that deceived and misled the U.S. Magistrate Judge.  *See* Trial Exhibit 2538 (for identification).  As a result, this Court ordered a Franks hearing.

The misstatements in Agent Binder's affidavit were sworn to on subsequent occasions in support of other warrants (as late as October 2010) by other FBI agents and an IRS.  One such affidavit was sworn to by FBI Special Agent Susan Guernsey ("Agent Guernsey") in support of the Bluffview seizure warrant.[2]

---

[1]     Federal Rule of Criminal Procedure 12(e) provides an exception "[f]or good cause" to the general requirement that motions to dismiss an indictment be made before trial.  Here, ample good cause exists for filing this motion during trial.  By repeatedly refusing to produce Agent Guernsey's grant jury testimony until two weeks after trial had commenced, the prosecution concealed the government's misconduct from the Court and the defense.  *See, e.g., United States v. Cathey*, 591 F.2d 268, 271 n.1 (5th Cir. 1979) ("Because defendant did not receive a transcript of [the agent's] grand jury testimony until after the trial began, he could not be expected to comply with Rule 12(b)[3].")

[2]     *See* Trial Exhibit 2533 (for identification), Affidavit of Agent Guernsey in support of Bluffview seizure warrant at ¶ 13 ("LINDSEY . . . made several large

1       Agent Binder's testimony at the March 23, 2011 Franks hearing disclosed

2   that the prosecutors inserted the false representation concerning Sorvill into her

3   affidavit.  Agent Binder, who also told the Magistrate Judge that she had reviewed

4   the Sorvill bank records, falsely represented that LMC made deposits into

5   Aguilar's Sorvill account.  This insertion was apparently made by the prosecutors

6   without discussing it with Agent Binder or determining that she knew of its

7   inclusion and agreed to its truthfulness.  This false representation was used

8   repeatedly in the subsequent affidavits supporting the various warrants to search

9   LMC and its data, and to seize the Aguilars' property.

10       At the grand jury proceedings in September and October 2010, the

11   prosecutors presented testimony that was designed to mislead the grand jury.

12   Agent Guernsey summarized the case for the grand jurors, some of whom appeared

13   clearly skeptical about the government's case.  Her false and misleading testimony,

14   presented in large part through the prosecutors' leading questions, concerned issues

15   that were material to the allegations made in the First Superseding Indictment

16   ("FSI").  Prosecutors, aware of the facts, did not correct the false testimony.

17       In contravention of their obligations under the due process clause of the

18   Fifth Amendment and *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecutors then

19   concealed this false testimony from the Court and the Defendants – going so far as

20   to keep Agent Guernsey off their witness list, until it became obvious that she was

21   critical to laying the foundation of most government exhibits (both those obtained

22   by search warrant and by subpoena) related to Lindsey and Lee.

23       The prosecutors repeatedly refused to produce information that would have

24   revealed this misconduct.  They repeatedly rebuffed requests by the Defendants for

25   *Brady* materials, drafts of the search warrant affidavits and the complete transcript

26

27   payments to Sorvill . . . .) and ¶ 18e ("Sorvill . . . also received payments from

28   Lindsey. . . .").

---

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1   of Agent Guernsey's grand jury testimony.  Defendants sought all *Brady* materials,

2   which clearly included Agent Guernsey's false testimony to the grand jury, in the

3   Bill of Particulars motion filed on November 30, 2010.

4        As early as January 3, 2011 the prosecutors informed defense counsel that

5   Agent Guernsey would not be testifying at trial.  The reason given: "because she

6   had testified before the grand jury."  *See* Handzlik Decl. at ¶ 7.  This was the basis

7   upon which the prosecutors declined defense counsels' repeated requests for Agent

8   Guernsey's grand jury testimony.  Instead of recognizing and acting on their

9   responsibilities to produce favorable evidence relating to the question of guilt or

10  innocence and potential punishment, the prosecutors obfuscated and concealed.

11  Indeed, the prosecution admitted to this Court that it was calling a summary

12  witness at trial who was unrelated to the case, in order to shield its investigation

13  from scrutiny. [3]

14       Meanwhile, the prosecutors continually assured defense counsel and the

15  Court that all discoverable information had been produced. [4]  When faced with

16  having to produce Agent Guernsey's grand jury testimony in advance of the

17  Lindsey Miranda hearing, the prosecutors purposefully extracted a handful of

18  excerpts from the transcripts, intentionally concealing testimony riddled with

19  material misrepresentations and falsehoods.

20       The prosecutors' attempt to sanitize Agent Guernsey's grand jury testimony

21  exemplifies their efforts to cover-up their course of conduct: they knew what was

22  in the transcripts and, instead of owning up to it, produced only minor portions of

---

23

24  [3]    This is in direct contrast to the ABB prosecution involving Mr. O'Shea,

25  where case agent Lisa Diemert (IRS) is set to testify as the summary witness.  *See*
    Exhibit L (Transcript of September 30, 2010 pre-trial hearing in *United States v.*

26  *O'Shea*, U.S. Dist. Ct., S.D. Tex., CR No. H-09-629 at p.16:16-18:19).

27  [4]    *See, e.g.,* April 7, 2010 Trial Trans. at 880:21-881:22 ("We have done what

28  we believe not only meets our obligation, but exceeds it.")

3

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  it.  But even these snippets of Agent Guernsey's testimony contained false and

2  misleading information designed to influence the grand jury.

3  Only after the Court ordered production of the complete transcripts of Agent

4  Guernsey's testimony and the drafts of Agent Binder's search warrant affidavit

5  was the scope of the government's mendacity and misconduct revealed.

6  Sadly, there is considerable evidence of substantial and sustained

7  prosecutorial misconduct throughout this case.  The defendants have been

8  irrevocably prejudiced.  A dismissal of the FSI with prejudice is warranted.

9  **II.  BACKGROUND**

10  **A.  False Testimony was Presented to the Grand Jury**

11  In September and October 2010, the prosecution presented its case to a

12  grand jury.  Agent Guernsey, the summary witness, was the last witness called

13  before both grand juries deliberated on the proposed charges.  In addition to

14  questions posed by prosecutors, many of which were leading, she was asked many

15  questions by the grand jury; some jurors appeared to be skeptical about the

16  government's evidence.

17  The transcripts reveal that Agent Guernsey made knowingly false and

18  misleading representations on critical matters and omitted the disclosure of

19  material facts.  The prosecutors were present and knowledgeable about the facts.

20  The knew that Agent Guernsey was providing the grand jury with deceptive and

21  misleading testimony.  The FSI, returned immediately after Agent Guernsey's

22  testimony, was irrevocably tainted.

