1 | ANDRÉ BIROTTE JR.
United States Attorney
2 | ROBERT E. DUGDALE
Assistant United States Attorney
3 | Chief, Criminal Division
DOUGLAS M. MILLER (SBN: 240398)
4 | Assistant United States Attorney
NICOLA J. MRAZEK
5 | JEFFREY A. GOLDBERG
Senior Trial Attorneys
6 |     1300 United States Courthouse
      312 North Spring Street
7 |   Los Angeles, California 90012
      Telephone:  (213) 894-2216
8 |   Facsimile:  (213) 894-6436
      Email: douglas.m.miller@usdoj.gov
9 |
Attorneys for Plaintiff
10 | UNITED STATES OF AMERICA

11 |              UNITED STATES DISTRICT COURT

12 |          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 | UNITED STATES OF AMERICA,     ) CR No. 10-1031(A)-AHM
                                  )
14 |          Plaintiff,          ) GOVERNMENT'S RESPONSE TO MOTION TO
                                  ) DISMISS THE INDICTMENT WITH
15 |          v.                  ) PREJUDICE BASED ON ALLEGED
ENRIQUE FAUSTINO AGUILAR         ) GOVERNMENT MISCONDUCT; MEMORANDUM
16 | NORIEGA, ANGELA MARIA          ) OF POINTS AND AUTHORITIES
GOMEZ AGUILAR, KEITH E.          )
17 | LINDSEY, STEVE K. LEE, and     )
LINDSEY MANUFACTURING            ) Hearing: June 27, 2011, 4:00 p.m.
18 | COMPANY,                       ) (Courtroom 14)
                                  )
19 |          Defendants.         )
                                  )
20 |

21 |     Plaintiff United States of America, by and through its

22 | attorneys of record, the United States Department of Justice,

23 | Criminal Division, Fraud Section, and the United States Attorney

24 | for the Central District of California (collectively, "the

25 | government"), hereby files its response to the Motion to Dismiss

26 | the Indictment With Prejudice Due to Repeated and Intentional

27 | Government Misconduct filed by defendants LINDSEY MANUFACTURING

28 | COMPANY ("LMC"), KEITH E. LINDSEY, and STEVE K. LEE ("the

1    defendants"). (Mot. #505). The government's response is based

2    upon the attached memorandum of points and authorities, the files

3    and records in this matter, the exhibits and testimony admitted

4    at trial, as well as any other evidence or argument presented at

5    any hearing on this matter.

6    DATED:     June 6, 2011

7                                   Respectfully submitted,

8

9                                   ANDRÉ BIROTTE JR.
                                    United States Attorney

10                                  ROBERT E. DUGDALE
                                    Assistant United States Attorney
11                                  Chief, Criminal Division

12

13                                  _____/s/_____
                                    DOUGLAS M. MILLER
14                                  Assistant United States Attorney

15                                  NICOLA J. MRAZEK
                                    JEFFREY A. GOLDBERG
16                                  Senior Trial Attorneys
                                    Criminal Division, Fraud Section

17

18

19

20

21

22

23

24

25

26

27

28                                      2

**TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . 1

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Legal Standard . . . . . . . . . . . . . . . . . . 1

    B.  The Grand Jury Testimony Identified by the
        Defendants Did Not Amount to "False Testimony" and
        Was Immaterial . . . . . . . . . . . . . . . . . . 4

        1.  As High As 90-95 Percent . . . . . . . . . . . 5

        2.  LMC Did Not Have A Lot of Business with CFE
            Before They Hired Enrique Aguilar . . . . . . 6

        3.  Steve Lee Did Not Want to Know How Grupo Used its
            Commission Payments . . . . . . . . . . . . . 9

        4.  LMC Knew They Weren't the Lowest Bidders
            Anymore . . . . . . . . . . . . . . . . . . . 12

        5.  LMC Got Contracts Regularly After Hiring
            Enrique Aguilar . . . . . . . . . . . . . . . 14

        6.  We Have No Other Explanation for the 30 Percent
            Commission . . . . . . . . . . . . . . . . . . 15

        7.  Looking at the Invoices, They Appear to be
            Fraudulent . . . . . . . . . . . . . . . . . . 18

        8.  LMC's Wire Transfers Went To Pay Off Moreno's
            American Express Bill . . . . . . . . . . . . 19

        9.  The 2006 Representation Agreement Between Enrique
            Aguilar and LMC Was In Response to an IRS Audit
            of LMC . . . . . . . . . . . . . . . . . . . . 20

        10.  In 2005 or 2006 LMC Reclassified Grupo's 30
            Percent Commission . . . . . . . . . . . . . . 23

    C.  The Government Did Not Violate *Brady* . . . . . . 25

        1.  Disclosure of Agent Guernsey's Grand Jury
            Testimony . . . . . . . . . . . . . . . . . . 26

i

**TABLE OF CONTENTS (CONTINUED)**

PAGE(S)

2.   Disclosure of Agent Binder's Search Warrant
     Affidavit . . . . . . . . . . . . . . . . .    28

3.   The Government's Motion to Admit SBB Evidence    30

4.   The Government's May 3, 2011 Discovery
     Production . . . . . . . . . . . . . . . . .    31

III. CONCLUSION . . . . . . . . . . . . . . . . . . .    34

ii

**TABLE OF AUTHORITIES**

**FEDERAL CASES:**                                                  **PAGE(S)**

Bank of Nova Scotia v. United States,
    487 U.S. 250 (1988) . . . . . . . . . . . . . . . . . 2

Brady v. Maryland,
    487 U.S. 250 (1988)  . . . . . . . . . . . . . . . . . 1

Strickler v. Greene,
    527 U.S. 263 (1999) . . . . . . . . . . . . . . . . .  26

United States v. Aichele,
    941 F.2d 761 (9th Cir. 1991) . . . . . . . . .  27, 28

United States v. Bagley,
    473 U.S. 667 (1985) . . . . . . . . . . . . . . . . .  26

United States v. Barrera-Moreno,
    951 F.2d 1089 (9th Cir. 1991) . . . . . . . . . . . . 2

United States v. Basurto,
    497 F.2d 781 (9th Cir. 1974) . . . . . . . . . . . . . 2

United States v. English,
    92 F.3d 909 (9th Cir. 1996) . . . . . . . . . . . .  20

United States v. Harkonen,
    2009 WL 5166246 (N.D. Cal. Apr. 15, 2009) . . . . . .  2, 11

United States v. Isgro,
974 F.2d 1091 (9th Cir. 1992) . . . . . . . . . . . . . . passim

United States v. Jacobs,
    855 F.2d 652 (9th Cir. 1988) . . . . . . . . . . . . . 1

United States v. Kearns,
    5 F.3d 1251 (9th Cir. 1993) . . . . . . . . . . . 3, 31

United States v. Lopez,
    4 F.3d 1455 (9th Cir. 1993) . . . . . . . . . . .  1, 3

United States v. Navarro,
    608 F.3d 529 (9th Cir. 2010) . . . . . . . . . . . 3, 9

United States v. Restrepo,
    930 F.2d 705 (9th Cir. 1991) . . . . . . . . . . . . . 2

