JAN L. HANDZLIK
(State Bar No. 47959)
GRACIA TSE
(State Bar No. 274293)
GREENBERG TRAURIG LLP
2450 Colorado Avenue, Suite 400 East
Santa Monica, CA 90404
Phone: (310) 586-6542
Fax: (310) 586-0542
EMAIL: handzlikj@gtlaw.com
EMAIL: tseg@gtlaw.com

Attorneys for Defendants
Lindsey Manufacturing Company and
Keith E. Lindsey

JANET I. LEVINE
(State Bar No. 94255)
MARTINIQUE E. BUSINO
(State Bar No. 270795)
CROWELL & MORING LLP
515 S. Flower Street, 40th Floor
Los Angeles, CA  90071-2258
PHONE:  (213) 622-4750
FAX:  (213) 622-2690
EMAIL: jlevine@crowell.com
EMAIL: mbusino@crowell.com

Attorneys for Defendant
Steve K. Lee

MATTHEW B. HAYES
(State Bar No. 220639)
225 South Lake Avenue, Suite 300
Pasadena, CA 91101
Tel. (626) 344-8530
Fax (626) 921-4932
EMAIL: mhayes@helpcounsel.com

Attorney for Defendants Lindsey
Manufacturing Company and Keith E.
Lindsey

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 10-1031(A)-AHM |
| Plaintiff, | ) |
| | ) **DEFENDANTS' REPLY BRIEF IN** |
| v. | ) **SUPPORT OF MOTION TO DISMISS** |
| | ) **THE INDICTMENT WITH PREJUDICE** |
| ENRIQUE FAUSTINO AGUILAR | ) **DUE TO REPEATED AND** |
| NORIEGA, ANGELA MARIA | ) **INTENTIONAL GOVERNMENT** |
| GOMEZ AGUILAR, LINDSEY | ) **MISCONDUCT; EXHIBITS** |
| MANUFACTURING COMPANY, | ) |
| KEITH E. LINDSEY and | ) |
| STEVE K. LEE, | ) |
| Defendants. | ) |

Defendants Keith E. Lindsey, Lindsey Manufacturing Company ("LMC") and Steve K. Lee (collectively, "defendants") hereby file a reply brief in support of their Motion to Dismiss the Indictment with Prejudice due to Repeated and Intentional Government Misconduct ("Motion to Dismiss," Document 505). Defendants' reply is based upon the accompanying memorandum of points and authorities, the attached exhibits, the records in this case, and the arguments and evidence presented at or before the hearing on this Motion.

DATED: June 17, 2011                    Respectfully submitted,

                                        JAN L. HANDZLIK
                                        GREENBERG TRAURIG LLP

                                        /s/ Jan L. Handzlik
                                        By: JAN L. HANDZLIK
                                        Attorney for Defendants
                                        Lindsey Manufacturing Company &
                                        Keith E. Lindsey

DATED: June 17, 2011                    Respectfully submitted,

                                        JANET I. LEVINE
                                        CROWELL & MORING LLP

                                        /s/Janet I. Levine
                                        By: JANET I. LEVINE
                                        Attorneys for Defendant
                                        Steve K. Lee

1

# TABLE OF CONTENTS

**Page**

I    INTRODUCTION.................................................................................1

II   THE VIOLATIONS OF DEFENDANTS' RIGHT TO DUE PROCESS
WARRANT DISMISSAL OF THE INDICTMENT .................................4

    A.    The Government's Response Fails to Refute Many Specifications of
Misconduct in Defendants' Motion to Dismiss .................................4

    B.    Due Process Violations Require an Automatic Dismissal Because
Prejudice is Presumed. ...................................................................7

    C.    Agent Guernsey's False Grand Jury Testimony Was Willful and
Material. .........................................................................................8

    D.    The Prosecutors' Decision to Conceal the False Grand Jury
Testimony, Rather Than Disclose and Rectify It, Violated
Defendants' Rights to Due Process...............................................13

    E.    The Prosecutors' Fabrication of Evidence to Secure Search
Warrants Violated Due Process. ...................................................15

III   DISMISSAL IS ALSO WARRANTED UNDER THE COURT'S
SUPERVISORY POWERS ................................................................16

IV   CONCLUSION..................................................................................19

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Bank of Nova Scotia v. United States,*
    487 U.S. 250 (1988)............................................................. 8

*Berger v. United States,*
    295 U.S. 78 (1935)........................................................ 3,7,16

*Brady v. Maryland,*
    487 U.S. 250 (1988)............................................................ 14

*Devereaux v. Abbey,*
    263 F.3d 1070 (9th Cir. 2001) ........................................... 16

*Locken v. United States,*
    383 F.2d 340 (9th Cir. 1967) ............................................. 16

*United States v. Basurto,*
    497 F.2d 781 (9th Cir. 1974) ............................ 7, 13-15, 17