23  **1.  Agent Guernsey Falsely Testified that 90% to 95% of the**

24  **Funds in Grupo's Account Came from LMC**

25  The grand jurors' questions made it clear they were concerned about linking

26  payments by LMC on the Grupo invoices to purportedly corrupt payments made

27

28

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  by Grupo. They specifically inquired about whether there were funds in the Grupo

2  account that did not come from LMC. Indeed, the last question asked by a

3  skeptical grand juror immediately before commencing deliberations sought to

4  confirm that "that there were essentially no other funds in [Grupo's] account other

5  than those that came from [LMC]." Rather than inform the grand jury of the true

6  facts,[5] Agent Guernsey falsely represented that "90, 95 percent of the funds in the

7  Grupo account are from Lindsey." *See* Exhibit C (Guernsey October 21, 2010

8  Trans.), at 68:25-69:9, 75:14-21.

9        However, this is at odds with Agent Guernsey's earlier sworn affidavit in

10  support of one of the seizure warrants related to this case, in which she stated,

11  "These deposits from LINDSEY constitute approximately 70% of all wire transfers

12  and checks deposited into the Global account during this period." *See* Trial

13  Exhibit 2533, for identification (Affidavit of Agent Guernsey in support of

14  Bluffview seizure warrant), at ¶ 47. As Agent Costley acknowledged at trial, this

15  is a "material" variance from 90 to 95%. *See* April 29th Trial Trans. at 3244:16-25.

16        Agent Guernsey's false statement, made in response to a skeptical juror's

17  question, gave the grand jurors no choice but to conclude that LMC's funds had

18  been used to pay bribes.

19        **2. In Her Grand Jury Testimony, Agent Guernsey Concealed**

20              **LMC's Prior Business Dealings with CFE that Occurred**

21              **Before the Retention of Grupo**

22        The prosecutors and Agent Guernsey misrepresented and concealed that

23  LMC and CFE had an established business relationship dating back to 1991 –

24  eleven years before Grupo was retained as an independent sales representative.

25  Agent Guernsey nonetheless falsely testified that their investigation "didn't find

26  _____

27  [5]    Even under the government's 29% - 71% theory, which is derived by

28  arbitrarily limiting credits to third-party deposits, Agent Guernsey's testimony is
false.

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  that [LMC] got any [contracts] with their other rep." Exhibit C (Guernsey October
2  21, 2010 Trans.) at 34:20-24.  Agent Guernsey further falsely stated that LMC
3  "didn't have a lot of business with CFE before they hired Aguilar." Exhibit C
4  (Guernsey October 21, 2010 Trans.) at 67:8-9.

5      As Agent Guernsey and the prosecutors knew, this was false.  LMC had
6  secured numerous contracts from CFE prior to engaging Mr. Aguilar's company as
7  its Mexican sales representative on about May 1, 2002.  LMC entered into
8  approximately ten contracts with a value of nearly $9,000,000 with CFE during
9  this period.[6]  In fact, LMC was the primary source of CFE's emergency restoration
10 systems even before Mr. Aguilar's retention.  Agent Guernsey, testifying in late
11 2010, knew her allegation about no prior contracts or significant business between
12 CFE and LMC was false.

13      A grand jury subpoena calling for records of LMC's dealings with CFE from
14 1989 to 2009 was served on LMC in January of 2010.  The documents produced
15 by LMC lawyers directly to Agent Guernsey.  They reflected a longstanding and
16 lucrative relationship with CFE dating back to 1991.  Although the subpoena and
17 the accompanying cover letter stated that the documents produced would be
18 handed over to the grand jury,[7] Agent Guernsey simply "logged into evidence at
19 the FBI, and examined there, and then placed into storage." *See* April 22, 2011
20 Trial Transcript at 2470:6-8.

21      The purpose of these false and misleading representations was to mislead the
22 grand jury into believing that LMC only got CFE business, or significant CFE

---

24 6   This constituted about 1/3 of all of LMC's business with CFE.

25 7   The cover letter from the prosecutor that accompanied the subpoena stated
26 that all responsive records could be delivered *directly to Agent Guernsey*, in lieu of
   a grand jury appearance. *See* Exhibit F.  The cover letter to Mr. Handzlik's
27 February 26, 2010 production on behalf of Lindsey Manufacturing Company states
28 that the documents were produced "for presentation to the grand jury."  Exhibit G
   (February 26, 2010 Letter from Jan Handzlik to Susan Guernsey), at p. 1.

6

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

business, once it embarked on a corrupt relationship with Mr. Aguilar. This was clearly prejudicial and material to securing the FSI.

### 3. Agent Guernsey Falsely Testified that Steve Lee had Informed the FBI that He "Didn't Want to Know" How Grupo Used its Commission Payments

The prosecution presented testimony from Agent Guernsey about Mr. Lee's statement to FBI agents made at the time of the search. Agent Guernsey, who was not present at Mr. Lee's interview, represented that Mr. Lee told the FBI that he "didn't want to know" how Grupo was using its commission payment. *See* Exhibit C (Guernsey October 21, 2010 Trans. at 22:20-24). This was not true.

As reflected in the FBI 302 report, Mr. Lee never stated that he "didn't want to know" how Grupo was using its commission. *See* Exhibit H (Lee 302). Ms. Guernsey simply misrepresented Mr. Lee's FBI interview.

In addition, even though Agent Guernsey was not present at Mr. Lee's interview, the prosecutors solicited Guernsey's opinion as to whether she found Mr. Lee to be credible when he denied any knowledge of purported bribe payments by Mr. Aguilar. Agent Guernsey responded by denigrating Mr. Lee's credibility, despite the fact that his statement was perfectly consistent with the facts. *See* Exhibit C (Guernsey October 21, 2010 Trans. at 23:6-21).

### 4. Agent Guernsey Falsely Testified that LMC Corruptly Obtained an Advantage Over Competitors, Even Though There Were No Competitors

Agent Guernsey's falsely represented that Mr. Lee and Dr. Lindsey must have known that Mr. Aguilar was paying bribes, because LMC continued to obtain contracts with CFE, even though "they knew they weren't the lowest bidders anymore." *See* Exhibit C (Guernsey October 21, 2010 Trans. at 23:6-21). Agent Guernsey stressed that, until retaining Grupo, LMC "had always been very careful in the past to make sure they came in with one of the lowest bids, if not the lowest

1  bid,"[8] because it understood that "CFE usually awarded their contracts to one of
2  the lowest bidders."  She then represented that the agreement to pay Grupo a 30%
3  fee, which was passed along to CFE by marking up the price of LMC's products,
4  resulted in LMC no longer offering the lowest price to CFE.  LMC was not the
5  lowest bidder but still got the contracts.*See* Exhibit C (Guernsey October 21, 2010
6  Trans. at 21:5-22:3).  This is untrue.

7       In fact, as the government knew, during the period that Mr. Aguilar was
8  LMC's sales representative, there were *no* competitors for LMC's ERS systems in
9  Mexico.[9]  *See* April 15 Trial Trans. at 1781:10-18, 1782:1-3.  Indeed, in 2006, no
10  one else competed in the public tenders resulting in LMC's successful bids.  Agent
11  Guernsey's representation that LMC gained an advantage over its competitors,
12  who offered lower prices, was false.  The prosecutors and Agent Guernsey
13  concealed this crucial fact from the grand jury.  Instead, in the closing summary of
14  evidence to the grand jury, the prosecutors portrayed it as suspicious that LMC
15  "began being awarded contracts from CFE . . . despite the fact that hiring Enrique
16  Aguilar caused Lindsey Manufacturing to raise its prices by 30 percent."  *See*
17  Exhibit E (Assistant U.S. Attorney's ("AUSA") Oct. 21, 2010 GJ Closing
18  Summary at 16:14-17:2). [10]

19       This misrepresentation and concealment of known facts was extremely
20  prejudicial.  It clearly, yet falsely, conveyed to the grand jury that LMC must have

21  _____

22  [8]     This too was a false statement.  It was also inconsistent with Agent
   Guernsey's own testimony that LMC has little or no prior CFE business.
23

24  [9]     By the time LMC hired Grupo, it previous competitor for sales of
   compatible 1070 ERS towers to CFE, SBB, had stopped manufacturing the
25  structure that was similar to and interchangeable with Lindsey's IEEE standard
26  1070 tower (also known as the "Lindsey Tower").  *See* April 15 Trial Trans. at
   1781:10-18, 1782:1-3.
27

28  [10]    The prosecutors' names have been redacted from the attached exhibits.