United States v. Rutgard,
    116 F.3d 1270 (9th Cir. 1997) . . . . . . . . . . .  20

**TABLE OF AUTHORITIES**

**FEDERAL CASES (con't):**                                        **PAGE(S)**

United States v. Sager,
    227 F.3d 1138 (9th Cir. 2000) . . . . . . . . . . . . . . 2

United States v. Williams,
    504 U.S. 36 (1992) . . . . . . . . . . . . . . . . . . 8

United States v. Woodley,
    9 F.3d 774 (9th Cir. 1993)  . . . . . . . . . . . . . 3, 27

iv

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

On May 9, 2011, the defendants moved to dismiss the first superseding indictment with prejudice on the ground that the government repeatedly and intentionally engaged in misconduct leading up to and during the course of the trial.  (Mot. #505). Specifically, the defendants allege that the government (1) made several intentional and materially false statements to the grand jury and the Court; (2) deceived the grand jury by omitting material evidence; (3) submitted false affidavits in support of search and seizure warrants so as to mislead the United States Magistrate Judges authorizing those warrants; and (4) withheld discovery in violation of Brady v. Maryland, 373, U.S. 83 (1963). (Id. at 1-21).  For the reasons set forth below, all of the defendants' arguments are without merit and therefore the motion to dismiss the indictment with prejudice should be denied.

### II.

### ARGUMENT

A.   Legal Standard

The dismissal of an indictment based on alleged misconduct is an "extreme remedy" and is "disfavored" because it is "the most severe sanction possible."  United States v. Lopez, 4 F.3d 1455, 1464 (9th Cir. 1993); United States v. Isgro, 974, F.2d 1091, 1097 (9th Cir. 1992); United States v. Jacobs, 855 F.2d 652, 655 (9th Cir. 1988).  The Ninth Circuit has held that this extreme remedy should only be granted in two limited circumstances.

First, a district court may dismiss an indictment for alleged government misconduct where the misconduct amounts to a due process violation. <u>United States v. Barrera-Moreno</u>, 951 F.2d 1089, 1091 (9th Cir. 1991). This involves "conduct which is so grossly shocking and so outrageous as to violate the universal sense of justice." <u>United States v. Restrepo</u>, 930 F.2d 705, 712 (9th Cir. 1991) (citations omitted). For example, where (1) racial discrimination has been used in the selection of the grand jurors, (2) women have been excluded from the grand jury, or (3) the government allows a defendant to stand trial on an indictment which it knows to be based on perjured testimony material to the return of that indictment. <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 257 (1988); <u>United States v. Basurto</u>, 497 F.2d 781, 785 (9th Cir. 1974). The third example cited above requires knowledge and materiality to prevent mere misstatements or poor word choices from forming the basis of a motion to dismiss. <u>United States v. Sager</u>, 227 F.3d 1138, 1149 (9th Cir. 2000); <u>United States v. Harkonen</u>, 2009 WL 5166246, *5-6 (N.D. Cal. Apr. 15, 2009).

Second, "[i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers." <u>Barrera-Moreno</u>, 951 F.2d at 1091. This is distinguishable from a dismissal on due process grounds because there is no presumption of prejudice to the defendant. <u>Id.</u> at 256-257. "To justify such an extreme remedy, the government's conduct must have caused substantial prejudice to the defendant and been flagrant in its disregard for the limits

of appropriate professional conduct." United States v. Lopez, 4 F.3d at 1464; see United States v. Kearns, 5 F.3d 1251, 1253-54 (9th Cir. 1993) ("Dismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice.").

A district court may not dismiss an indictment under its supervisory powers if the defendant has failed to demonstrate actual and substantial prejudice. See, e.g., Id. at 254 ("a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants"); United States v. Woodley, 9 F.3d 774, 777 (9th Cir. 1993) (government's refusal to disclose Brady materials was not flagrant or prejudicial and did not justify dismissal of indictment); United States v. Isgro, 974 F.2d at 1096-99 (dismissal of indictment based on alleged misconduct for failure to disclose prior testimony reversed because defendant suffered no prejudice). Finally, a district court may not dismiss an indictment under its supervisory powers for misconduct alleged to have occurred before the grand jury once the petit jury has rendered a verdict of guilty beyond a reasonable doubt, because the guilty verdict establishes a fortiori there was probable cause to bring the indictment and that any error was therefore harmless. United States v. Navarro, 608 F.3d 529, 539-540 (9th Cir. 2010).

//

//

B.   The Grand Jury Testimony Identified by the Defendants
     Did Not Amount to "False Testimony" and Was Immaterial

     The motion to dismiss the first superseding indictment in
this case is based largely on what the defendants argue were 11
false statements that Federal Bureau of Investigation ("FBI")
Special Agent Susan Guernsey made to the grand juries returning
the original indictment and the first superseding indictment.
(Mot. #505 at 4-14).  This aspect of the motion fails under the
Court's supervisory powers, because the jury has already rendered
verdicts of guilty on all counts in the first superseding
indictment.   Thus, in order to prevail on this part of their
motion, the defendants must establish a due process violation.

     The defendants have utterly failed to show that Agent
Guernsey or the prosecutors allowed the defendants to proceed to
trial on an indictment which they knew was based on perjured
testimony.   At best, the defendants have managed to scrape
together a few instances in which Agent Guernsey made a slight
misstatement or used poor word choice in summarizing several
hundreds of pages of witness statements and several hundred
thousand pages of documents.   A close examination of the
remainder of the defendants' motion reveals that they have taken
Agent Guernsey's grand jury testimony entirely out of context
and/or have completely ignored evidence showing the veracity of
her grand testimony.   Moreover, the defendants' have repeatedly
premised the alleged falsities on a misplaced belief that Agent
Guernsey and the government were obligated to present what they
claim was exculpatory evidence to the grand jury, something the

4

1   Ninth Circuit has aptly described as "flat wrong."  The

2   government now addresses each of these serious allegations of

3   perjury separately to show how each is completely unfounded.

4        1.   As High As 90-95 Percent

5        The first allegedly false statement relates to Agent

6   Guernsey's response to a grand juror's question just before

7   deliberations began on the first superseding indictment:

8   GRAND JUROR:    I have a question.  For the Grupo account at
                    Global, you mentioned earlier that there were
9                   essentially no other funds in that account
                    other than those that came from –
10
    WITNESS:        I said the majority of the funds from Grupo.
11                  I would say as high as 90, 95 percent of the
                    funds in the Grupo account are from Lindsey,
12                  yes.

13  (RT 10/21/10 at 75) (emphasis added).  The defendants argue that

14  this testimony was false because the government's own analysis of

15  the Grupo account had revealed that only 71 percent of the money

16  in the Grupo account came from LMC.  (Mot. #505 at 5).  The

17  defendants' argument fails for several reasons.

18       First, it completely ignores the fact that Agent Guernsey

19  cut off the grand juror in the middle of his question and

20  immediately corrected his misconception that there were

21  "essentially no" other funds in the Grupo account and immediately

22  clarified that her prior testimony was that "the majority" of the

23  funds were from LMC.  Second, Agent Guernsey made it abundantly

24  clear to the grand juror that her statement regarding the

25  percentage of funds in the Grupo account was merely an

26  approximation — "as high as" 90 or 95 percent — and was neither

27  an exact amount nor the entire amount of funds in the account.