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ...................................... 16,18

*United States v. Goyal,*
    629 F.3rd 912 (9th Cir. 2010) ............................................. 3

*United States v. Navarro,*
    608 F.3d 529 (9th Cir. 2010) ............................................... 8

*United States v. Restrepo,*
    930 F.2d 705 (9th Cir. 1991) ......................................... 7, 16

*United States v. Samango,*
    607 F.2d 877 (9th Cir. 1979) ............................................. 13

*United States v. Sanchez,*
    176 F.3d 1214 (9th Cir. 1999) ........................................... 16

*Welchel v. Washington,*
    232 F.3d 1197 (9th Cir. 2000) ........................................... 16

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

# I    INTRODUCTION

As a result of government misconduct, Defendants' were deprived of their Fifth Amendment right to the due process of law.   The government's misconduct was intentional and, on numerous occasions, purposefully designed to undermine and frustrate the defendants' right to a fair and impartial grand jury hearing and a fair trial. This misconduct began at the inception of the LMC investigation and permeated the grand jury proceedings leading to the defendants' indictment.   The government's misconduct continued into and infected the trial of this case.  This misconduct mandates dismissal of the indictment.

As detailed in defendants' Motion to Dismiss, the government's misconduct took place on many occasions and took many forms (Motion, e.g. at pp. 4-21).   Instances of this repeated and intentional misconduct infected, *inter alia*, the government's first request for a search warrant; pervaded the grand jury process; and, as a result of the government's knowing and intentional suppression of information, contaminated the trial.  Instead of fulfilling its obligations under the Due Process Clause, the government actively sought to conceal and withhold evidence of misconduct, making disclosures only when forced to do so by the Court.

Among other instances of government misconduct, the First Superseding Indictment was the product of tainted and unfair grand jury proceedings.  The question is not whether the defendants were prejudiced by the government's misconduct before the grand jury.  Instead, defendants have alleged significant violations of their fundamental right to due process, which includes a fair grand jury proceeding, as mandated by the Fifth Amendment.

Compounding these violations of Defendants' right to due process at the grand jury stage, the prosecutors allowed defendants to proceed to trial and be placed in jeopardy on serious felony charges.   All the while, the government was purposefully withholding evidence of its misconduct from the defendants and the Court.  Following numerous and, at times, indignant representations of complete adherence to their duties

and fulfillment of their obligations, and only after the trial was well underway, did the government disclose evidence revealing some of the infirmities amounting to due process violations that had permeated the grand jury process.

Even at the latter stages of the prosecution, the government did not voluntarily come forward with evidence of misconduct – evidence that should have been revealed to the Court and disclosed to the defendants as early as October of last year. Instead, the Court had to order the government to produce the Guernsey grand jury testimony and, subsequently, transcripts of the government's comments and instructions to the grand jury. In fact, if the Court, acting on its own initiative, had not read the Guernsey grand jury testimony and ordered the government to disclose it, it's a safe bet it would never have been disclosed.

While acknowledging the impropriety of some instances of conduct cited in the Motion to Dismiss, the government seeks to minimize their importance and diminish their legal significance (*See* Government's Response to Motion to Dismiss the Indictment, etc., "Response," at pp. 4-25). And while, in passing, the government mentions the due process standard applicable to the conduct cited in the Motion to Dismiss (Response at p. 2), the government characterizes its transgressions as possible *Brady* violations, which necessitates a showing of substantial prejudice before dismissal is warranted (Response at pp. 2-3). The government thus seeks the application of less stringent legal standards, such as those underlying the supervisory powers of the Court (Response at p. 3).[1] This is disappointing.

_____

[1] To be clear, the government engaged in numerous substantial, material and prejudicial violations of *Brady*. In addition to dismissing the indictment based on violations of defendants' due process rights, the Court should dismiss the indictment as a result of these *Brady* violations. Likewise, under its supervisory powers over the administration of justice in this District, including the operation of grand juries, the Court should dismiss the indictment. These are additional reasons supporting dismissal of the indictment, not the exclusive grounds for doing so. If the government's flagrant and prejudicial misconduct, much of it taking place out of the view of the Court and defense counsel, is not sanctioned through dismissal of the indictment, what happened to the defendants in

2

The government's Response also seeks to deal with each specification of misconduct in isolation.  The government then essentially argues that, considered in isolation, each of these matters is insignificant.  This approach is apparently designed to demonstrate that the defendants suffered no prejudice, or at least no substantial prejudice, as the result of the government's mendacity and misconduct.  This, too, is disappointing.