8

1   known Grupo was paying bribes, because that would be the only reason it could
2   still win contracts at higher prices.

3   **5.  Agent Guernsey Falsely Testified that LMC Gained an**
4   **Immediate Advantage With CFE Upon Its Retention of Grupo**

5       The prosecutors presented testimony from Agent Guernsey that, upon
6   retaining Mr. Aguilar, LMC immediately began obtaining contracts "regularly"
7   with CFE.  *See* Exhibit C (Guernsey October 21, 2010 Trans. at 34:9-11).  The
8   prosecutors and Agent Guernsey knew this was untrue.

9       As the records in their possession made clear, for several years after
10  retaining Grupo,  LMC's sales to CFE continued in a sporadic fashion, just as they
11  had before its retention.  During the next 13 month period, LMC made only one
12  sale to CFE.  During 2005 and the first half of 2006, LMC made no sales to CFE.

13      Indeed, LMC did not obtain any significant contracts with CFE until July
14  2006.  This was more than four years after it retained Grupo and came on the heels
15  of Hurricane Wilma, believed to be the worst hurricane to have ever hit Mexico.
16  Wilma had devastating force and killed over 60 people, caused billions of dollars
17  in damages and wiped out numerous power lines.  These crucial facts were
18  concealed from the grand jury.  Instead, Agent Guernsey fostered the false
19  impression that LMC immediately began receiving regular contracts with CFE
20  upon retaining Grupo.  This was extremely prejudicial.  It reinforced her testimony
21  that LMC had reason to suspect that it was getting business as the result of bribes
22  by Mr. Aguilar.

23  **6.  Agent Guernsey Misled the Grand Jury by Testifying that**
24  **Corruption was the Only Plausible Reason That Grupo's Fees**
25  **were Higher than Those of Prior Sales Representatives**

26      In the grand jury proceedings, a skeptical juror specifically inquired as to
27  whether there was any "plausible explanation" for why Grupo's fee was higher
28  than LMC's earlier sales representative.  Specifically, the juror asked if it could be

9

1  related to the fact that Grupo was taking on additional sales and travel

2  responsibilities and, therefore, incurring more expenses on behalf of LMC.  In

3  response, Agent Guernsey falsely represented that there could be "no other

4  explanation" for the higher fee other than the money being used for corrupt

5  purposes.  *See* Exhibit B (Guernsey September 8, 2011 Trans. at 35:13-36:11,

6  82:5-23).

7      This testimony was misleading and deceptive in several respects.  First, as

8  noted above, based on the information seized and subpoenaed from LMC, the

9  prosecutors and Agent Guernsey were aware that Grupo in fact performed

10  significant outside services for LMC, including repeated travel, coordination of

11  training, transportation of LMC's products and translation.  However, these facts

12  were concealed from the grand jury.

13      Second, the prosecutors and Agent Guernsey were aware that the

14  commission payments to LMC's prior representatives in Mexico did not include

15  the representatives' expenses.  Instead, the prior representatives separately billed

16  LMC for the expenses they incurred.  In contrast, the 30 percent fee paid to Grupo

17  was all-inclusive, covering both the sales commission and expenses related to sales

18  efforts and transportation.  And it was payable only after sales were made and

19  product delivered.  The all-inclusive, contingent nature of Grupo's fee was a

20  plausible reason for its size as compared to prior sales representatives, who billed

21  immediately and separately for their expenses.  The prosecutors and Agent

22  Guernsey, however, concealed this obvious and plausible reason for the higher

23  percentage paid to Grupo.

24      Third, Agent Guernsey falsely represented that most of the money LMC

25  paid to Mr. Aguilar was ultimately utilized to buy "luxury goods" for CFE

26  officials.  But, as the prosecutors and Agent Guernsey knew, the evidence did not

27  support this implication.  In truth, the evidence demonstrates that only about $2.2

28  million of these monies were allegedly used for these purposes. Moreover, the

10

1   earliest that Grupo made any purportedly corrupt payments to or on behalf of CFE

2   officials was in August 2006. [11]  There is no evidence to suggest that any corrupt

3   payments were made by Grupo during the first four plus years it represented LMC,

4   from May 2002 through July 2006.  The prosecutors and Agent Guernsey

5   concealed these key facts from the grand jury.

6   ## 7.  Agent Guernsey Misled the Grand Jury by Testifying that

7   ## Grupo Never Performed Outside Services for LMC

8          In summarizing the evidence, Agent Guernsey represented that the Grupo

9   invoices to LMC for its representation services were "false" and "fraudulent." She

10  testified that the Grupo invoices split the 30% fee charged by Grupo between 15%

11  commissions and 15% outside services, such as travel expenses, training expenses

12  and translation services.  Agent Guernsey represented that these invoices were

13  "fraudulent" – and designed to hide the fact that the 30% fee was entirely a

14  commission – because Grupo did not actually perform the outside services

15  reflected on the invoices.  *See* Exhibit B (Guernsey Sept. 8, 2010 Trans. at 29:14-

16  22, 35:6-23).  This misleading testimony had no basis in fact.

17         As Agent Guernsey and the prosecutors knew from the records seized from

18  LMC on November 20, 2008 and LMC's production of documents (which was

19  delivered directly to Agent Guernsey) in response to the January 20, 2010 grand

20  jury subpoena, there was extensive evidence that Grupo was, in fact, performing

21  valuable outside services for LMC.  There are numerous e-mail exchanges between

22  Mr. Aguilar and LMC reflecting Grupo's marketing, sales and travel throughout

23  Mexico on behalf of LMC.  These records also show Mr. Aguilar's involvement in

24  other aspects of LMC's products.  The prosecutors and Agent Guernsey concealed

25  this crucial evidence from the grand jury.

26

27  [11]     The first alleged corrupt payment consisted of a $300 payment by Grupo on

28  Nestor Moreno's American Express bill.

11

1        **8. Agent Guernsey Falsely Testified that LMC's Funds Were**

2            **Used to Pay 100% of Nestor Moreno's American Express Bill**

3        The prosecution elicited testimony from Agent Guernsey alleging that a

4    portion of LMC deposits to the Grupo account were designed for the purpose of

5    paying Nestor Moreno's American Express bill.  The prosecutors presented Agent

6    Guernsey's false testimonyrepresenting that "over $170,000" of "Lindsey's wire

7    transfers [went] to pay off [Mr. Moreno's] Amex bill." *See* Exhibit C (Guernsey

8    Oct. 21, 2010, Trans. at 35:19-36:5).

9        All of LMC's wire transfers to the Grupo account were expressly tied to

10   invoices from Grupo and linked to actual contract payments by CFE to LMC.