28                                5

Third, because Agent Guernsey made it abundantly clear that LMC funds did not make up all (100 percent) of the funds in the Grupo account, the defendants' argument that the grand jury was left with "no choice but to conclude that LMC's funds had been used to pay bribes" is unavailing. (Mot. #505 at 5). In fact, if — as the defendants contend — the grand juror was truly "skeptical" of whether LMC funds had been used to pay bribes, the juror would have asked follow-up questions once Agent Guernsey made it clear that non-LMC funds were also present in the Grupo account.

    2.   <u>LMC Did Not Have A Lot of Business with CFE Before They Hired Enrique Aguilar</u>

The second allegedly false statement relates to Agent Guernsey's testimony regarding LMC's history of winning contracts with CFE:

| | |
|---|---|
| GRAND JUROR: | My understanding is that Lindsey has been in business for sixty-some years. Does Lindsey have a history of winning contracts from CFE? |
| WITNESS: | I believe according to Keith Lindsey's testimony their first contract awarded by CFE was in '94. They didn't have a lot of business with CFE before they hired Aguilar. |
| PROSECUTOR: | What did Sergio Cortez say about kind of the drought, if you will, right before they hired Enrique Aguilar? |
| WITNESS: | He said it was like six or seven years before they got a contract or that they didn't have any business with CFE prior to hiring Aguilar. |
| PROSECUTOR: | During that time they had a representative in Mexico? |
| WITNESS: | They did. They had separate – they had Manuel Gutierrez and a gentlemen named Cardenas before him. They would go to CFE, do bids, but just generally anything that they got from CFE was very small. |

6

1 | (RT 10/21/11 at 67).

2     The defendants argue that this testimony was false because

3 | Agent Guernsey and the prosecutor "knew" that LMC had entered

4 | into "approximately ten contracts with a value of nearly

5 | $9,000,000 with CFE during this period." (Mot. #505 at 6). But

6 | this argument ignores the fact that LINDSEY told the FBI during

7 | his November 2008 interview that his recollection was "that the

8 | first contract between [LMC] and CFE was around 1994" and that

9 | "[d]uring the time that [Enrique] Aguilar represented SBB, SBB

10 | routinely beat [LMC] out for CFE contracts." Sergio Cortez

11 | provided similar information during his grand jury testimony:

12 | CORTEZ:    That was Cardenas. That was Cardenas, '94, '95,
'96. After we sold that big order in '94, we

13 |                didn't sell nothing else under him. And that's why
we considered that time that CFE needed more

14 |                towers, but we needed somebody to go and look for
that business and that's when we hire Manuel

15 |                Gutierrez. (RT 5/5/2010 at 39).

16 |                                   * * *

17 | CORTEZ:    Because we didn't see - we didn't see no - even
though Gutierrez told me, 'I can go in there and -

18 |                and visit the customer and I can try to get some
jobs,' et cetera, we didn't see no action; no real

19 |                action for few years ... I think we sold two or
four towers to the area of Veracruz through

20 |                Gutierrez. (Id. at 49).

21 | Cortez provided essentially the same testimony at trial. When

22 | asked whether LMC was successful in selling ERS towers to CFE

23 | with Gutierrez as LMC's sales representative, Mr. Cortez

24 | responded, "Not very much." (RT 4/14/11, p. 1643). Thus, there

25 | was nothing false about Agent Guernsey's testimony regarding what

26 | she learned from these witnesses.

27 |

28 |

The defendants further argue that Agent Guernsey should have disclosed to the grand jury several documents produced by LMC in response to a grand jury subpoena that the defendants maintain "reflected a longstanding and lucrative relationship with CFE dating back to 1991." (Mot. #505 at 6).  But as Agent Guernsey made clear during the trial, at the time of her grand jury testimony she was only aware of two contracts between LMC and CFE before Enrique Aguilar was hired and did not find "any other evidence" of contracts being awarded to LMC, "even in the subpoenaed documents, from [LMC]." (RT 4/22/2011 at 2479-80).  Defense counsel for LMC attempted to impeach Agent Guernsey during the trial by showing her five documents — purporting to be contracts between LMC and CFE prior to 2002 — that LMC produced to the government during its investigation.  Agent Guernsey explained, however, that she was not aware of the five documents at the time of her grand jury testimony.  Moreover, the documents were in Spanish, a language Agent Guernsey does not know.  (RT 4/26/2011 2617-2630; DEX 2527, 2528, 2529, 2530, 2531).

Although the defendants contend that these five documents were exculpatory (they were not) and should have been "handed over to the grand jury," this argument fails to recognize that the government has no legal obligation to present exculpatory evidence to the grand jury and a district court may not dismiss an indictment based on its failure to do so.  <u>United States v. Williams</u>, 504 U.S. 36, 36-37 (1992) ("A district court may not dismiss an otherwise valid indictment because the Government failed to disclose to the grand jury "substantial exculpatory

1  evidence" in its possession."); <u>United States v. Navarro</u>, 608

2  F.3d at 537 (it is "flat wrong" for a district court to state

3  that a prosecutor has a duty to present exculpatory evidence to

4  the grand jury); <u>United States v. Isgro</u>, 974 F.2d at 1096

5  ("prosecutors simply have no duty to present exculpatory evidence

6  to grand juries.").

7       3.   <u>Steve Lee Did Not Want to Know How Grupo Used its
             Commission Payments</u>

8

9       The third allegedly false statement was Agent Guernsey's

10 testimony that LEE "didn't want to know" what Enrique Aguilar was

11 doing with his 30 percent sales commission.  (RT 10/21/2011

12 at 22).  Although it is true that LEE never said he "didn't want

13 to know" what happened with the 30 percent commission, it is

14 clear from the context in which Agent Guernsey made this

15 statement that she was simply conveying to the grand jury that

16 both LINDSEY <u>and</u> LEE made similar statements during their FBI

17 interviews.  Moreover, the prosecutor quickly sought to correct

18 this slight misstatement:

19 PROSECUTOR:   Now, did there come a time that Keith Lindsey
               talked about what he believed this high
               commission was being used for?

20

21 WITNESS:      When we interviewed him, he said that he
               didn't want to ask what it was used for.  He
               thought it was high.  Didn't want to know.

22              Just didn't want to know.

23 PROSECUTOR:   Did he say that he assumed it was being used
               for something?

24

25 WITNESS:      He said he assumed that it was being used to
               possibly pay someone at CFE but that he
               didn't want to know.

26

27 PROSECUTOR:   Now, you also talked to Keith; or pardon me,
               Steve Lee about his own perception of why the

28
                                    9

|  |  |  |
|---|---|---|
|  |  | 30-percent commission was needed or how it would be used; is that right? |
| WITNESS: | | I'm sorry? |
| PROSECUTOR: | | Steve Lee, the CFO, he was asked by the FBI about what he thought this 30-percent commission was going to be used for; is that right? |
| WITNESS: | | Yeah.  But he also said that he didn't – he didn't want to know. |
| PROSECUTOR: | | There came a point in that interview that someone asked him, "Well, if I told you it was being used to pay bribes," and he suggested that he didn't know that; is that correct? |
| WITNESS: | | Yes.  He did say that he wasn't aware of that happening. |

(RT 10/21/10 at 22-23).