Of course, the government's attempts to isolate and refute each of these specifications of misconduct ignores two irrefutable circumstances: the Defendants have established that their fundamental right to due process of law at the grand jury and trial stages was violated.   As a result, no showing of prejudice is required.  In addition, the government's stilted approach attempts to convince the Court to ignore the fact that the government's acts of misconduct did not take place in isolation or in a vacuum; all of these things took place in the same case.  Thus, these instances of misconduct have a cumulative effect that is greater and more significant than if considered in isolation.  *See Berger v. United States*, 295 U.S. 78, 89 (1935)

This is not the way the criminal process is supposed to work.[2]  Of course, federal prosecutors have an obligation to investigate and vigorously prosecute crimes, and to bring wrongdoers to justice.  They must represent their client, citizens of the United States, in an impartial and effective manner.  In doing so, of course, federal prosecutors have a solemn responsibility to act in a way that secures rather than undermines the rights of defendants to the due process of law.  In short, they must play by the rules and seek justice in the true sense of the word.  That did not happen here.

---

this case could happen to anyone.

[2] Although spoken in different circumstances, the words of Chief Judge Kozinski's concurring opinion in United States v. Goyal, 629 F.3rd 912, 922(9th Cir. 2010), resonate: "When prosecutors have to stretch the law or the evidence to secure a conviction, as they did here, it can hardly be said that such [moral condemnation of society] is warranted." (bracketed material added)

3

**II**     **THE VIOLATIONS OF DEFENDANTS' RIGHT TO DUE PROCESS WARRANT DISMISSAL OF THE INDICTMENT**

    **A.**     **The Government's Response Fails to Refute Many Specifications of Misconduct in Defendants' Motion to Dismiss**

    In its Response, the government fails to address or effectively refute numerous specifications of misconduct set forth in the Motion to Dismiss. By way of examples, the government does not dispute the following:

(1) The false representations in Agent Binder's first search warrant affidavit (November 14, 2008) alleging LMC deposits to the Sorvill account (which were repeated numerous times in other affidavits). These representations were *inserted by the prosecutors themselves*.[3] This issue is simply ignored by the government. *See* Response at 28:11-30:13.

(2) Agent Guernsey's assurance to the grand jury that "as high as 90, 95 percent of the funds in the Grupo account are from Lindsey" was untrue and was a "material" variance from her own previous sworn declaration. *See* Response at 5:4-9. As the Court will recall, this part of Agent Guernsey testimony resulted from a grand juror's questions and came immediately before the jury retired to deliberate on the First Superseding Indictment. In addition, the government erroneously states that her answers related to "funds in the Grupo account" and "money" in the account. (Response at pp. 5, 6) This simply reinforces the falsity of Agent Guernsey's testimony, by which she misinformed the grand jury about the amount "funds in the Grupo account." In fact, as was conclusively shown at trial, the LMC funds constituted only a small portion of the funds in the Grupo account. Even under the government's interpretation of

---

[3] Agent Binder testified that she "did not make" the representations regarding deposits from LMC to Sorvill and this representation "came back in a draft" from the prosecutors. *See* Exhibit I (March 23, 2011 Trans.), at 13:6-23, 15:3-14, 58:22-59:1. There is no evidence which prosecutor actually inserted the false evidence.

Agent Guernsey's testimony, the best that could be said is that 71% of the funds came from LMC.

(3) Agent Guernsey falsely testified to the grand jury that Steve Lee admitted to the FBI that he "didn't want to know" what Enrique Aguilar was doing with his commission. The Response expressly admits that Mr. Lee never made any such statement. *See* Response at 9:7-16.

(4) Agent Guernsey falsely testified to the grand jury that she knew LMC prepared a contract with Grupo in 2006 "in response" to an IRS audit questioning "the 30 percent commission," so the company would have some "documentation" to provide the auditors. The government admits that the contract was not made in response to any audit, but seeks to provide its own explanation of Agent Guernsey's thought process. *See* Response at 21:13-16.[4]

(5) Agent Guernsey falsely testified to the grand jury that, in response to an IRS audit, Mr. Lee instructed the company bookkeeper to reclassify all payments to Grupo "up to that point," so that only 15% of the payment would be allocated to commissions. The government admits that, in truth, this change was made to only a single invoice and was not in response to an IRS audit. *See* Response at 23:19-24, 21:7-16.

(6) Agent Guernsey assured the grand jury that LMC "didn't have a lot of business with CFE before they hired Aguilar" and that the investigation "didn't find that [LMC] got any [contracts] with their other rep," despite being in possession of documents reflecting numerous contracts between LMC and CFE dating back to 1991. The government seeks to excuse her false testimony by noting that "documents were in Spanish, a language [she] does not know." *See* Response at 8:1-18. Aside from the simply preposterous nature of this explanation, as discussed below, the Spanish-language contracts provided directly to Agent

---

4   On this point, the government concedes that some "…inaccuracies the defendants point out in their motion are correct." Response at 21:13-16.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

Guernsey were accompanied by English-language company records referring to the contracts.