11   Although she knew it, Agent Guernsey failed to inform the grand jurors that no

12   LMC funds were used to pay Mr. Moreno's American Express bills.

13       **9. Agent Guernsey Falsely Testified that Most of the Funds in**

14           **Grupo's Account at the Time of the Yacht Purchase Came**

15           **From LMC**

16       The prosecutors and Agent Guernsey represented to the grand jury that, in

17   August 2006, "the money in [the Grupo account] was largely from the money that

18   was received from Lindsey Manufacturing" and "that money was used to purchase

19   a yacht." *See* Exhibit B (Sept. 8, 2010 Trans. at 56:6-57:4. 62:11-18).  This was

20   untrue.  In fact, no LMC monies had been deposited into the Grupo account for the

21   previous 18 months, and no LMC monies were in the account when the yacht was

22   purchased.

23       In the closing summary of evidence for the grand jury, the prosecutors

24   sought to reinforce the false notion that LMC's funds could be specifically traced

25   to corrupt payments.  The prosecutor advised the grand jury that "approximately

26   $5,000,000 was wired from Lindsey's California bank account to the Grupo's

27   Global Financial account in Houston, Texas," and "Enrique Aguilar used *that*

28                                    12

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  money to buy goods and services for Nestor Moreno."[12]   (emphasis added) *See*

2  Exhibit D (AUSA Sept. 15, 2010 GJ Closing Summary at 46:15-20); Exhibit E

3  (AUSA Oct. 21, 2010 GJ Closing Summary at 18:5-11).

### 10. Agent Guernsey Falsely Represented that LMC Committed a Possible Tax Crime by Creating a False Document

6  During Agent Guernsey's testimony, the prosecution introduced a July 3,

7  2006 contract between LMC and Grupo.  The prosecution questioned Agent

8  Guernsey about why this written agreement was made in 2006.  Agent Guernsey

9  responded by falsely stating that the agreement was created in 2006 "in response,

10  actually, to an IRS audit of Lindsey Manufacturing's account practices," so that

11  LMC would have some "documentation" supporting its payments to Grupo.  *See*

12  Exhibit B (Guernsey Sept. 8, 2010 Trans. at 80:10-20).

13  As of July 3, 2006, LMC had received no notification that the IRS would be

14  auditing any of its tax years.  In addition, when LMC was notified of an audit on

15  July 12, 2006, that audit did not involve issues relating to tax year 2006 or to sales

16  commissions or costs of sales.  Rather, it related to, among other things, bad debt

17  deductions in 2004 and 2005.

18  In fact, LMC was not informed about an audit concerning tax year 2006 and

19  commissions paid until February 2008.  This was when IRS revenue agent Kellie

20  Hua took over the audit.  As a result, as the prosecutors and Agent Guernsey well

21  knew, the 2006 contract was not created "in response" to an IRS audit.

22  The presentation of this false testimony to the grand jury regarding the

---

[12]   With regard to the Ferrari purchase, a prosecutor made patently untrue representations regarding Ms. Aguilar's involvement when summarizing the evidence for the grand jury.  On September 15, 2010 and again on October 21, 2010, the prosecutor informed the grand jury that "Angela Aguilar presented a passport *at* the car dealership."  *See* Exhibit D (AUSA Sept. 15, 2010 GJ Closing Summary at 47:3-5); Exhibit E (AUSA Oct. 21, 2010 GJ Closing Summary at 18:15-18) (emphasis added).  As the prosecutors well knew, Ms. Aguilar was never

13

1 apparent fabrication of the 2006 contract improperly alleged that LMC had

2 willfully sought to deceive the IRS.  In fact, no audit was underway at the time and

3 it was not until 2008 that the IRS raised any issue regarding LMC cost of sales,

4 including commission payments.  This is confirmed by evidence that was already

5 in the government's possession.

6 **11. Agent Guernsey Falsely Testified that LMC Reclassified its**

7 **Payments to Grupo in 2006 in an Effort to Deceive The IRS**

8       Agent Guernsey also falsely testified that, in response to the IRS audit, LMC

9 began splitting the Grupo fees between commissions and outside services on its

10 general ledger in 2005 or 2006, in an effort to conceal the commissions.

11       Agent Guernsey represented that "in '05 or '06 [LMC was] audited by the

12 IRS," and "all of a sudden" Steve Lee instructed LMC's bookkeeper "to reclassify

13 the commission" and "split it out" with 15% to commission and the other 15% to

14 other services.  Agent Guernsey asserted that "he did that with any of the

15 commissions that had been submitted or the bills that had been submitted by Grupo

16 up to that point."  According to Agent Guernsey, once "all those documents [were]

17 reclassified," they "were turned over to their accountant for the IRS audit."  *See*

18 Exhibit C (Agent Guernsey Oct. 21, 2010 Trans. at 29:24-31:21).

19       This testimony is false and misleading in several respects.  First, the decision

20 to split the payments in LMC's ledger in 2006 could not have been in response to

21 an IRS audit.  As noted earlier, the audit of LMC's commission payments in tax

22 year 2006 did not commence until 2008.  As a result, at the time Mr. Lee instructed

23 Ms. Kwok to reclassify the August 2006 invoice, LMC could not have known of

24 an audit for tax year 2006 concerning commissions.

25       Second, there is no evidence to suggest that, in 2006 (or anytime), LMC

26 reclassified any of its past payments to Grupo.  Ms. Kwok first began handling

27

28 at the Ferrari dealership.

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  LMC's general ledger in 2005.  The first time she received an invoice from Grupo
2  was in August 2006, since LMC had no sales to CFE in 2005 and much of 2006.
3  At the time the invoice was sent by LMC to CFE, Ms. Kwok initially classified the
4  entire contingent liability to Grupo as a commission.  Thereafter, when payment
5  was received from CFE, Ms. Kwok asked Mr. Lee how the impending payment to
6  Grupo should be classified and posted.

7       Mr. Lee informed Ms. Kwok that the payment was to be allocated 15% to
8  commission and 15% to outside services.  The August 2006 entry is the *only* entry
9  that was reclassified. [13]  *See* Trial Exhibits 101 to 149 (Grupo Invoices to LMC).

10      It is clear that this misleading testimony about LMC's reclassification of its
11  payments to Grupo influenced the jurors.  A juror specifically asked about the
12  purported reclassification by LMC in response to an IRS investigation.  Neither
13  Agent Guernsey nor the prosecution clarified to the juror that the reclassification in
14  2006 was an isolated incident and was not in response to any IRS audit or
15  investigation.  They also did not reveal that the IRS audit found no irregularities in
16  the payments to the Mexican sales representatives and no taxes owing.  *See* Exhibit
17  C (Guernsey Oct. 21, 2010 Trans. at 64:23-65:18).

18   **B.  Agent Guernsey's False and Misleading Testimony and the**
19       **Prosecutors' Role in Presenting it to the Grand Jury was**
20       **Concealed from the Defense Until Partway Through Trial**

21      Defense counsel repeatedly requested the disclosure of Agent Guernsey's
22  grand jury testimony.   The prosecutors steadfastly refused to disclose it.  They did
23  so on the basis that they would not be calling Agent Guernsey as a witness at trial.