Thus, the grand jury was never left with the impression that LEE had known or had assumed that the 30 percent commission was being used to pay bribes.  In fact, it was made very clear to the grand jury that LEE had told the FBI that he was not aware of that happening.

Moreover, LEE's statement to the FBI was not the only evidence presented to the grand jury to establish his involvement in the charged crimes.  On the contrary, Agent Guernsey's grand jury testimony was that LEE had, among other things, (1) been put on notice of Enrique Aguilar's and Nestor Moreno's corruption by Jean Guy Lamarche's email, (2) been told by Sergio Cortez and Manuel Gutierrez about what happened at Hermosillo and thus knew about Enrique Aguilar's influence over Moreno, (3) agreed to pay a 30 percent commission to Enrique Aguilar, (4) paid that commission even though only a 15 percent commission was listed on

10

the invoices, and (5) passed that additional 30 percent cost on to CFE by increasing the cost of LMC's products. (RT 10/21/2010 at 8-21). Therefore, there can be no serious argument that this slight misstatement was flagrant or substantially influenced the grand jury's decision to indict. See Harkonen, 2009 WL 5166246 at *5-6.

The defendants next argue that it was improper for Agent Guernsey to comment on the credibility of LEE's statement that he did not know about the bribe payments, because Agent Guernsey was not present for his interview. (Mot. #505 at 7). This argument suggests that Agent Guernsey offered some abstract "opinion" as to LEE's credibility, but the transcript shows that this is not what happened. Agent Guernsey was indeed asked, "Now, did you find that statement on Steve Lee's behalf to be credible that he did not know that these payments were being made." (RT 10/21/2011 at 23). But in response Agent Guernsey did not opine on LEE's credibility. Instead, she simply testified that LEE's statement was "strange" based on all of the other evidence she uncovered during the investigation. She then proceeded to explain in detail all of the other evidence she relied upon to reach that conclusion. (Id. at 23-29). Thus, the defendants argument that Agent Guernsey gave her "opinion" as to LEE's credibility or somehow "denigrated" LEE's credibility is without merit.

//

//

11

4.   <u>LMC Knew They Weren't the Lowest Bidders Anymore</u>

The fourth allegedly false statement was Agent Guernsey's testimony that LMC began increasing its bids by 30 percent after hiring Enrique Aguilar:

> PROSECUTOR:   When they have this discussion about paying
>               Enrique Aguilar this 30-percent commission
>               and just passing it off, did they acknowledge
>               to you that went against what they understood
>               to be the normal bidding process?
>
> WITNESS:      Yeah, they did.  Cortez mentions it in his
>               testimony that they've always known that CFE
>               usually went with the lowest bid or one of
>               the lowest bids just depending upon what the
>               contract said.  They had always been very
>               careful in the past to make sure they came in
>               with one of the lowest bids, if not the
>               lowest bid, and Steve Lee also said the same
>               thing.  That his understanding was always
>               that CFE usually awarded their contracts to
>               the one of the lowest bidders, and once they
>               hired Aguilar and added that 30 percent, they
>               still got the contracts, and they knew they
>               weren't the lowest bidder anymore.

(RT 10/21/2011 at 21).  The defendants argue that this testimony was false because the "government knew . . . there were <u>no</u> competitors for LMC's ERS systems in Mexico."  (Mot. #505 at 8) (emphasis in original).  The defendants support this argument by pointing to Cortez's trial testimony during which he stated that LMC had no competition in Mexico between 2002 and 2007.  (RT 4/15/2011 at 1781).  But this was not the testimony Agent Guernsey was summarizing when she appeared before the grand jury. Rather, Agent Guernsey summarized the following <u>grand</u> jury testimony:

> CORTEZ:       To tell you the truth, most of the time our
>               price is high than the competitors.  And the
>               only reason that utilities decide to buy our
>               product because we are the pioneers of these

12

types of towers and it's the best engineered
tower.  (RT 5/5/2010 at 26).

* * *

CORTEZ:        When we are participating in a bid, an
               international public bid, you compete with –
               with Tower Solutions or SBB or only one of
               them, maybe Kema comes in hand, you have to
               sharpen up the pencil and be sure to give
               them a price that is going to be competitive.
               And, like I said, our price – even in public
               bids like that is higher than SBB or Tower
               Solutions or even Kema.  (Id.)

* * *

PROSECUTOR:    So now this maybe 2003, 2004, somewhere
               around there.  SBB was one of your
               competitors, correct?

CORTEZ:        Yes.

PROSECUTOR:    But SBB didn't get any of the towers from
               these seven purchase orders that you
               mentioned?

CORTEZ:        No, that – not to my knowledge.

PROSECUTOR:    Did any other competitor get any of the
               towers from the purchase orders?

CORTEZ:        Not to my knowledge (Id. at 87).

* * *

CORTEZ:        I gave him the price and I gave him the
               quotation and SBB also gave their price and
               they ended up purchasing from SBB.  And why
               was that?  Because our price was higher than
               SBB.  And again I mention to Mario, 'You
               know, we should be cutting this 30 percent
               because you guys are – we not going to sell
               the towers or anymore product, you know.
               SBB's going to start getting these jobs
               because they're cheaper in price than us, we
               need to cut this commission.'  And he mention
               something like, 'Yes.  Yes, I know.  I'm going
               to talk to Aguilar about this.'" (Id. 89).

At trial, the defendants and Cortez attempted to draw a much

finer distinction regarding whether LMC had any competitors in

13

Mexico by arguing that LMC had no competitors for its "1070 tower," (RT 4/15/2011 at 17681), but Cortez was merely addressing competitors during his grand jury testimony.

   5.   <u>LMC Got Contracts Regularly After Hiring Enrique Aguilar</u>

   The fifth allegedly false statement was Agent Guernsey's testimony that LMC started getting contracts "regularly" once it hired Enrique Aguilar as its sales representative in Mexico. (Mot. #505 at 9).  The defendants argue that Agent Guernsey's testimony was false because "LMC's sales to CFE continued in a sporadic fashion, just as they had before its retention."  (<u>Id.</u>). This argument is completely unfounded.

   As discussed above, Cortez testified in the grand jury that before hiring Enrique Aguilar "we didn't see no action; no real action for few years . . . I think we sold two or four towers to the area of Veracruz through Gutierrez."  Other evidence showed that within approximately one month of hiring Enrique Aguilar, LMC was awarded a direct purchase contract with CFE worth over $1 million and received approximately $18 million worth of payments from CFE over the next six years.  As Agent Guernsey testified in the grand jury, there came a time when "they were so busy with contracts that they were getting from CFE they had to put three eight-hour shifts a day, seven days a week."  (RT 10/21/2011 at 34).  The defendants attempt to dismiss this obvious increase in contracts by pointing to a 13-month period when LMC received no contracts from CFE.  (Mot. #505 at 9).  This narrow focus

14

completely ignores Cortez's testimony regarding the sales cycle
in the electrical tower industry:

> CORTEZ:   So, therefore, this is not a product that you –
> that the utilities are going to buy every year
> because they need to stock every year.  No.
> Actually, you know, once –once we sell 20 towers
> to one utility over here in the USA, that's it.
> They are set forever.