(7) The prosecutors concealed the falsity of Agent Guernsey's testimony from the grand jury, the court and the defense. The defense requested, early and often, Agent Guernsey's testimony.[5] The complete transcript was only produced mid-trial in response to a Court order, after numerous key witnesses had already testified. *See* Response at 26:13-27:11. In its Response, the government seeks to characterize this as purely a *Brady* violation. It then proceeds to argue that no prejudice was shown (Response at pp. 26-27). In fact, defendants have argued that the government sought to suppress evidence of the due process violations they knew had taken place before the grand jury. That the government's conduct also amounted to a flagrant violation of the Brady doctrine does not excuse this fact. In any event, although a showing of prejudice is not required in order to demonstrate due process violations, it is clear that the defense was irrevocably prejudiced during trial by the suppression of this evidence, which was not available to it during the testimony of numerous government witnesses.

(8) The prosecutors withheld discoverable witness statements until after the close of their case-in-chief, despite previously assuring the Court and the defense team in the midst of trial that they had conducted a "top-to-bottom review of discovery" and had "exceed[ed]" their discovery obligations. *See* Response at 31:5-32:3. Among other things, while conceding that its production was "untimely," the government's Response essentially argues that its conduct was not flagrant or reckless. Response at p. 31.

---

[5] Indeed, the prosecutors admitted to initially deciding not to call Agent Guernsey as a witness at trial so as to avoid producing her grand jury testimony. *See* Handzlik Dec. at ¶ 7. She testified at trial only after the Court otherwise ordered her testimony produced, and only because it could not admit evidence seized under the search warrant without her testimony.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

Although the prosecutors concede that each of these serious incidents occurred, the Response brushes them off as "a few instances" of "a slight misstatement," "poor word choice," or the result of material evidence being "in Spanish." This cavalier approach to their own misconduct demonstrates a fundamental disregard for the prosecution's obligation to seek justice fairly and impartially. As stated in *Berger v. United States*:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice will be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

295 U.S. 78, 88-89 (1935) (ordering new trial based on "pronounced and persistent" prosecutorial misconduct with "probable cumulative effect upon the jury").

The prosecutors' attempt to disregard and downplay the substantial and sustained misconduct throughout the investigation, prosecution and trial of this case betrays a desire to secure a "win" at any cost, even at the expense of the defendants' right to due process. Justice mandates that the First Superseding Indictment ("FSI") be dismissed.

**B.     Due Process Violations Require an Automatic Dismissal Because Prejudice is Presumed.**

As the Response acknowledges, a due process violation occurs when "the government allows a defendant to stand trial on an indictment which it knows to be based on perjured testimony material to the return of that indictment." Response at 2:10-12; *United States v. Basurto*, 497 F.2d 781, 786 (9th Cir. 1974). A due process violation may also arise from other types of government misconduct that "is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991).

The government similarly acknowledges (Response at 2:22-25) that a due process violation requires an automatic dismissal of the indictment, without an assessment of the

7

prejudicial impact of the errors, because prejudice is presumed. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1988) (when "structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair," there is a "presumption of prejudice"). Unlike the sort of misconduct before the grand jury that implicates only the Court's supervisory powers, a due process violation in connection with the grand jury is not rendered harmless through a finding of guilt by the trial jury. *United States v. Navarro*, 608 F.3d 529, 539-40 (9th Cir. 2010) (finding Court's error in instructing the grand jury on the prosecutors' obligations was rendered harmless by a subsequent finding of guilt following trial, but noting that if "the error" had been "structural, it would not matter that the error was harmless, and we would reverse denial of the motion to dismiss without regard to whether Navarro's substantial rights had been affected").

Here, the evidence demonstrates that the government allowed the defendants to stand trial on an indictment they knew to be based, *at least partially*, on perjured incomplete and misleading testimony; testimony they had elicited from the FBI case agent at the grand jury; and which they suppressed until mid-trial. In addition, at least one of the two original prosecutors was responsible for inserting a false, material representation into the initial search warrant affidavit for the LMC premises. These instances of misconduct constitute due process violations necessitating dismissal.

**C.  Agent Guernsey's False Grand Jury Testimony Was Willful and Material.**

The perjured testimony to the grand jury came from the prosecutors' summary witness, Agent Guernsey, a critical witness to securing the FSI. Agent Guernsey summarized for the grand jury all of the evidence purportedly supporting the indictment, answered the grand jurors' questions and provided substantive evidence. She was the last witness to testify before the grand jury deliberated.

The government does not dispute that Agent Guernsey's grand jury testimony contains numerous "inaccuracies" or that her sworn statements contradicted her own

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

sworn affidavit or other evidence that was already in the government's possession. The government nonetheless downplays this misconduct, characterizing it as "a few instances in which Agent Guernsey made a slight misstatement or used poor word choice in summarizing several hundreds of pages of witness statements and several hundred thousand pages of documents." Response at 4:16-20. The facts belie this assertion.