24  _____

25  [13]    From a tax perspective, whether LMC classified the payments to Grupo as a
26  commission or other expense made no difference.  Either were fully deductible as
    sales expenses.  Accordingly, LMC did not receive any tax advantage from
27  reclassifying the August 2006 payment to Grupo, nor did it or would have any
28  reason to hide it.  The grand jury was not made aware of this.

15

1   The transcript was finally produced in the midst of trial, on April 15, 2011,

2   pursuant to the Court Order.  *See* Handzlik Dec. at ¶¶ 3-11.  Given the numerous

3   false and misleading representations Agent Guernsey made to the grand jury, the

4   prosecutors should have voluntary turned the transcript over at the outset.  Instead,

5   they chose to conceal Agent Guernsey's false and misleading testimony and their

6   own role in presenting it to the grand jury.

7       **C.**    **Prosecutors Failed to Disclose the Falsities in Agent Binder's**

8               **Search Warrant Affidavit.**

9         On November 14, 2008, the FBI applied for a warrant to search the premises

10   of LMC.  The application stated that it was based on the sworn affidavit of Agent

11   Binder.  In that affidavit, Agent Binder linked routine payments by LMC to its

12   Mexican sales representative, Grupo, with purportedly corrupt payments by

13   Enrique Aguilar to CFE officials.  Agent Binder represented that Sorvill was a

14   foreign account controlled by Mr. Aguilar.  Among other things, the affidavit

15   falsely stated that "Sorvill, one of the intermediaries that received payments from

16   ABB Sugarland, also received payments from LINDSEY. . ."  Trial Exhibit 2538

17   (Binder Aff. for November 14, 2008 Search Warrant), at ¶ 18e.  As the record now

18   demonstrates, LMC never deposited funds into the Sorvill account.[14]

19         The insertion of non-existent Sorvill deposits into Agent Binder's affidavit

20   in support of the 2008 search warrant should have been immediately disclosed.

21   Again, as with the transcript of Agent Guernsey's grand jury testimony, there can

22   be no excuse for non-disclosure in light of the direct requests by the defense for

23   this information.  *Brady v. Maryland*, 373 U.S. 83 (1963), required this disclosure.

24   From the outset of this case, defense counsel repeatedly requested the disclosure of

25

26   14     The prosecutors only conceded this key fact on March 10, 2011, when
forced to respond to the Defendants' motion for a Franks hearing.  The government

27   chose not to disclose this key exculpatory fact sooner, despite the fact that,

28   according to Agent Binder, the government had been aware of this false

---

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  all *Brady* material, including drafts of the affidavits in support of the search

2  warrants. *See* Declaration of Jan L. Handzlik ("Handzlik Dec.") at ¶¶ 2-5. But the

3  government consistently refused to disclose this evidence until specifically ordered

4  to do so by this Court after Agent Binder's testimony.[15]

5      At the March 23, 2011 Franks hearing, Agent Binder testified that the false

6  Sorvill representations in her affidavit were inserted by the prosecutors. *See*

7  Exhibit I (March 23, 2011 Trans.), at 13:6-23, 15:3-14, 58:22-59:1. She testified

8  that they did not consult her before inserting this false representation, did not

9  confirm the facts with her, or bring the insertion to her attention. This false

10  statement was repeated in later sections of search warrant and seizure affidavits.

11      Additionally, the prosecution waited until the Court issued its tentative

12  ruling denying the defendants' Franks motion before disclosing an "additional

13  error" in Agent Binder's search warrant affidavit.[16] This "additional error"

14  concerned the affidavit's failure to disclose a deposit of approximately $433,000

15  into the Grupo account, by someone other than LMC, at the time of the Ferrari

16  purchase. *See* Exhibit I (March 23, 2011 Trans.), at 62:21-63:13. This exculpatory

17  evidence should likewise have been identified and disclosed by the prosecutors

18  long before the Franks hearing.

19  **D.    The Government's Misconduct Includes Additional**

20  **Misrepresentations and Further Brady Violations**

21

22  representation since before the indictment in this case was returned.

[15]    The drafts of Agent Binder's November 14, 2008 affidavit were produced,
23  pursuant to Court order, on or about March 24, 2011. This was only after Agent

24  Binder disclosed through cross-examination on March 23, 2011 that the
  prosecution had inserted the Sorvill misrepresentation into her affidavit for the
25  search warrant. Agent Binder's testimony revealed that the prosecutors had not

26  even requested that Agent Binder provide copies of the draft affidavits to them, so
  they could be reviewed for *Brady* material. *See* Exhibit I (March 23, 2010 Trans.),
27  at 33:23-34:11.

28  [16]    The Assistant U.S. Attorney's initials appear on the cover sheet of the

1    The government's concealment of key evidence was not isolated to Agent

2    Guernsey and Agent Binder.  It has plagued the entire case.  The latest instances of

3    misconduct include the prosecutors misrepresentations to the Court to justify their

4    April 28, 2011 motion to admit previously undisclosed information about SBB

5    evidence and their failure to disclose certain *Brady* and Jencks discovery until after

6    the conclusion of their case in chief.

7    ## 1.  The Government's Motion to Admit SBB Evidence was

8    ## Founded on False Representations.

9    In an attempt to justify their belated attempt to introduce certain misleading

10   and highly prejudicial information concerning SBB, the government accused the

11   defense of having concealed until trial one of the flaws with the government's

12   case.

13   The prosecutors' moving papers represented that the SBB materials were

14   necessary to "rebut a defense **raised for the first time at trial** and made in its

15   most direct form during the testimony of the last witness, Special Agent Guernsey,

16   namely that defendant LMC could not have been paying bribes between 2002 and

17   2008 because it had no competition during that period as none of LMC's

18   competitors made a '1070' tower." *See* Docket Entry 483 (Government's Motion

19   to Admit Government Exhibit 1022 at 1:6-12) (emphasis added).  The prosecutors

20   further asserted that "[t]he government could not have been expected to predict,

21   pre-trial, that the defendants defense would rest on the (false) premise that LMC's

22   competitors did not meet a particular technical standard." *Id.* at 5:2-5.17

23   These representations are untrue.  In fact, the government was put on notice

24   by the defense before trial that the lack of competition for LMC's ERS towers in

25

26   warrant application.

17    It was highly misleading for prosecutors to tell the Court that the defense
27   had asserted that LMC's competitors "did not meet a particular technical
     standard."  In fact, other companies manufactured and sold the 1070 tower or a
28

18

1  Mexico during Grupo's retention was a flaw in the prosecution's case.  The

2  Defendants' Motion to Dismiss the First Superseding Indictment for Violation of

3  *Brady v. Maryland*, which was filed on March 22, 2011 – more than a week before

4  trial commenced –stressed the lack of competition in Mexico during the relevant

5  time period.  *See* Handzlik Decl. at ¶¶ 23-24.  That motion specifically notes:

6           [S]tarting in about 2000, LMC was the only company

7           manufacturing and supplying the industry-standard 1070

8           transmission towers.  During the time period charged in

9           the FSI, LMC had no competition.  CFE had purchased

10          many of these towers long before Mr. Aguilar became

11          the LMC sales representative and it was happy with

12          them.  As a result, LMC was the only bidder on these

13          contracts that went to bid.  [*See* Docket Entry 317 (at

14          11:22-28).]