(RT 5/5/2010 at 61).

The defendants' argument that Agent Guernsey should have
told the grand jury that the most significant contract came in
July 2006, after hurricane Wilma hit Mexico, also fails.  (Mot.
#505 at 9).  Again, assuming this was exculpatory evidence (it
was not), "prosecutors simply have no duty to present exculpatory
evidence to grand juries."  Isgro, 974 F.2d at 1096.

   6.   We Have No Other Explanation for the 30 Percent
        Commission

The sixth allegedly false statement was Agent Guernsey's
grand jury testimony regarding the 30 percent commission being
paid to Enrique Aguilar:

> GRAND JUROR:   I just wonder, they have got 30 percent in
> commission and 15 percent is clearly paid as
> commission, and the other is all these other
> miscellaneous expenses.  And I was just
> wondering are there any real plausible –
> because if you're running a company and you
> have a whole department for sales and then
> you don't need that department anymore maybe
> you agree I'll pay you 15 percent for your
> travel and – I'm just wondering did they give
> you any other plausible reasons for the
> commissions to be so high?
>
> PROSECUTOR:   And if you have evidence of why these
> commissions were so high I think is the
> question regardless of who gave it to you.
> Do you have any evidence that would explain
> why a 30 percent commission would be paid to

15

1                               [LMC] <u>other than what you've already</u>

2                               <u>testified to?</u>

        WITNESS:          No, we have <u>no other explanation</u> for the 30

3                               percent commission.

4  (RT 9/8/2010 at 82) (emphasis added).  The defendants argue that

5  this testimony was false because (1) the government was aware

6  that Grupo had, in fact, performed significant outside services

7  for LMC, including travel, training, transportation and

8  translation; and (2) the all-inclusive, contingent nature of

9  Grupo's 30 percent commission was another plausible explanation

10  for its size.  (Mot. #505 at 10).

11      The first argument has no merit because it presumes that

12  Agent Guernsey gave "no other explanation for the higher fee

13  other than the money being used for corrupt purposes."  (<u>Id.</u>).

14  This is inaccurate.  Agent Guernsey was asked whether there was

15  any explanation for the payments "other than what [she had]

16  already testified to."  She said no, because she had already

17  explained the "plausible explanations" listed on the invoices,

18  which the defendants argue were "concealed from the grand jury,"

19  namely that the money was for "commissions, customer visits,

20  translations, and travel."  (RT 9/8/2010 at 28-35).

21      The defendants claim that Agent Guernsey uncovered evidence

22  that these explanations on the invoices were in fact true, but as

23  Agent Guernsey explained to the grand jury, she determined that

24  the invoices being submitted by Grupo were fraudulent because

25  many of the invoices listed the commission as 15 percent of the

26  sales contract, even though Cortez and other evidence clearly

27  indicated that Enrique Aguilar's commission was 30 percent.  (<u>Id.</u>

28

at 31-35; 10/21/2010 at 25-28).  Agent Guernsey further explained
that many of the invoices claimed to be for customer visits,
translation, and travel, yet in many instances were for the exact
same amount as the invoices submitted for commissions, even when
the invoice was for over $1 million.  (9/8/10 at 31-35).
Finally, Agent Guernsey explained how when she looked at Grupo's
brokerage account for evidence of these purported expenses, she
found no payments for travel, customer visits, or translation.
(Id. at 35).

The argument that Agent Guernsey concealed the all-inclusive
and the contingent nature of Grupo's 30 percent commission from
the grand jury is also inaccurate.  The government introduced
several of the invoices from Grupo during the grand jury
proceedings and each showed that the purported explanation for
the payments to Grupo were commissions and expenses for customer
visits, translation, and travel.  (Id. at 31-35).  As for the
contingent nature of the payments, Agent Guernsey explained that
the 30 percent commission was "in exchange for achieving . . .
contracts for [LMC] from CFE."  (Id. at 16).  Agent Guernsey also
made it clear that these payments were "always after [LMC was]
paid by CFE."  (Id. at 27).  Therefore, there is nothing to
suggest that Agent Guernsey tried to conceal any of these other
"plausible explanations" from the grand jury.

The defendants' assertion that Agent Guernsey testified that
"most of the money" from LMC was ultimately used to buy luxury
goods for CFE officials is again inaccurate.  (Mot. #505 at 10).
Agent Guernsey testified that a "substantial portion of the

17

proceeds" and "a significant amount of money" was used to buy luxury goods for CFE officials. (RT 9/8/2010 at 36). The defendants cannot dispute the accuracy of this testimony given their own acknowledgment that "$2.2 million of these monies were . . . used for these purposes."

Lastly, Agent Guernsey did nothing to conceal from the grand jury the dates on which these corrupt payments were made to CFE officials. (Id.). The government introduced documents showing that (1) the authorization to pay Moreno's American Express card "in full every month" was dated July 13, 2006, (2) the $297,500 check used to purchase the Ferrari was dated February 16, 2007, and (3) the $540,000 check used to help purchase the yacht was dated August 28, 2006. (9/8/2010, Ex. 6, 7, 10, 16).

7.   Looking at the Invoices, They Appear to be Fraudulent

The seventh allegedly false statement was Agent Guernsey's grand jury testimony that "looking at the invoices they appear to be [fraudulent]." (RT 9/8/2010 at 29). The defendants argue that this testimony "had no basis in fact" because "there was extensive evidence that Grupo was, in fact, performing valuable outside services for LMC." (Mot. #505 at 11). As explained above, Agent Guernsey did not testify that Grupo never performed any outside services for LMC. Rather, her testimony was that the invoices she reviewed during her investigation "appeared" to be fraudulent. (RT 9/8/2010 at 29-35). When Agent Guernsey was asked to "walk through" how she came to that determination, the grand jury was shown several of the invoices and how they reflected a 15 percent commission and how in many instances were

18

the same exact amount as the invoices for expenses.  (Id.).  In the end, however, the grand jury ultimately made its own determination as to the authenticity of the invoices.  (Id.).

The argument that there were "numerous email exchanges between Mr. Aguilar and LMC" to support the validity of these invoices is again inaccurate.  (Mot. #505 at 11).  The reason the defendants do not include these "numerous emails" in their motion is because none can explain (1) the high dollar values being listed on the invoices, (2) why the commission invoices listed only 15 percent of the contract price, or (3) why in many instances they were the same exact amount as the expense invoices — features that were the crux of Agent Guernsey's determination the invoices "appeared" fraudulent.  Again, assuming that the emails showing Enrique Aguilar's mere involvement in the administration of contracts with CFE were exculpatory (they were not), the government had no obligation to present those documents to the grand jury.