*First*, it is undisputed that Agent Guernsey assured the grand jury that "as high as 90, 95 percent of the funds in the Grupo account are from Lindsey." This assurance was untrue. *See* Response at 5:1-6:9. It is also undisputed that Agent Guernsey's own prior sworn affidavit in connection with the Bluffview seizure warrant stated that no more than 71% of the "wire transfers and checks deposited" to the Grupo account came from LMC. This demonstrates that Agent Guernsey and the prosecutors knew her representations to the grand jury were false. *See* Trial Exhibit 2533 (Guernsey Bluffview Affidavit). Finally, it is undisputed that Agent Guernsey's fellow FBI agent, Dane Cosley, testified that the variance between Agent Guernsey's sworn affidavit and her grand jury testimony was "material." *See* April 29th Trial Trans. at 3244:16-25.

The prosecutors downplay this false testimony, pointing out that Agent Guernsey initially represented that "the majority of the funds" were from LMC, as opposed to "essentially" all funds. *See* Response at 5:18-27. That was not the grand jury testimony. Agent Guernsey clarified that, by "majority" she meant "as high as 90, 95 percent" and "pretty much all." *See* Exhibit C (Guernsey October 21, 2010 Trans.), at 68:25-69:9, 75:14-21. Moreover, she concluded her response by affirming the grand juror's basic understanding that "…there were essentially no other funds in that account other than those that came from Lindsey" with a "yes." *See* Exhibit C (Guernsey October 21, 2010 Trans.), at 75:14-21.

This false testimony was clearly significant to obtaining the FSI. It was made in response to the *last question* asked by a member of the grand jury. It established that the FBI case agent, based on her investigation, found that a substantial majority of *funds* in the account were Lindsey *funds*. Since the grand jury was never informed about the vast

9

sums of non-LMC money in the account, a fact known to Agent Guernsey and the government (much less about the alternative figure of 71%), it made it much easier for the grand jury to conclude that LMC funds were used to pay bribes.[6]

*Second*, it is undisputed that Agent Guernsey testified to the grand jury that the government's investigation "didn't find that [LMC] got any [contracts] with their other rep," despite having been provided subpoenaed documents, over seven months earlier, substantiating that LMC had secured numerous contracts with CFE prior to hiring Aguilar. *See* Exhibit C (Guernsey October 21, 2010 Trans.) at 34:20-24. The prosecutors downplay the seriousness of this misrepresentation, arguing that although she received the contracts in response to a grand jury subpoena, Agent Guernsey was "not aware of" the other documents "at the time of her grand jury testimony" and emphasizing that "the documents were in Spanish, a language Agent Guernsey does not know." *See* Response at 8:1-17.

This argument is, at best, spurious. The prior contracts with CFE were specifically requested by the government's January 2010 subpoena. They were personally delivered to Agent Guernsey. *See* Exhibit F (January 21, 2010 subpoena cover letter); Exhibit G (February 26, 2010 production cover letter). That they were in Spanish – contracts with a Mexican Company – was of course normal and to be expected. In fact, much of the evidence relied upon by the government in this case was in Spanish. Of course, even absent an understanding of Spanish, it is obvious from the face of the documents that they are contracts with CFE, and that they were from prior to LMC's retention of Grupo. *See* Trial Exhibits 2527-2531.

In any event, Agent Guernsey's testimony is demonstrably false for yet another reason: English language versions of nine separate CFE purchase orders predating LMC's retention of Grupo, with a total value of more than $8 million dollars, were also

---

[6] The evidence at trial showed that Agent Guernsey had traveled to the Global offices in Houston and interviewed Mr. Bustani and others about the Grupo account prior to her October 2010 grand jury testimony.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

1  produced to Agent Guernsey at the same time, pursuant to the same grand jury subpoena.

2  *See* Exhibit M (9 CFE purchase orders to LMC from 1991 to 2000).

3      *Third*, it is undisputed that Agent Guernsey falsely testified to the grand jury that

4  Mr. Lee admitted to FBI agents that "he didn't want to know" what Grupo was doing

5  with the 30 percent commission.  The prosecutors expressly concede that, contrary to

6  Agent Guernsey's sworn testimony to the grand jury, "Lee never said 'he didn't want to

7  know' what happened with the 30 percent commission."  *See* Response at 9:8-17.  Based

8  on the FBI 302 reports, the prosecutor questioning Agent Guernsey knew her testimony

9  was false and chose not to correct it.  The Response nevertheless maintains that "the

10 grand jury was never left with the impression that LEE had known or had assumed that

11 the 30 percent commission was being used to pay bribes."  *See* Response at 10:13-15.