15      Accordingly, the prosecutors were clearly aware of this flaw in their case

16  before trial.  Their representations to the contrary are simply false.

17      **2.  The Government Delayed the Production of Certain *Brady* and**

18          **Jencks Materials until after their Case-in-Chief.**

19      In another recent development that was troubling and prejudicial to the

20  defense, following the close of their case-in-chief on May 3, 2011, the prosecution

21  produced, for the first time, several pieces of key discovery, including *Brady* and

22  Jencks materials.  On the evening of May 3, 2011, the defense received FBI 302

23  reports for five witnesses who were interviewed between March 30, 2011 and

24  April 4, 2011.  *See* Exhibit K.  This production was accompanied by a cover letter

25  from the prosecutors indicating that the government had intended to produce the

26  materials on April 4th, but "cannot be certain that the April 4 production was

27

28  similar tower during the indictment period.

19

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  actually made." *See* Exhibit J. *See also* Handzlik Decl. at ¶¶ 20-21. In fact, it was

2  not.

3  Despite this, on April 7, 2011, the prosecution specifically assured this Court

4  that it had conducted a "top-to-bottom review of discovery that's been turned over

5  and what we're required to turn over" and confirmed "[w]e have done what we

6  believe not only meets our obligation, but exceeds it." *See* April 7 Trial Trans. at

7  880:21-881:22). The delayed production of the five FBI 302 reports further

8  demonstrates that this assurance was not accurate.

9  Moreover, this delayed production was prejudicial to the defense. The late

10  production included an April 4th FBI 302 report for Fernando M. Basurto, a witness

11  who testified three days later, on April 6th and 7th, in the government's case-in-

12  chief. Pursuant to the Jencks Act, the government was required to disclose this

13  testimony for the defense for cross examination purposes.[18] They did not.

14  The late production also included *Brady* materials. The four other FBI 302

15  reports reflected interviews of former LMC employees. *See* Exhibit K. One of the

16  former employees, Patrick Rowan, who was employed by LMC as a design

17  engineer from 2001 to 2005, stated that he was aware of LMC having trouble with

18  a Mexican job during his employment. He relayed that there had been hopes of

19  getting a large Mexican job that never came to fruition during his four years of

20  employment. The report indicates that he ultimately " 'kissed off' the big job

21  because it kept getting pushed back."

22  This statement by Mr. Rowan is helpful to the defense, since it undermines

23  the government's theory that, upon retaining Grupo, LMC promptly began

24  securing a windfall of contracts with CFE. As the prosecutors knew, Mr. Rowan's

25  statement supports the defense's position that this did not happen. It corroborates

26  ———————————————

27  [18]     The government had actually agreed to produce Jencks statements for all

28  government witnesses prior to their testimony.

20

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  the fact that contracts with CFE were sporadic during the four years following the

2  retention of Grupo, from 2002 through 2005.  The prosecutors were

3  constitutionally required to produce this exculpatory evidence upon obtaining it.

4  In violation of *Brady*, they did not.

5  **III.   THE INDICTMENT SHOULD BE DISMISSED WITH PREJUDICE**

6  The Ninth Circuit has expressly held that "[a]n indictment may be dismissed

7  with prejudice under either of two theories." *United States v. Chapman*, 524 F.3d

8  1073, 1081 (9th Cir. 2008).  First, dismissal with prejudice is warranted when

9  "outrageous government conduct . . . amounts to a due process violation." *Id.*

10  Second, even if the misconduct does not rise to the level of a due process violation,

11  "the court may nonetheless dismiss under its supervisory powers" so long as the

12  misconduct is "flagrant" and causes "substantial prejudice" to the defendant. *Id.* at

13  1084-87.  "[F]lagrant misbehavior" includes "reckless disregard for the

14  prosecution's constitutional obligations." *Id.* at 1085.  Dismissal premised on the

15  Court's supervisory powers is "used as a prophylactic tool for discouraging future

16  deliberate governmental impropriety of a similar nature." *United States v.*

17  *Samango*, 607 F.2d 877, 884 (9th Cir. 1979).

18  **A.   The Government's Presentation of False Testimony to the Grand**

19  **Jury Constituted Flagrant Misconduct and a Violation of Due**

20  **Process.**

21  It is well established that "[d]ismissal of an indictment is required . . . in

22  flagrant cases in which the grand jury has been overreached or deceived in some

23  significant way, as where perjured testimony has knowingly been presented." *Id.*

24  at 884.  Indeed, "deliberate introduction of perjured testimony is perhaps the most

25  flagrant example of misconduct." *Id.*  The Ninth Circuit has gone so far as to hold

26  that a prosecutor's failure to rectify the known presentation of perjured testimony

27  to the grand jury rises to the level of a due process violation. *See United States v.*

28  *Basurto*, 497 F.2d 781, 785-86 (9th Cir. 1974).

21

In *Basurto*, after the grand jury returned the indictment but prior to the commencement of trial, the prosecution learned that one of the key witnesses before the grand jury had committed perjury. *Id.* at 784. Upon learning of the perjured testimony, the prosecutor informed opposing counsel. He did not, however, notify the court or the grand jury, and the case proceeded to trial. *Id.* at 786. In his opening statement at trial, the prosecutor made reference to the perjury before the grand jury, but sought to minimize its scope and importance. *Id.* at 784-85. The defendants were ultimately convicted. They subsequently appealed, arguing that their right to due process was violated by having to stand trial on an indictment secured through perjury. *Id.* at 784.

The Ninth Circuit agreed. The Court reasoned that a prosecutor's great power over the grand jury proceedings gives rise to a corresponding duty to ensure that the proceedings are not tainted with perjury:

> Today, the grand jury relies upon the prosecutor to initiate and prepare criminal cases and investigate which come before it. The prosecutor is present while the grand jury hears testimony; he calls and questions the witnesses and draws the indictment. With that great power and authority there is a correlative duty, and that is not to permit a person to stand trial when he knows that perjury permeates the indictment. [*Id.* at 785]

The Ninth Circuit continued:

1           At the point at which he learned of the perjury before the

2           grand jury, the prosecuting attorney was under a duty to

3           notify the court and the grand jury, to correct the cancer

4           of justice that had become apparent to him.  To permit

5           the appellants to stand trial when the prosecutor knew of

6           the perjury before the grand jury only allowed the cancer

7           to grow.  [*Id.*]

8          In reaching its decision, the Ninth Circuit also stressed that "jeopardy had

9    not attached at the time the prosecutor learned of the perjured testimony." *Id.*  It

10   noted that the prosecution could have, but chose not to, cure the defect by

11   dismissing the tainted indictment and proceeding to trial under a new indictment. [19]

12   *Id.*

13         The Court ultimately held that "the  Due Process Clause of the Fifth

14   Amendment is violated when a defendant has to stand trial on an indictment which

15   the government knows is based partially on perjured testimony, when the perjured

16   testimony is material, and when jeopardy has not attached." *Id.* at 785.  It therefore

17   reversed the conviction.