   8.   LMC's Wire Transfers Went To Pay Off Moreno's American
        Express Bill

The eighth allegedly false statement was Agent Guernsey's grand jury testimony that LMC's wire transfers to the Grupo account were used to pay over $170,000 towards Moreno's American Express bill.  (Mot. #505 at 12).  The defendants argue that this testimony was false because "no LMC funds were used to pay Mr Moreno's American Express bills."  (Id.).  The defendants, however, provide no support for this argument in their motion.

19

Presumably, the argument is based on the same ground as the ninth argument in the defendants' motion: "the prosecutors [were seeking] to reinforce [a] false notion that LMC's funds could be specifically traced to corrupt payments." (Id.). What both of these arguments overlook, however, is that Agent Guernsey was not required to trace, i.e., to identify which particular funds were used to pay the bribes and could point to any funds in that account once they had been commingled in the Grupo account. United States v. Rutgard, 116 F.3d 1270, 1292 (9th Cir. 1997). As the Ninth Circuit explained in Rutgard, the reasoning rests on the fungibility of money in a bank account, which destroys the specific identity of any particular funds, and allows the government to point to "any funds 'involved' in the transaction." Id.; see also United States v. English, 92 F.3d 909, 916 (9th Cir. 1996) ("it is sufficient to prove that the funds in question came from an account in which proceeds were commingled with other funds").

> 9.   The 2006 Representation Agreement Between Enrique Aguilar and LMC Was In Response to an IRS Audit of LMC

The tenth allegedly false statement was Agent Guernsey's grand jury testimony regarding why the Representation Agreement between Enrique Aguilar and LMC was dated in 2006:

> WITNESS:        I do know why. It's in response, actually, to a IRS audit of Lindsey Manufacturing's accounting practices with regards to their tax returns and they were questioned as to the 30 percent commission. And the date of that contract is about the time that the audit began. So it's basically documentation documenting the 30 percent commission because they did not have any in their files until that point.

20

(RT 9/8/2010 at 80).  The defendants argue that this testimony was false for several reasons.  First, LMC was not notified by the IRS about an audit until July 12, 2006, and the agreement Agent Guernsey referred to was dated nine days earlier, on July 3.  Second, the IRS audit in July 2006 did not relate to tax year 2006 or to sales commissions, but rather to bad debt deductions taken in tax years 2004 and 2005.  Third, it was not until February 2008 that LMC was audited with regard to its 2006 tax return's sales commissions.  (Mot. #505 at 13).  The defendants argue that Agent Guernsey knew these were false statements and that she led the grand jury to believe LMC had committed a tax crime.  (Id.).

Although the inaccuracies the defendants point out in their motion are correct, Agent Guernsey was not trying to falsely represent to the grand jury that LMC had committed a tax crime.  (RT 4/22/2011 at 2576).  She was simply mistaken about the purpose of the IRS audit that began in 2006.  As Agent Guernsey explained during her cross-examination at trial, she knew that the IRS began auditing LMC sometime in the middle of 2006 and that the representation agreement was created "about the time that the audit began."  (Id. at 2576-85; 9/8/2010 at 80).  Agent Guernsey also knew that the audit had to do with the tax returns LMC had filed during tax years 2004 and 2005.  (Id. at 2580-2585).  Agent Guernsey mistakenly believed, however, that the audit related to LMC's commissions, so when she conveyed that information to the grand jury "that's what [she] believed to be the truth."  (Id. at 2581).  Agent Guernsey's confusion about

21

this issue was corroborated by her appearance before the grand
jury on October 21, 2010, in connection with return of the first
superseding indictment, when she again said, "I'm going to say in
'05 or '06, they were audited by the IRS with regard to their
commissions." (RT 10/21/2010 at 29). Agent Guernsey's confusion
was not surprising given that the tax audits in question were
back-to-back and one involved commissions related to tax year
2006.

The defendants' assertion that they were nevertheless
prejudiced by the testimony because it suggested to the grand
jury that they had committed a tax crime is not supported by the
record. (Mot. #505 at 13). Almost immediately after reference
to the IRS audit was made, the prosecutor admonished the grand
jury:

> PROSECUTOR:   There was a reference made to an IRS audit
> being conducted of Lindsey Manufacturing.
> That's not charged in the indictment that
> will be presented to you ... You're not to
> consider those acts or allegations in your
> deliberations. Your deliberations regarding
> probable cause should only consider the
> testimony which relates to the acts charged
> in the indictment. Does everyone understand
> that?
>
> GRAND JURORS: Yes.

(RT 9/8/2010 at 81).

Moreover, Agent Guernsey gave her testimony in connection
with the return of the original indictment, which did not charge
LMC, LINDSEY, or LEE. Agent Guernsey's testimony with respect to
the first superseding indictment made only a fleeting reference
to an IRS audit ("I'm going to say in '05 or '06, they were

22

audited by the IRS with regard to their commissions" (RT 10/21/10 at 29)) and the prosecutor gave the grand jury essentially the same admonishment to address that minor comment. (Id. at 31). Therefore, because Agent Guernsey's testimony about the IRS audit was not a knowing misrepresentation to the grand jury and was not material to the return of the first superseding indictment, it should not serve as a basis to dismiss that indictment.

      10.  <u>In 2005 or 2006 LMC Reclassified Grupo's 30 Percent Commission</u>

     The eleventh allegedly false statement was Agent Guernsey's grand jury testimony regarding LEE's instruction to LMC employee Mang Hue Kwok to "reclassify" Grupo's 30 percent commission to 15 percent commission and 15 percent to outside services in the general ledger in 2005. (Mot. #505 at 14). Agent Guernsey testified that LEE instructed Ms. Kwok

> WITNESS    [W]e have to reclassify the 30-percent commission that we're listing on our general ledger, and he did that with any of the commissions that had been submitted or the bills that had been submitted by Grupo up to that point.

(RT 10/21/2010 at 31). The defendants correctly point out that there was only one instance in 2006 where LEE instructed Ms. Kwok to "reclassify" a commission on the general ledger and that he did not instruct her to reclassify the entries "up to that point."

     However, whether the 15 percent commission ended up on LMC's general ledger as a result of a "reclassification" or whether it was originally "classified" that way was not the focus of Agent

Guernsey's testimony.  What Agent Guernsey was conveying to the grand jury – correctly – was that after '05 or '06 LMC began classifying the 30 percent commission as a 15 percent commission, and that change in how LMC classified the commission came from LEE, even though he knew the commission was, in fact, 30 percent. This is clear from Agent Guernsey's grand jury testimony.

Agent Guernsey was asked why she had found LEE's statement about not knowing the 30 percent commissions were being used to pay bribes "strange."  (RT 10/21/2010 at 23).  One of the reasons Agent Guernsey gave was that when she looked at the invoices she recalled that LEE and others had acknowledged that Enrique Aguilar's commission was 30 percent, yet the invoices only showed a commission rate of 15 percent.  (Id. at 26).  Agent Guernsey said it appeared the invoices were splitting the commission to make it appear smaller.  (Id. at 26-28).  Agent Guernsey examined the general ledger for this pattern and saw the commission was also split down to 15 percent instead of 30 percent.  (Id. at 29-30).  Agent Guernsey asked Ms. Kwok, the Assistant Comptroller at LMC, who was responsible for listing the commission as 15 percent.  Ms. Kwok said in '05 or '06, LEE came to her and said, "We need to reclassify the commission.  We need to split it out. We need to split it 15 and 15.  15 to commission and 15 to other services."