12     This does not make sense.  If the grand jury was *not* given the impression that Mr.

13 Lee knew about the alleged bribes, there would be no basis for them to return an

14 indictment against Mr. Lee for violating the FCPA.  Indeed, none of the other evidence

15 cited by the Response papers to "establish [Mr. Lee's] involvement in the charged

16 crimes" concerns the specific issue of Mr. Lee's knowledge about how Mr. Aguilar was

17 using LMC's payments to Grupo.  *See* Response at 10:18-11:16.   Obviously, the false

18 testimony about Mr. Lee admitting that he "didn't want to know" what Mr. Aguilar was

19 doing with his commission was material, as it provided a key basis for the jury to

20 mistakenly conclude that Mr. Lee was aware of something amiss with Mr. Aguilar's use

21 of LMC's payments.  Again, these instances of false testimony resulted in a deprivation

22 of the defendants' due process right to a fair and impartial grand jury proceeding.

23     *Fourth*, it is undisputed that Agent Guernsey's falsely testified that (1) she did

24 "know why" the representation agreement between Grupo and LMC was made in 2006,

25 (2) that the agreement was "in response . . . to an IRS audit of Lindsey Manufacturing's

26 account practices" and "the 30 percent commission," and (3) that the purpose of

27 preparing the agreement was to provide some "documentation" justifying its payments to

28 Grupo.  *See* Exhibit B (Guernsey Sept. 8, 2010 Trans. at 80:10-20).  Despite admitting to

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

the "inaccuracies," the prosecutors maintain that "Agent Guernsey was not trying to falsely represent to the grand jury that LMC had committed a tax crime." *See* Response at 21:13-16.

But if Agent Guernsey had been honest with the grand jury, she would have told it the truth: she *did not know* why the agreement was made in 2006. Instead, she testified falsely about her own knowledge, seemingly based on the FBI's investigation of LMC, and fabricated a reason for the timing of the agreement that portrayed the defendants in the worst possible light -- engaging in a deceitful act with regard to the very payments at issue in the indictment. This testimony was also key to obtaining the indictment.

*Fifth*, it is undisputed that Agent Guernsey falsely testified about LMC's reclassification of a Grupo invoice on its ledger in August 2006. Agent Guernsey represented to the grand jury that "in '05 or '06 [LMC was] audited by the IRS," and "all of a sudden" Steve Lee instructed LMC's bookkeeper "to reclassify the [Grupo] commission" and "split it out" with 15% to commission and 15% to other services. Agent Guernsey represented that Mr. Lee "did that with any of the commissions that had been submitted or the bills that had been submitted by Grupo up to that point." She then drove home the impression that this was done for the specific purpose of deceiving the IRS, testifying that once "all the documents [were] reclassified," they "were turned over to their accountant for the IRS audit." *See* Exhibit C (Agent Guernsey Oct. 21, 2010 Trans. at 29:24-31:21).

Acknowledging that this testimony was inaccurate, the prosecutors admit that the reclassification pertained to only a single invoice; Mr. Lee "did not instruct [the bookkeeper] to reclassify the entries 'up to that point.'" In addition, this single instance of reclassification was not done in response to, nor did it relate to, an IRS audit. *See* Response at 23:19-24, 21:5-16. The Response nevertheless argues that this false testimony was immaterial, because Agent Guernsey's intention was simply to show that Mr. Lee made the decision to split up the payment to Grupo "even though he knew the commission was, in fact, 30 percent." *See* Response at 23:24-24:6. But this is also

12

untrue. It is well documented that, from the outset of the retention of Grupo, Mr. Aguilar directed that half the fees invoiced by Grupo represented commissions and half pertained to outside services. *See* Exhibit N (Aguilar e-mail attaching first invoices). As such, Mr. Lee's request was simply that the ledger reflect how Grupo directed that its fees be broken down.

Furthermore, the government's Response does not even attempt to address the fact that Agent Guernsey took great pains to falsely portray the misclassification as an attempt to conceal the commissions from an IRS audit. *See* Response at 23:9-25:24. This was not only false, but highly prejudicial, as it again suggested a willful attempt by Mr. Lee and LMC to deceive the tax authorities with regard to the payments at issue in the FSI.

The acknowledged false testimony detailed above, as well as the many other misrepresentations by Agent Guernsey set forth in Defendants' moving papers, were not isolated instances of a "slight misstatement" or "poor word choice," as the government argues. Agent Guernsey's testimony was riddled with false representations and omissions to state key facts. Moreover, these falsities did not concern minor or tangential issues. They concerned key issues to be decided by the grand jury, including the defendants' knowledge, the existence of an intent to deceive, as well as the funding of the purported bribe payments. As such, there is no room for doubt that the false testimony "substantially influenced" the grand jury's decision to indict or, at the very least," posed "grave doubt" as to whether that decision was tainted.