18   **B.**    **The Prosecutors Knew that Agent Guernsey had Testified Falsely**

19            **and Misled the Grand Jury**

20         Here, the prosecutors' misconduct is even more egregious than the conduct

21   _____

22   [19]    While the opinion did not directly address the issue, the Court's reasoning

23   suggests that, by allowing the trial to proceed despite knowing of a tainted

24   indictment, the prosecution effectively prevented a retrial under a new indictment
     due to the Double Jeopardy Clause.  The Court noted that, "if the prosecutor had

25   brought the perjury to the court's attention before the trial commenced and the
     indictments had been dismissed, the Double Jeopardy Clause of the Fifth

26   Amendment would not have barred trial under a new indictment." *Id.*  The Double

27   Jeopardy Clause therefore provides an additional reason why the dismissal of the

28   indictment in this case must be with prejudice.

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  addressed by the Court in *Basurto*. As in *Basurto*, the prosecutors in this case
2  knew well before trial about Agent Guernsey's false statements to the grand jury.
3  In fact, based on the search warrant affidavit she had previously signed and other
4  documents already in the government's possession, the prosecutors knew Agent
5  Guernsey's statements were false at the time they were made to the grand jury.

6          This is even more troubling than was the case in *Basurto*. There the
7  prosecution learned of the perjury only after the indictment had been returned.
8  Here, the evidence indicates that the prosecutors presented the false and misleading
9  testimony to the grand jury.[20]

10         Also, unlike the prosecutor in *Basurto* – who voluntarily disclosed the
11  perjured testimony to the defense before trial and alerted the jury to the perjury in
12  opening statements – the prosecutors in this case concealed the false and
13  misleading testimony. The prosecutors declined repeated requests for the
14  transcript of Agent Guernsey's grand jury testimony. The complete transcript was
15  only produced by the prosecutors mid-trial when they were ordered by the Court.
16  By that time, jeopardy had attached, trial was well under way, and numerous
17  government witnesses had completed their testimony. In short, the prosecutors did
18  not comply with their obligation to bring the false testimony to the attention of the
19  grand jury, the Court, and defense counsel. Instead, they made every effort to
20  conceal it, to the prejudice of the Defendants.

21  _____

22  [20]     In further violation of their ethical obligations, the prosecutors also
23  concealed from the grand jury evidence that contradicted the testimony of Agent
24  Guernsey – such as her sworn Bluffview seizure affidavit and numerous contracts
   between LMC and CFE predating the retention of Grupo, which had been in the
25  government's possession for over a year. *See United States v. Samango*, 607 F.2d
26  877, 884 n.8 (9th Cir. 1979) ("If evidence exists . . . which casts serious doubt on
   the credibility of testimony which the jurors are asked to rely upon in finding an
27  indictment, the prosecutor has an ethical duty to bring it to their attention.")
28  (quoting 8 Moore's Federal Practice p. 6.03(2) at 6-41 (2d ed. 1978)).

24

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1    It is clear that the false testimony of Agent Guernsey influenced the grand

2  jury and therefore prejudiced the defendants.  *See Bank of Nova Scotia v. United*

3  *States*, 487 U.S. 250, 256, 263 (1988) ("The prejudicial inquiry must focus on

4  whether any violations had an effect on the grand jury's decision to indict" and

5  dismissal is warranted where the misconduct "substantially influenced the grand

6  jury's decision to indict, or if there is 'grave doubt' that the decision to indict was

7  free from the substantial influence of such violations.")

8    As detailed above, much of Agent Guernsey's false testimony came in

9  response to pointed questions by skeptical jurors.  Indeed, one of the most blatant

10  misrepresentations– the assurance that "90, 95 percent of the funds in Grupo are

11  from Lindsey" – came in response to the final question by a skeptical grand juror

12  immediately before deliberations began on October 21, 2010.  There is no doubt

13  this and other false and misleading testimony "substantially influenced" the grand

14  jury's decision to indict or, at the very least, poses "grave doubt" as to whether the

15  decision was tainted.

16    In sum, the prosecutors' conduct in presenting false and misleading

17  testimony and then keeping it from the defense, the grand jury and the Court was

18  willful and flagrant.  This calls for dismissal of the indictment with prejudice,

19  pursuant to the due process clause of the Fifth Amendment and the Court's

20  supervisory powers over the administration of justice in the District.

21    **C.    The Prosecutors' Suppression of *Brady* Material, including False**

22    **Statements in Grand Jury Testimony and in Other Sworn**

23    **Statements, Calls for Dismissal of the Indictment with Prejudice**

24    The Ninth Circuit has held that, "we expect prosecutors and investigators to

25  take all reasonable measures to safeguard the system against treachery."  *Benn v.*

26  *Lambert*, 283 F.3d 1040, 1062 (9th Cir. 2002).  This includes, under *Brady v.*

27  *Maryland*, 373 U.S. 83 (1963), a duty to disclose "information in the possession of

28  the prosecutor and his investigating offices that is helpful to the defendant."

25

1    *United States v. Price*, 566 F.3d 900, 903 (9th Cir. 2009).  It also "includes the duty

2    as required by *Giglio* to turn over to the defense in discovery all material

3    information casting a shadow on a government witness's credibility." *Benn*, 283

4    F.3d at 1062, citing *Giglio v. United States*, 405 U.S. 150 (1972).

5         In *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), the Court

6    affirmed the dismissal of an indictment with prejudice when the prosecution failed

7    to produce, until mid-trial, extensive *Brady* and *Giglio* materials.  Like here, the

8    prosecution in that case had previously misrepresented that it had fully complied

9    with its discovery obligations. *Id.* at 1085.  The Ninth Circuit reasoned that "the

10   failure to produce documents and to record what had or had not been disclosed,

11   along with the affirmative misrepresentations to the Court of full compliance,

12   support the district court's finding of flagrant prosecutorial misconduct, even if the

13   documents themselves were not intentionally withheld from the defense." *Id.* at

14   1085.

15        In *Chapman*, the court also affirmed the District Court's decision to dismiss

16   the indictment with prejudice rather than declare a mistrial.  Noting the weak case

17   that the government had presented thus far at trial, the Ninth Circuit reasoned that

18   "the mistrial remedy would advantage the government, probably allowing it to

19   salvage what the district court viewed as a poorly conducted prosecution." *Id.* at

20   1087.  Accordingly, it concluded that "a dismissal was the only means of avoiding

21   prejudice to the Defendants." *Id.*; *see also United States v. Fitzgerald*, 615 F.

22   Supp. 2d 1156, 1161-62 (S.D. Cal. 2009) (holding that dismissal of indictment

23   with prejudice, rather than mistrial, was warranted for *Brady* violation, because

24   "the strength of the Government's case against Defendant was not overwhelming"

25   and, therefore, "retrial would be substantially prejudicial" in that it would "allow

26   the Government to revise its case strategy").

27        The similar situation presented here warrants a similar holding.  As

28   developed earlier in this motion, throughout the investigation and prosecution of

26

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

1  this case, the prosecutors violated their obligations under *Brady* and *Giglio*. They

2  did so by withholding and concealing false and misleading testimony and sworn

3  statements on material issues given by the two FBI case agents, Agents Guernsey

4  and Binder. They were jointly responsible for leading the investigation of this

5  case.