The defendants argue that Agent Guernsey's testimony that LEE instructed Ms. Kwok to reclassify the general ledger "up to that point" improperly influenced the grand jury's deliberations. (Mot. #505 at 15).  Actually, it provided Agent Guernsey with an

1   opportunity to clarify her earlier misstatement.  A grand juror

2   said he was "a little confused on the dates and timing," because

3   he thought Ms. Kwok was "writing a check [for] 30 percent" up

4   until 2005, even though the invoices being presented from August

5   1, 2002 through 2005 were split into two separate payments.  (RT

6   10/21/2010 at 65) (emphasis added).  The prosecutor asked Agent

7   Guernsey to explain that part of her testimony again.  Agent

8   Guernsey explained that Ms. Kwok was not writing a check to

9   anyone, but rather entering information on LMC's general ledger.

10  (Id.).  Agent Guernsey further explained that up until 2005, Ms.

11  Kwok was "documenting everything as 30 percent commission.  They

12  weren't separating it out, distinguishing the two."  (Id.).

13       Once again, the defendants argue that the government failed

14  to "reveal that the IRS audit found no irregularities in the

15  payments to the Mexican sales representative and no taxes owing."

16  (Mot. #505 at 15).  For the reasons previously stated, the

17  government had no obligation to present such evidence and its

18  failure to do so may not serve as a basis to dismiss the

19  indictment.  Moreover, the prosecutor admonished the grand jury

20        PROSECUTOR:   Ladies and gentlemen, you've heard testimony
                        that they were being audited, that is, one of
21                      the defendants in this case.  But that's not
                        what their charged with.  You should not
22                      consider that in your deliberations as to
                        whether or not they were guilty of the
23                      offenses that they have been charged with.

24  (RT 10/21/2010 at 32).

25  C.   The Government Did Not Violate Brady

26       The defendants argue that the indictment should also be

27  dismissed for what they allege were a series of Brady violations

28                                25

1  and misrepresentations to the Court.  (Mot. #505 at 15-21).  In

2  order to establish a Brady violation, a defendant must make a

3  three-part showing: "[t]he evidence at issue must be favorable to

4  the accused, either because it is exculpatory, or because it is

5  impeaching; that evidence must have been suppressed by the State,

6  either willfully or inadvertently; and prejudice must have

7  ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

8  Evidence is material for Brady purposes "if there is a reasonable

9  probability that, had the evidence been disclosed to the defense,

10  the result of the proceeding would have been different." Id.

11  at 280 (quoting United States v. Bagley, 473 U.S. 667, 682

12  (1985)).

13       1.   Disclosure of Agent Guernsey's Grand Jury Testimony

14       The defendants first argue that the government violated its

15  Brady obligation by failing to turn over Agent Guernsey's grand

16  jury testimony before the start of the trial.  (Mot. #505 at 16).

17  The defendants premise this Brady argument on the 11 allegedly

18  false statements Agent Guernsey made in that grand jury

19  testimony.  (Id.).  For the reasons set forth above, however,

20  these statements did not amount to false statements or perjury

21  before the grand jury.  Agent Guernsey's grand jury testimony

22  became discoverable only when the government decided to call her

23  as a trial witness, a decision that was made after the trial had

24  commenced.

25       Even assuming for the sake of argument that Agent Guernsey's

26  grand jury testimony constituted Brady material (it did not), the

27  defendants' assertion that the indictment should be dismissed as

28                              26

a result of it not being disclosed "at the outset" has no merit.
(Mot. #505 at 16).  The Ninth Circuit has held that <u>Brady</u> only
requires that the disclosure of information be made while it
still has substantial value to the accused.  <u>United States v.
Woodley</u>, 9 F.3d 774, 777 (9th Cir. 1993); <u>United States v.
Aichele</u>, 941 F.2d 761, 764 (9th Cir. 1991).  In other words, to
establish a <u>Brady</u> violation, a defendant still must prove that
prejudice ensued from the timing of the disclosure.  (<u>Id.</u>).

Here, the defendants acknowledge that they were provided
with Agent Guernsey's grand jury testimony on April 15, 2011.
(Mot. #505 at 16).  The government did not call Agent Guernsey as
a witness at trial until one week later, on April 22.  The
defendants' counsel, therefore, had ample time to prepare their
extensive cross-examination of Agent Guernsey and to present the
alleged falsities to the jury.  In fact, three of the seven week
days before Agent Guernsey testified, there were no court
proceedings held.  Then, after Agent Guernsey testified for a
full day on April 22 (a Friday), defense counsel were given
another three days during which no court proceedings were held to
prepare for additional cross-examination of Agent Guernsey, which
resumed on April 26, 2011 (Tuesday).

Another factor that undermines the defendants' showing of
prejudice is the quality of their defense counsel, two seasoned
criminal defense attorneys with extensive trial experience and
extensive resources.  Their ability to prepare effectively for
cross-examination was most evident from the fact that neither
defense counsel sought a continuance or additional time to

27

prepare their cross-examination.  Nor did they ask that Agent
Guernsey be called as a witness after the government's summary
witness, so that they might have additional time to prepare.
Finally, there can be no prejudice given that all of the key
arguments raised in the defendants' motion to dismiss are the
same arguments that were brought out during the extensive cross-
examination of Agent Guernsey at trial.  <u>United States v.
Aichele</u>, 941 F.2d at 764 ("When a defendant has the opportunity
to present impeaching evidence to the jury ... there is no
prejudice in the preparation of his defense.").

    2.   <u>Disclosure of Agent Binder's Search Warrant Affidavit</u>

The second alleged <u>Brady</u> violation relates to the disclosure
of Agent Binder's search warrant affidavit.  (Mot. #505 at 16-
17).  The defendants argue that, in addition to disclosing Agent
Binder's search warrant affidavit in discovery, the government
was also required to "immediately" point out the fact that Agent
Binder's statement in the affidavit regarding LMC making deposits
to Sorvill was inaccurate.  (<u>Id.</u> at 16).  The defendants cite no
authority, and the government is aware of none, that stands for
the proposition that <u>Brady</u> required more than the government's
early disclosure of the affidavit.

But perhaps more importantly, the defendants again fail to
demonstrate how they were prejudiced by this alleged deficiency
or how further disclosure would have resulted in a different
outcome at trial.  Indeed, it was this inaccuracy that the
defendants relied upon to form the basis for their <u>Franks</u> motion
and other motions to suppress, which the Court ultimately denied

after finding that the inaccuracy was immaterial to the finding
of probable cause and was not the result of bad faith or
dishonesty on the part of Agent Binder.  (CR 439).

Next, the defendants argue that the government should have
voluntarily produced several drafts of Agent Binder's search
warrant affidavit without being specifically ordered to do so by
the Court.  (Mot. #505 at 17).  The defendants offer no support
for their argument that these drafts of the affidavit constituted
Brady material or even Jencks material beyond that which was
disclosed in Agent Binder's signed affidavit.  Nor do they
explain why, if there was Brady material in these drafts, the
defendants failed to renew their motions to suppress and other
motions in advance of trial and failed to make any further use of
that alleged Brady information from March 24, 2011, through to
the conclusion of trial in May.