### D. The Prosecutors' Decision to Conceal the False Grand Jury Testimony, Rather Than Disclose and Rectify It, Violated Defendants' Rights to Due Process.

"Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel – and, if the perjury be material, also the grand jury – in order that appropriate action be taken." *Basurto*, 497 F.2d at 785-86; *see also United States v. Samango*, 607 F.2d 877, 884 n.8

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

(9th Cir. 1979) ("If evidence exists . . . which casts serious doubt on the credibility of testimony which the jurors are asked to rely upon in finding an indictment, the prosecutor has an ethical duty to bring it to their attention." )

Here, the prosecutors knew well before trial about Agent Guernsey's false testimony to the grand jury. Indeed, based on the search warrant affidavits Agent Guernsey had previously signed, the FBI 302 report of Steve Lee's interview, and other documents already in the government's possession, the prosecutors knew that Agent Guernsey's statements were false at the time they were made to the grand jury. Despite the clear directives of the Ninth Circuit, the prosecutors did not reveal the known falsities in the Guernsey testimony to the grand jury, to the defense or the Court. Agent Guernsey's grand jury testimony was only produced mid-trial after numerous requests by the defense and when ordered by the Court. By then, jeopardy had attached, the trial was well underway and several government witnesses had testified.

The prosecutors do not dispute their failure to disclose Agent Guernsey's testimony. Instead, they argue that such concealment does not warrant dismissal under a *Brady v. Maryland*, 487 U.S. 250 (1988). In an apparent effort to convince the Court to rely upon a lesser standard, the government then argues there was insufficient prejudice to the defendants' *at trial* from the delayed production of Agent Guernsey's grand jury testimony. But the *Brady* analysis is separate from whether the failure to disclose and rectify the perjured testimony before the *grand jury* necessitates dismissal under the Ninth Circuit's holding in *Basurto*. Other than mentioning *Basurto* in passing (Response at p. 2), the government simply does not address the *Basurto* issue.

As detailed in defendants' moving papers, in *Basurto* the Ninth Circuit reversed a conviction because the prosecution allowed the defendants to stand trial on an indictment that prosecutors knew was based, in part, on perjured testimony. 497 F.2d at 785-86. However, in *Basurto*, the defense was informed of the perjured testimony by the prosecution well before trial. In addition, the government informed the jury about the perjured testimony at the outset of the trial. *Id.* at 784. The Ninth Circuit nonetheless

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

reversed Basurto's conviction, reasoning that due process required that the defendants not be required to stand trial on an indictment secured through perjury: "[T]he Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached." *Id.* at 786. But, despite *Basurto*, that is exactly what happened here. Accordingly, pursuant to *Basurto*, the FSI must be dismissed.

### E.    The Prosecutors' Fabrication of Evidence to Secure Search Warrants Violated Due Process.

It is not disputed that co-case agent Agent Binder's November 14, 2008 search warrant affidavit (and several other affidavits, including one by Agent Guernsey) falsely stated that LMC had made deposits to Mr. Aguilar's Sorvill account. At the Franks hearing, Agent Binder revealed that the false representations in her affidavit concerning LMC making deposits to the Sorvill account were inserted into the November 14, 2008 affidavit by the *prosecutors*. Her testimony revealed that the prosecutors did not even consult her before inserting this false representation, did not seek to confirm the veracity of this fact with her before inserting it, and never brought the insertion to her attention. *See* Exhibit I (March 23, 2011 Trans.), at 13:6-23, 15:3-14, 58:22-59:1. She claimed not to have even known of it when she attested to the truth of her affidavit. This false statement about LMC making deposits to Sorvill was repeated in later search warrant and seizure affidavits by both Agent Binder and Agent Guernsey, as well as IRS Special Agent Mendoza. *See, e.g.,* Trial Exhibit 2533 (marked for identification only) at ¶ 13.

The prosecutors do not dispute that they caused this false evidence to be inserted into the initial search warrant affidavit, which bore the initials of the lead prosecutor in this case (or into the other affidavits). It provided the basis for the introduction of the highly prejudicial ABB conduct into the affidavit. The evidence in the government's possession prior to the preparation and execution of the initial search warrant affidavit disproved this allegation.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

The prosecutors' insertion of false evidence into search and seizure warrants "is so grossly shocking and so outrageous as to violate the universal sense of justice. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). Such misconduct necessitates dismissal of the FSI. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.")

## III   DISMISSAL IS ALSO WARRANTED UNDER THE COURT'S SUPERVISORY POWERS

As the government's Response acknowledges, even absent a due process violation, prosecutorial misconduct can still warrant a dismissal under the Court's supervisory powers, so long as the misconduct is both "flagrant" and "prejudicial." *See* Response at 2:20-3:5; *United States v. Chapman*, 524 F.3d 1073, 1081 (9th Cir. 2008). The prosecutors argue that this standard is not met here, because each of the alleged instances of misconduct, standing alone, was not sufficiently prejudicial to warrant dismissal.