6       As in *Chapman*, the only way to remedy these substantial and sustained

7  *Brady* violations is to dismiss the indictment with prejudice. The lesser remedy of

8  a dismissal without prejudice would unfairly disadvantage and prejudice the

9  Defendants and advantage the government. The government's case-in-chief is

10  weak. The prosecutors should not be permitted the benefit of revising their case

11  strategy and searching for additional evidence, given that any retrial would be

12  necessitated by their own misconduct.

13  **IV.**    <u>**CONCLUSION**</u>

14       For these reasons, the First Superseding Indictment should be dismissed

15  with prejudice.

16  DATED: May 9, 2011        Respectfully submitted

17                          JAN L. HANDZLIK
                        GREENBERG TRAURIG. LLP

18

19                          By:  /s/ Jan L. Handzlik

20                          Attorneys for Defendants
                        LINDSEY MANUFACTURING COMPANY and

21                          KEITH E. LINDSEY

22

23

24                          JANET I. LEVINE
                        CROWELL & MORING, LLP

25

26                          By:  /s/ Janet I. Levine
                        JANET I. LEVINE

27                          Attorneys for Defendant
                        STEVE K. LEE

28

27

# DECLARATION OF JAN L. HANDZLIK

I, Jan L. Handzlik, declare:

1.      I am a lawyer duly admitted to practice law before this Court and in the courts of the State of California.  I am counsel of record for Defendants Keith E. Lindsey and Lindsey Manufacturing Company ("LMC") (collectively "Lindsey Defendants") in this case.  Unless otherwise stated, I have personal and first-hand knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently to those facts.

2.      As reflected in the Joint Proposed Schedule for Discovery, filed with the Court on November 29, 2010, I met with the Assistant U.S. Attorney ("AUSA") and Janet Levine at the offices of Crowell & Moring on November 22, 2010 for the purpose of meeting and conferring regarding discovery issues.

3.      At the November 22, 2010 meeting, the defense requested that the government produce all *Brady* materials, including any and all statements and testimony that contained *Brady* or *Giglio* information.  The AUSA agreed to produce all required *Brady* materials by December 3, 2010.

4.      At the November 22, 2010 meeting, the defense also requested that the government produce drafts of any witness statements, which included drafts of FBI Special Agent Farrell Binder's ("Agent Binder's) November 14, 2008 search warrant affidavit.  The AUSA declined to produce these materials.  The defense received drafts of Agent Binder's affidavit only after the Court ordered them produced on March 24, 2011.

5.      Counsel for the parties conducted a second meet and confer meeting concerning discovery at the prosecutors' offices on January 3, 2011.  Counsel for the Lindsey Defendants and Mr. Lee attended.  At that meeting, the AUSA and the DOJ trial attorney assigned to the case represented that the government had produced all *Brady* materials to the defense.

28

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

6.      During the January 3rd meet and confer, the government attorneys disclosed that FBI Special Agent Susan Guernsey had testified at the grand jury on October 21, 2010 to summarize the evidence supporting the First Superseding Incident ("FSI").  Counsel for the Lindsey Defendants and Mr. Lee then requested that the government produce Agent Guernsey's grand jury testimony.

7.      The government attorneys declined to produce the transcript, stating that they did not intend to call Agent Guernsey as a witness at trial, and thus need not produce her testimony.  In fact, the DOJ attorney at the meeting stated that Agent Guernsey would not be called at trial, "because she had testified before the grand jury."

8.      Following the Court's March 21, 2011 order requiring that Agent Guernsey be present for the hearing on Dr. Lindsey's motion to suppress his statement, I reiterated the request for Agent Guernsey's grand jury testimony on numerous occasions, including by telephone to the AUSA on March 22, 2011 and by e-mail to the prosecution team on March 24, 2011.  The government attorneys did not respond to these requests.

9.      On the evening of March 24, 2011, the day before the suppression hearing, the government attorneys produced a handful of heavily redacted pages from Agent Guernsey's grand jury testimony – portions of nine pages out of a transcript that was at least 67 pages.  A copy of the excerpts produced by the government on March 24, 2011 is attached hereto as Exhibit A.

10.     Upon receiving the snippets of testimony, I immediately requested in an e-mail to the AUSA that the full transcript be produced.  I received no response to this request.

11.     The government attorneys did not produce the complete transcript of Agent Guernsey's testimony until ordered to do so by the Court on April 15, 2011.  The was at the conclusion of the second week of trial.

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

12.     Attached as Exhibits B and C are copies of excerpts from the transcript of Agent Guernsey's grand jury testimony on September 8, 2010 and October 21, 2010, respectively.

13.     Attached as Exhibit D and E are copies of excerpts from the transcript of the AUSA's closing instructions to the grand jury on September 15, 2010 and October 21, 2010, respectively.

14.     Attached as Exhibit F is the January 12, 2010 subpoena, accompanied by the AUSA's cover letter, that the government attorneys issued to LMC.  I accepted service of the subpoena on LMC's behalf.

15.     Attached as Exhibit G is a copy of my cover letter from the production that was hand-delivered to Agent Guernsey on February 26, 2010.

16.     Attached as Exhibit H is a copy of the FBI 302 report of Steve Lee's interview on November 20, 2008.

17.     The November 14, 2008 Affidavit of Agent Binder in support of the search warrant for LMC has been marked for identification as trial Exhibit 2538.

18.     Attached as Exhibit I are excerpts from the transcript of the March 23, 2011 hearing on Defendants' Franks motion.

19.     The December 1, 2008 Affidavit of Agent Guernsey in support of the Bluffview seizure warrant has been marked for identification as trial Exhibit 2533.

20.     Attached as Exhibit J is a May 3, 2011 discovery cover letter I received from the prosecutors received by defense counsel on the evening of May 3, 2011.

21.     Attached as Exhibit K is a discovery letter dated April 4, 2011 and attachments that I also received on the evening of May 3, 2011.  This April 4, 2011 discovery letter and the attachments were not previously been received by me.

22.     Attached as Exhibit L is an excerpt from a pre-trial hearing in *United States v. O'Shea,* U.S. Dist. Ct., S.D. Tex., CR. No. H-09-629, which was produced in discovery by the government in this case.

30

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT

23.      On April 28, 2011, near the conclusion of their case, the prosecutors filed a motion to admit previously undisclosed information concerning the Canadian company, SBB.  in that motion, the prosecutors alleged that they had been surprised in trial by the defense's claim that LMC had no competition in selling its IEEE standard 1070 ERS structures in Mexico.

24.      As early as March 22, 2011, in a Brady motion, the defense had explicitly raised this argument, stating among other things, "[d]uring the time period charged in the FSI, LMC had no competition." *See* Docket Entry 371 at 11:22-28.

25.      Moreover, as the prosecutors and Court know, the defense has argued and represented that, during the indictment period, LMC had no competition for the IEEE standard 1070 ERS structure and system.  This is because, during that period, no other company manufactured and sold a 1070 structure/system.

26.      The government's motion regarding SBB refers to another company meeting a "particular technical standard."  This reference is, at best, misleading.  Again, no other company manufactured and sold an IEEE 1070 structure or system at that time.

I declare under the penalties of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of May 2011, at Los Angeles, California.


/s/ Jan L. Handzlik

JAN L. HANDZLIK

31

DEFENDANTS' MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE
DUE TO THE GOVERNMENT'S REPEATED AND INTENTIONAL MISCONDUCT