The final argument raised by the defendants with respect to
Agent Binder's affidavit is that the government failed to
disclose the fact that a deposit of approximately $433,000 was
made into the Grupo account by someone other than LMC around the
time of the purchase of the Ferrari.  (Id. at 17).  The
defendants argue that the government knowingly waited until after
the Court had issued its tentative ruling denying the Franks
motion to make this disclosure.  (Id.).  However, as the
government explained to the Court at the Franks hearing, it
discovered this additional error while it was preparing its
response to the Franks motion.  (RT 3/23/201 at 56).  More
importantly, defense counsel were given the opportunity to cross-

examine Agent Binder about this additional error before the Court
rendered its final ruling on the motion and the Court went so far
as to take judicial notice of the fact "that the account was
funded — that the account had moneys in it from which the
payments for the Ferrari could have been used, and not all the
moneys — evidently, according to what Mr. Miller just disclosed,
not even close to all the moneys had been recently placed there
by [LMC]." (RT 3/23/2011 at 62). When the Court asked defense
counsel if that was the ultimate fact that they wanted the Court
to conclude with respect this additional evidence, defense
counsel for LEE said, "Yes." (Id.). Thus, the defendants have
again failed to demonstrate how any prejudice resulted from the
alleged Brady violation.

   3.   The Government's Motion to Admit SBB Evidence

   The defendants next argue that the indictment should be
dismissed because the government represented to the Court in a
motion to admit evidence relating to LMC's Canadien competitor,
SBB, that such evidence was necessary to "rebut a defense raised
for the first time at trial." (Mot. #505 at 18). The defendants
correctly point out that this representation to the Court was
inaccurate and that the government had overlooked the fact that
over a month earlier the defendants had arguably put the
government on notice of this defense by making reference to it in
a footnote of one of their motions. (Mot. #317 at 11 n.11).
However, this mere oversight cannot serve as a basis for
dismissing the indictment, especially given that the Court denied
the government's motion to admit the evidence and there was no

1  resulting prejudice to the defendants.  <u>United States v. Kearns</u>,

2  5 F.3d 1251, 1255 (9th Cir. 1993) (holding that even though the

3  government's conduct "may have been negligent, or even grossly

4  negligent," it did not rise to the level of flagrant misconduct).

5      4.   <u>The Government's May 3, 2011 Discovery Production</u>

6      Lastly, the defendants argue that the indictment should be

7  dismissed because the government produced five FBI 302s on May 3,

8  2011, after the close of its case-in-chief.  (Mot. #505 at 19).

9  The defendants argue that this production of six pages of

10 discovery warrants dismissal of the entire first superseding

11 indictment with prejudice because the government had previously

12 represented to the Court that it had complied with its discovery

13 obligations and because the timing of the production allegedly

14 prejudiced the defendants in two ways.  (<u>Id.</u>).

15     The first argument fails because the government's untimely

16 production of the witness statements was not flagrant or in

17 reckless disregard for its discovery obligation.  As the

18 government explained in its May 3, 2011 letter, the prosecutors

19 had Bates-stamped the five witness interviews, which took place

20 between March 30 and April 4, 2011, and had attached them to a

21 discovery letter to be sent out by a paralegal on April 4.  On

22 May 3, the government discovered a duplication in the Bates

23 numbering for the five witness statements.  The paralegal who was

24 responsible for sending out the April 4 discovery letter

25 containing the five witness statements was no longer working for

26 the government, so the prosecutors were unable to resolve the

27 discrepancy.  In an abundance of caution, the government

28                          31

immediately reproduced the witness statements with new Bates numbers and provided them to the defense counsel the same night that the discrepancy was discovered.

Next, the argument that the defendants were prejudiced by this late disclosure also fails.  Although the defendants note that one of the five witness statements provided by the government belonged to someone who had already testified (Fernando Maya Basurto), the defendants do not explain how they would have made use of the witness statement if it had been produced before Basurto took the stand.  Nor could they, as the statement is only one half of a page and deals primarily with the ABB case and what type of car an ABB coconspirator drove. Furthermore, the Court admonished the jury that this case "does not involve ABB" and limited the jury's consideration of Basurto's testimony solely to the issue of Sorvill International's role in this case   (RT 4/7/2011 at 784-85).

The defendants attempt to manufacture prejudice with respect to the Patrick Rowan witness statement.  Rowan worked at LMC from September 2001 through April 2005.  (Mot. #505 at 20).  The defendants argue that Rowan's information was helpful to them because Rowan discussed how everyone at LMC was told that this "really big" job in Mexico would be coming, but it kept getting pushed back and Rowan eventually "kissed [it] off."  (Id. at 20). According to the defendants, Rowan's statement "undermines" the government's theory that LMC received a windfall of contracts after hiring Enrique Aguilar and corroborates their argument that

32

contracts with CFE remained "sporadic" from 2002 through 2005. (Id. at 20-21).

However, merely showing that the statement might have been "helpful" to the defendants is insufficient to establish a Brady violation. Rather, the defendants must establish that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." And the defendants cannot make this showing. To start, the defendants tacitly acknowledged that any testimony by Rowan would not have resulted in a different outcome at trial because they did not call Rowan as a witness in the defense case. The defendants were provided with Rowan's witness statement before the trial had concluded. If Rowan's information was really so useful, the defendants would have called him as a witness at trial.

In addition, other information provided by Rowan would have been very helpful to the government's case, and not just the defense. For example, Rowan told the FBI that (1) "LMC manufactures Emergency Restoration Systems and there were other companies that made the same product," and (2) "LMC made pretty routine stuff and other companies could make the same thing" and "[b]ecause of this, . . . people would be crazy to buy LMC." These and other statements by Rowan directly contradict the defense theory that the reason LMC was being rewarded contracts in Mexico was because LMC was the only company manufacturing and supplying the industry-standard 1070 transmission towers after

33

2002.  A theory which was basically only supported by the testimony of Sergio Cortez at trial.

Finally, Rowan's testimony regarding the "really big job" apparently relates to the 100 towers LMC sold to CFE in 2006 by way of public bid for over $10 million.  The defendants' argument that Rowan's testimony about this contract repeatedly getting pushed back would not only support the defense's theory.  After all, Rowan told the FBI that LMC was, in fact, awarded the big contract after he left LMC.  This shows that internally LMC's salesmen were discussing winning a CFE contract submitted for public bid more than six months in advance of it being awarded, which the government would have argued was consistent with LMC rigging the bids and paying bribes.

* * *

In summary, the defendants' motion to dismiss - filed during jury deliberations - appears to be just another in a series of motions designed to attack the government and specifically the conduct of the prosecutors and agents in this case, all while ignoring the applicable legal standards and/or the evidence. When those standards and evidence are applied to the defendants' present challenge, the defects in the motion become clear.

## III.

### CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the first superseding indictment for alleged government misconduct should be denied in all respects.