However, when the misconduct is not confined to a single instance, the "cumulative effect" of the misconduct can warrant dismissal. *See Berger v. United States*, 295 U.S. 78, 89 (1935) ("[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probably cumulative effect upon the jury which cannot be disregarded as inconsequential."); *Welchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) ("although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors" may establish sufficient prejudice); *United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999) (holding that "the cumulative effect of [the prosecutor's] errors, when viewed in the context of the entire trial, compels a reversal"); *Locken v. United States*, 383 F.2d 340, 340 (9th Cir. 1967) (holding that, while no single act of misconduct on part of the

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

1  prosecution would warrant reversal, the cumulative effect of the misconduct necessitated
2  setting aside the conviction).

3  In this case, the misconduct was not simply limited to the presentation of false
4  testimony to the grand jury or the insertion of false evidence into search warrant
5  affidavits. As detailed in the moving papers, it also included efforts by the prosecutors to
6  conceal this misconduct, the withholding of *Jencks* and *Brady* material until after the
7  government's case-in-chief, and misrepresentations to the court regarding compliance
8  with discovery obligations.

9  On April 7, 2011, in response to issues of discovery compliance, the prosecution
10 assured this Court that it had conducted a "top-to-bottom review of discovery that's been
11 turned over and what we're required to turn over" and confirmed "[w]e have done what
12 we believe not only meets our obligation, but exceeds it." *See* April 7, 2010 Trial Trans.
13 at 880-881.

14 That assurance was made when the prosecution was still concealing Agent
15 Guernsey's patently false grand jury testimony from the defense. The complete
16 Guernsey transcript was not disclosed for another week – on April 15th. By that time
17 several key witnesses, such as Richard Serocki, Eduardo Bustani, Jose Zavaleta, Sergio
18 Cortez and Mindy Kwok, had already completed their testimony. Much of the false
19 testimony by Agent Guernsey concerned information within the personal knowledge of
20 Mr. Serocki, Mr. Bustani, Mr. Cortez and Ms. Kwok. Had the defense known about
21 Agent Guernsey's false testimony to the grand jury at the time these witnesses testified,
22 they could have laid the groundwork for discrediting Agent Guernsey before she took the
23 stand.

24 Similarly, at the time of the prosecutors' April 7th assurances of full discovery
25 compliance, the prosecutors were still withholding other witness (FBI 302) statements.
26 *See* Response at 31:6-17. The withheld discovery, produced only after the close of the
27 government's case-in-chief on May 3 2011, included a statement by Fernando M.
28 Basurto, *a witness who testified the same day the prosecutors falsely assured the Court of*

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

1  *their discovery compliance.*  *See* Exhibit K.  The withheld discovery also included a
2  statement by a former LMC employee, Patrick Rowan, confirming that LMC had
3  difficulty securing contracts with CFE from 2001 to 2005.  This time period
4  corresponded with the first four years of LMC's retention of Grupo and *undermined the*
5  *prosecution's argument that things changed promptly* upon hiring Grupo.  On the other
6  hand, this undisclosed witness would have helped corroborate that Hurricane Wilma in
7  2005, as opposed to any alleged *corrupt payments*, ultimately caused the increase of
8  LMC's business with CFE.

9        The demonstrated falsity of the prosecutors' previous assertions of full compliance
10  with discovery begs the question of what other evidence helpful to the defense was never
11  disclosed.  *See United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) ("[T]he
12  failure to produce documents and to record what had or had not been disclosed, along
13  with the affirmative misrepresentations to the Court of full compliance, support the
14  district court's finding of flagrant prosecutorial misconduct, even if the documents
15  themselves were not intentionally withheld from the defense.")

16        Given that the prosecutorial misconduct in this case was by no means isolated to a
17  single incident, but was pronounced and persistent throughout the course of the
18  investigation, prosecution and trial of this case, the "cumulative effect" of this substantial
19  and sustained misconduct was more than sufficient to meet the "substantial prejudice"
20  threshold necessary to justify dismissal of the FSI under the Court's supervisory powers.
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT

## IV      CONCLUSION

For the reasons discussed above and in the Defendants' moving papers, the FSI should be dismissed.

DATED:  June 17, 2011              Respectfully submitted,

JAN L. HANDZLIK
GREENBERG TRAURIG LLP


 /s/ Jan L. Handzlik
By:  JAN L. HANDZLIK
Attorney for Defendants
Lindsey Manufacturing Company &
Keith E. Lindsey


DATED:  June 17, 2011              Respectfully submitted,

JANET I. LEVINE
CROWELL & MORING LLP


 /s/Janet I. Levine
By:  JANET I. LEVINE
Attorneys for Defendant
Steve K. Lee

19

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT