Jan L. Handzlik (State Bar No. 47959)
GREENBERG TRAURIG LLP
2450 Colorado Avenue, Suite 400 East
Santa Monica, California  90404
Telephone: (310) 586-6542
Fax: (310) 586-0542
Email: handzlikj@gtlaw.com

Attorneys for Defendants Lindsey Manufacturing
Company and Keith E. Lindsey

Janet Levine (State Bar No. 94255)
Martinique Busino (State Bar No. 270795)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California  90071
Telephone: (213) 622-4750
Fax: (213) 622-2690
Email: jlevine@crowell.com
        mbusino@crowell.com

Attorneys for Defendant Steve K. Lee

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>          v.<br><br>ENRIQUE FAUSTINO AGUILAR NORIEGA, ANGELA MARIA GOMEZ AGUILAR, LINDSEY MANUFACTURING COMPANY, KEITH E. LINDSEY, and STEVE K. LEE,<br><br>                     Defendants. | Case No. CR 10-1031(A)-AHM<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT; DECLARATIONS OF ALAIN BRUNELLE, JANET I. LEVINE, AND MARTINIQUE E. BUSINO; EXHIBITS**<br><br>Date:      September 8, 2011<br>Time:      3:00 p.m.<br>Judge:     Hon. A. Howard Matz |

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES..........................................2

I.   INTRODUCTION ........................................................................................2

II.  SUMMARY OF ARGUMENT ....................................................................2

III. THE PENDING MOTION TO DISMISS FOR GOVERNMENT
     MISCONDUCT............................................................................................5

IV.  THE COURT REPEATEDLY EXPRESSED CONCERN WITH THE
     GOVERNMENT'S ACTIONS, BOTH BEFORE AND DURING
     TRIAL .......................................................................................................11

V.   SUMMARY OF INSTANCES OF GOVERNMENT
     MISCONDUCT..........................................................................................23

     A.   Instances Discussed in the Motion to Dismiss...................................23

     B.   Other Instances of Government Misconduct ......................................25

VI.  GOVERNMENT MISCONDUCT PERMEATES THIS CASE...............28

     A.   The Investigation, Including The Drafting And Execution Of The
          Affidavits In Support Of The Search And Seizure Warrants And The
          Presentation To Both Of The Grand Juries, Was Permeated With
          Misconduct.........................................................................................29

          1.   The Searches ..............................................................................29

               a.   The False Sorvill Statement ........................................29

               b.   The ESI Search.............................................................31

          2.   The Grand Jury ..........................................................................33

     B.   The Government's Discovery And *Brady* Abuses Were
          Misconduct.........................................................................................35

     C.   The Government's Intent To Shield Its Investigation From The
          Light of Day And Its Actions Doing So Are Misconduct ...............37

D.   Presenting Special Agent Dane Costley As A Summary
Witness Was Misconduct..................................................................39

E.   The Prosecution's Introduction Of ABB's Criminal Conduct –
And Attempt To Present A "Pattern Of Bribery" – Despite The
Court's Pretrial Ruling Excluding The Evidence And The
Prosecution's Jury Argument Highlighting The Stricken
ABB Evidence Was Misconduct ......................................................44

F.   The Government's Conduct As It Relates To Jean Guy LaMarche
Was Improper, From Beginning To End .........................................46

G.   The Government Played Games With Its Witness List ...................49

H.   The Government Committed Misconduct in its Closing
Argument By Expressly Urging The Jury To Convict Based On
A Willful Blindness Theory of Knowledge, Even Though The
Court had Rejected Such An Invitation ...........................................50

VII.   THE PERVASIVE GOVERNMENT MISCONDUCT
NECESSITATES DISMISSAL OF THE INDICTMENT .......................53

A.   The Cumulative Effect Of Government Misconduct Throughout
The Investigation, Discovery And Trial Phases Of This Case
Warrants Dismissal ........................................................................54

1.   The Misconduct Was Flagrant.............................................54

2.   The Misconduct Caused Substantial Prejudice .....................58

B.   Allowing The Defendants To Stand Trial On An Indictment
Knowingly Secured, In Part, By Material False Testimony Violates
Due Process ....................................................................................61

VIII.   THE INDICTMENT SHOULD BE DISMISSED WITH PREJUDICE....62

IX.   CONCLUSION ......................................................................................63

DECLARATION OF ALAIN BRUNELLE .......................................................64

DECLARATION OF JANET I. LEVINE.............................................................67

1

DECLARATION OF MARTINIQUE E. BUSINO ............................................. 69

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

iii

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
TO DISMISS INDICTMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ........................................................................ 61

*Benn v. Lambert*,
    283 F.3d 1040 (9th Cir. 2002) ....................................................... 35

*Berger v. United States*,
    295 U.S. 78 (1935) .......................................................... 4, 28, 59

*Brady v. Maryland*,
    373 U.S. 83 (1963) ........................................................................ 5

*Bullcoming v. New Mexico*,
    131 S. Ct. 2705 (2011) ............................................................. 39, 43

*Franks v. Delaware*
    438 U.S. 154 (1978) ...................................................................... 31

*Hein v. Sullivan*,
    601 F.3d 897 (9th Cir. 2010) ......................................................... 59

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ...................................................................... 38

*Rochin v. California*,
    342 U.S. 165 (1952) ...................................................................... 53

*Strickler v. Green*,
    527 U.S. 263 (1999) ...................................................................... 28

*United States v. ABB Inc.*,
    No. 10-CR-664 (S.D. Tex.) ............................................................ 44

*United States v. ABB Ltd-Jordan*,
    No. 10-CR-665 (S.D. Tex.) ............................................................ 44

*United States v. Baker*,
    10 F.3d 1374 (9th Cir. 1993) ......................................................... 43

*United States v. Basurto,*
    497 F.2d 781 (9th Cir. 1974) ..................................................................... 62

*United States v. Basurto,*
    No. 09-CR-325 (S.D. Tex.) ................................................................. 27, 44

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ................................................. 53, 54, 56, 57

*United States v. Dionisio,*
    410 U.S. 1 (1973) ...................................................................................... 61

*United States v. Fitzgerald,*
    615 F. Supp. 2d 1156 (S.D. Cal. 2009) ........................................ 54, 57, 62

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir. 1996) ..................................................................... 60

*United States v. Gaitan–Acevedo,*
    148 F.3d 577 (6th Cir. 1998) ..................................................................... 43

*United States v. Hector,*
    No. CR 04-00860 DDP, 2008 WL 2025069 (C.D. Cal. May 8, 2008) ............. 59

*United States v. Kojoyan,*
    8 F.3d 1315 (9th Cir. 1993) ......................................................... 2, 4, 62, 63

*United States v. Leung*
    351 F. Supp. 2d 992 (C.D. Cal. 2005) .................................................. 4, 48

*United States v. Navarro,*
    608 F.3d 529 (9th Cir. 2010) ..................................................................... 61

*United States v. Norton,*
    867 F.2d 1354 (11th Cir. 1989) ................................................................. 43

*United States v. O'Shea,*
    No. 09-CR-629 (S.D. Tex.) .................................................................. passim

*United States v. Olano,*
    62 F.3d 1180 (9th Cir. 1995) ..................................................................... 43

*United States v. Price,*
    566 F.3d 900 (9th Cir. 2009) ..................................................................... 35

*United States v. Radseck,*
   718 F.2d 233 (7th Cir. 1983) ............................................................. 43

*United States v. Renzi,*
   722 F. Supp. 2d 1100 (D. Ariz. 2010) ............................................... 54

*United States v. Ross,*
   372 F.3d 1097 (9th Cir. 2004) ........................................... 53, 54, 58, 59

*United States v. Sanchez,*
   176 F.3d 1214 (9th Cir. 1999) ...................................................... 59, 60

*United States v. Struckman,*
   611 F.3d 560 (9th Cir. 2010) ............................................................ 53

*United States v. Tamura,*
   694 F.2d 591 (9th Cir. 1982) ................................................ 28, 31, 32, 55

*United States v. Wainwright,*
   351 F.3d 816 (8th Cir. 2003) ............................................................ 43

*Wood v. Georgia,*
   370 U.S. 375 (1962) ......................................................................... 61

**STATUTES**

18 U.S.C. § 3144 ...................................................................................... 47

**OTHER AUTHORITIES**

Fed. R. Crim. P. 15 ................................................................. 18, 47, 48, 50

Joseph M. McLaughlin, et al., *Weinstein's Federal Evidence* § 1006.04[3]
   (2011) ................................................................................................ 39

U.S. Const. amend. V. .............................................................................. 61

1    Defendants Lindsey Manufacturing Company ("LMC"), Keith E. Lindsey
2  and Steve K. Lee ("Lindsey-Lee Defendants"), by their counsel of record, submit
3  this Supplemental Brief in Support of their Motion to Dismiss the Indictment With
4  Prejudice Due to Repeated and Intentional Government Misconduct.
5    This Supplemental Brief is based on the accompanying Memorandum of
6  Points and Authorities, the declarations of Alain Brunelle, Janet I. Levine, and
7  Martinique E. Busino, exhibits, all files and records in this case, and any such
8  arguments and evidence as may be presented at or before the hearing on this
9  pending motion.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

On June 27, 2011 counsel appeared on the previously filed Motion to Dismiss the Indictment With Prejudice Due to Repeated and Intentional Government Misconduct ("Motion to Dismiss" or "Motion").  Remarkably, as set forth below, that day the prosecutors revealed that they had not complied with the Jencks Act and orders of this Court, and had not produced the complete grand jury testimony of Special Agent Susan Guernsey to the defendants.  This continuing nondisclosure clearly troubled the Court ("this disclosure is very troubling," June 27, 2011, RT at 26:25 – 27:1).  The Court stated:  "I don't know if there was a stench that developed in this case, but there was a bad odor at times. . . ."  June 27, 2011, RT at 28:16-17.  After listing many things it found troubling, the Court asked the parties to address the prosecutorial misconduct issue in more detail in supplemental pleadings, and specifically to address whether "the whole being greater than the sum of its parts justifies throwing out this conviction, because a lot of the parts that led up to this conviction are extremely troublesome."  June 27, 2011, RT at 29:4-6.

Without rearguing each motion, repeating each interchange, or detailing the testimony of each court day, and cognizant of the Court's dislike of sensationalized pleadings and oratory, the following is submitted.

## II.   SUMMARY OF ARGUMENT

The investigation and prosecution of this case were permeated with instances of purposeful, prejudicial government misconduct.  The government's misconduct was patent and pervasive, designed to win the case, not do justice.  *United States v. Kojoyan*, 8 F.3d 1315, 1323 (9th Cir. 1993) ("The prosecutor's job isn't just to win, but to win fairly, staying well within the rules.").  Despite repeated criticism by the Court, which gave the government numerous opportunities to live up to its obligations, the misconduct continued through closing arguments and even into the

1    hearing on the Lindsey-Lee Defendants' Motion to Dismiss.

2        Based on the information thus far available to the defense, the government's

3    misconduct:

4        -    began with the preparation of the affidavit for the first search warrant,

5    a warrant obtained on November 14, 2008 and executed on the Lindsey

6    Manufacturing Company premises on November 20, 2008;

7        -    continued during the search that day;

8        -    extended to subsequent affidavits in support of search warrants and

9    seizure warrants, including seizure warrants obtained as recently as October 2010;

10       -    infected the manner in which electronically stored evidence was

11   seized, handled, and reviewed;

12       -    fatally contaminated the presentation of this case to two grand juries in

13   this District, most particularly the grand jury that indicted the Lindsey-Lee

14   Defendants based on the flagrantly false and material testimony of FBI Special

15   Agent Susan Guernsey;

16       -    was compounded by the government's purposeful concealment of the

17   Guernsey testimony and other material matters from scrutiny, as it sought to

18   prevent the defense from putting "the investigation on trial.";[1]

19       -    was demonstrated by the government's deliberate preparation and

20   production of a carefully redacted version of Agent Guernsey's grand jury

21   testimony to defense counsel in connection with Keith Lindsey's Miranda motion;

22       -    is reflected in the purposefully late and incomplete production of

23   discovery, especially *Brady, Giglio,* and *Henthorn* materials;

24       -    is evidenced by the government's repeated misrepresentations to the

25   Court and defense counsel as to the state of discovery, including repeated assertions

26   that the government had met and exceeded its discovery obligations;

27

28

---

[1]    *See* April 15, 2011, RT at 1697:22-23

1        -        is further established by the government's presentation of evidence at

2    trial, including evidence excluded by the Court, such as references to the

3    Basurto/ABB evidence;

4        -        is reflected in the government's strategic misuse of witness lists

5    designed to deceive the defense as to the witnesses it would call, such as CFE

6    executives and Mr. LaMarche;

7        -        is shown by the continual misuse of the LaMarche evidence;

8        -        is further demonstrated by the use of a patently unqualified FBI agent

9    as a "summary" witness, who turned out not to be a summary witness at all, and the

10   government's misrepresentations to the Court about this witness;

11       -        and was capped off by the government's prejudicial and improper

12   summation, including arguing to the jury that it should convict based on willful

13   blindness and deliberate ignorance theory, despite the Court's explicit rejection of

14   an instruction on this prosecution theory; and

15       -        included a closing argument in which the government referenced and

16   misused the stricken Basurto/ABB evidence and continued to misuse the LaMarche

17   evidence.

18       Every aspect of this case was infected by purposeful prosecutorial

19   misconduct – conduct that did not comply with the law and was contrary to orders

20   of this Court.  *Kojoyan*, 8 F.3d at 1325 ("Prosecutors are subject to constraints and

21   responsibilities that don't apply to other lawyers.") (*citing Berger v. United States*,

22   295 U.S. 78, 88 (1935)); *see also United States v. Leung* 351 F. Supp. 2d 992, 998

23   (C.D. Cal. 2005) (A prosecutor's job "is to serve truth and justice, and assure that

24   those accused are given a fair trial.")  The misconduct included representations by

25   the government that were purposefully false or incomplete – misrepresentations that

26   continued through the June 27 hearing on this misconduct motion.  While some

27   instances of the government's misconduct standing alone are enough to warrant

28   dismissal, the cumulative impact of this prejudicial behavior on the Lindsey-Lee

1   Defendants' rights to a fair grand jury hearing and trial was devastating and
2   compels the relief sought.

3   **III.    THE PENDING MOTION TO DISMISS FOR GOVERNMENT**
4   **        MISCONDUCT**

5          On Monday, May 9, 2011 the jury retired to deliberate.  *See* Minutes of Jury
6   Trial, May 9, 2011, Docket Entry 506.  The Lindsey-Lee Defendants filed their
7   Motion to Dismiss that day.  *See* Motion to Dismiss, May 9, 2011, Docket Entry
8   505.  The verdict was returned on May 10, 2011.

9          The Motion to Dismiss sets forth several (although clearly not all) instances
10  of prosecutorial misconduct, including:

11         • That Agent Guernsey's grand jury testimony was permeated with false
12            statements;
13         • That the affidavits supporting search and seizure warrants contained
14            false sworn statements by the case agents claiming that several large
15            payments had been made by Lindsey Manufacturing Company to
16            Sorvill International, SA;
17         • That the prosecution had failed to meet its obligations under *Brady v.*
18            *Maryland*, 373 U.S. 83 (1963), and its progeny.

19         The primary focus of the Motion to Dismiss was on Agent Guernsey's
20  September 8, September 15 and October 21, 2010 grand jury testimony.  The

21
22
23
24
25
26
27
28

1   Motion detailed her material false statements to the grand jury.[2]  The Motion to

2   Dismiss also examined the prosecutors' roles in presenting this testimony to the

3   grand jury, and then concealing it for as long as possible from the defense.

4        The government filed an opposition to the Motion on June 6, 2011.  The

5   opposition took a "point-by-point" approach to the false statements discussed in the

6   Motion, attempting to minimize Agent Guernsey's false testimony by isolating each

7   false statement, while never examining the impact of the totality of the falsehoods

8   and of Guernsey's misconduct.  The opposition also failed to address the

9   prosecutors' obligations to the Court, the defendants, and the grand jury as a result

10  of this pervasive false testimony by their case agent, nor did it explain their decision

11  to shield this testimony from the light of day.

12       The defense filed its reply brief on June 17, 2011.

13       On June 27, 2011, the day of the hearing on the Motion, the government

14  disclosed **_for the first time_** that Agent Guernsey testified to the grand jury a fourth

15  time – on October 14, 2010.

16       In a pleading captioned "Notice of Grand Jury Testimony," the government

17  provided defense counsel and the Court with Agent Guernsey's previously

18  undisclosed testimony.  June 27, 2011, Docket Entry 616.  The government also

19  provided the prosecutors' comments to the grand jury to defense counsel.

20  Significantly, both of the lead prosecutors on this case, Douglas M. Miller and

---

21  [2]     The defense sought Agent Guernsey's grand jury testimony both formally

22  and informally.  The government refused to produce that.  _See_ Motion to Dismiss,
    May 9, 2011, Docket Entry 505, at pp. 2-3.  The Court ordered the government to

23  produce Agent Guernsey's grand jury testimony _in camera_ on January 27, 2011.  _In

24  Camera_ Filing of Susan Guernsey's Grand Jury Testimony, January 27, 2011,
    Docket Entry 155.  The government produced three days of testimony to the Court,

25  September 8, 15, and October 21, 2010.  The Court ordered the testimony disclosed

26  to defense counsel, mid-trial, on April 15, 2011.  April 15, 2011, RT at 1698:11 –
    1699:13.  Neither the Court nor defense counsel received the October 14, 2010

27  Guernsey testimony until June 27, 2011.

28

1    Nicola J. Mrazek, took the testimony of Agent Guernsey on October 14, 2010.  This

2    was the first day of testimony to the grand jury that returned the First Superseding

3    Indictment – the only indictment against the Lindsey-Lee Defendants.  This grand

4    jury met **only two** days, October 14 and October 21, 2010, and heard from only two

5    witnesses, Special Agent Guernsey and LMC employee Philip Spillane.[3]  Agent

6    Guernsey testified **both** days.

7         Both Mr. Miller and Ms. Mrazek were present for the June 27 hearing.  The

8    Court asked the prosecution to explain why it had not previously disclosed this

9    testimony, as it had been ordered to do.  In explanation, Mr. Miller, the government

10   counsel who produced the grand jury testimony, stated that this was not "done

11   intentionally," but was simply "an oversight."  June 27, 2011, RT at 10:3-4.

12        The Court stated that it was "shocked" and inquired further.  June 27, 2011,

13   RT at 10:14.

14        Ms. Mrazek, government counsel responsible for preparing and presenting

15   Special Agent Guernsey at trial, represented that she had not intentionally withheld

16   the testimony.  Rather, she said she had forgotten about it.[4]  June 27, 2011, RT at

17   14:5-24.

18        In elaborating on her "explanation," Ms. Mrazek represented that the

19   government "didn't intend" to call Agent Guernsey to testify at trial, and that the

20   decision to call Agent Guernsey as a witness was only made midway through the

21   trial.  June 27, 2011, RT at 16:18-20.[5]  In a remarkable explanation that seeks to

---

22   [3]    Mr. Spillane's testimony is not pertinent to the issues raised in the Motion or
23   this Supplemental Brief.

24   [4]    Both Ms. Mrazek and Mr. Miller have been assigned to this matter for
     several years:  Ms. Mrazek since at least 2007 and Mr. Miller since at least 2008.
25   *See* Declaration of Janet I. Levine ("Levine Decl.") at ¶ 2.

26   [5]    This explanation avoided and failed to address the fact that the government
27   had intentionally withheld Agent Guernsey's false testimony and the government's
     clear obligation under *Brady v. Maryland* to disclose this testimony.

28

shift blame to the defense, Ms. Mrazek further explained that Agent Guernsey was called as a witness only "because the defendants would not agree to the authenticity of their subpoenaed records and so [the government] had to have a witness to testify to that and [the government] needed a witness for the last part of the chain of custody for the search warrant documents because [the defense] wouldn't agree to their admission." June 27, 2011, RT at 16:20-25.

Inexplicably and inaccurately, Ms. Mrazek then represented to the Court that Agent Guernsey "was always on our witness list." June 27, 2011, RT at 17:4-5.[6]

The Court verbalized its concern over the government's failure to produce this grand jury transcript. In doing so, the Court set forth many examples of what it recalled was "troubling" conduct the prosecution.

The Court stated:

> I think this question of whether or not the right of any or both or all three of the remaining defendants to due process was violated, and if so, what remedy has to be perceived – not perceived but has to be briefed and addressed in a broader context. I've already read all of the briefs. I read a lot of cases. I had certain conclusions I had drawn, but I'm going to recite just randomly and anecdotally – because I just had a post note that I occasionally generated and kept during the

---

[6]    As the February 15, 2011 witness list (Docket Entry 202, filed Under Seal), the February 28, 2022 witness list (Docket Entry 208), the March 31, 2011 letter from Mr. Miller regarding trial witnesses (Exhibit A), and the March 31, 2011 government witness direct examination time estimate sheet (Exhibit B) reflect, Agent Guernsey was not on the government's witness list. In fact, Ms. Mrazek told defense counsel on January 3, 2011 that Agent Guernsey was not going to be called as a trial witness **because** she testified at the grand jury. *See* Declaration of Jan L. Handzlik In Support of Motion to Dismiss, May 9, 2011, Docket Entry 505, at ¶¶ 6-7. In fact, given the government's representation that it would produce all witness statements and Jencks material well in advance of trial, had Agent Guernsey been on the witness list, her grand jury testimony should have been produced well before trial. Clearly, it was to avoid having to produce this material as Jencks statements that Agent Guernsey was kept off the lists. *See* Motion to Dismiss, May 9, 2011, Docket Entry 505, at p. 3.

course of the trial – to things that I found troubling, that sometimes were the subject of requests or rulings – and by no means is this inclusive – that suggests to me that the at best extraordinarily sloppy investigation and prosecution of this case – at best – needs to be assessed fully in order to determine whether the defendants' rights were violated.

June 27, 2011, RT at 25:21 – 26:10.

The Court provided "a brief anecdotal list," noting:

- "[T]he government searched two buildings without a search warrant." June 27, 2011, RT at 27:8-9. *See also* Motion to Suppress Evidence Seized as a Result of Warrantless Searches (Suppression Motion Two), February 28, 2011, Docket Entry 210.

- "[T]he government obtained emails of Angela Aguilar while [she was] in [the] MDC that were unauthorized . . ." June 27, 2011, RT at 27:9-11. *See infra* Section IV, pp. 13-14 (March 29, 2011 Hearing); *see also* Motion *In Limine* to Exclude Evidence of Recorded Statements Taken of Angela Maria Gomez Aguilar, March 17, 2011, Docket Entry 279; Motion to Dismiss the First Superseding Indictment Based on Prosecutorial Misconduct in Violating Attorney-Client and Marital Privileges, March 24, 2011, Docket Entry 344.

- "[T]he government played games with the inclusion or absence of Mr. Costley on the witness list." June 27, 2011, RT at 27:11-13. *See also* Joint Response to Court Order # 248, March 11, 2011, Docket Entry 262.

- Laura Garza's failure to make timely entries in her notary book, of which the

government was aware.[7]  June 27, 2011, RT at 27:15-18.  *See also* April 14, 2011, RT at 1515:16 – 1526:18; 1528:18 – 1532:15.

- Agent Guernsey's grand jury and trial testimony.[8]  June 27, 2011, RT at 27:19 – 28:7.  *See also* Grand Jury Testimony:  September 8 and 15, 2010 and October 14 and 21, 2010; Trial Testimony:  April 20, 2011, at RT 2260:12 – 2305:1; April 22, 2011, at RT 2378:24 – 2536:18; 2546:9 – 2600:18; April 26, 2011, at RT 2613:17 – 2673:8; 2685:8 – 2810:15.

- "The government constantly came in with all kinds of belated requests to fill [evidentiary] gaps that it had failed to address," such as recalling Patricia Alma Cerdan Saavedra as a witness.  June 27, 2011, RT at 28:8-12.  *See also* April 14, 2011, RT at 1684:21 – 1685:15; 1686:10 – 1688:1; 1688:22 – 1689:9; April 15, 2011, RT at 1853:13 – 1856:25.

- "[T]he game playing with the chain of custody testimony."  June 27, 2011, RT at 28:12-13.  *See also* April 15, 2011, RT at 1847:5-18; 1849:20 – 1852:16 (colloquy regarding witness Monica Lopez Guerra); April 20, 2011 RT at 2106:12 – 2109:14 (colloquy regarding witness Tracy Hanlon); *supra* at p. 7-8.

---

[7]  Ms. Garza failed to make an entry into her notary book to reflect Angela Aguilar's notarized signature until after being interviewed by the FBI agents and Mr. Miller.  At that interview, held in Houston on September 23, 2010, Ms. Garza showed the agents and Mr. Miller her incomplete notary book.  April 14, 2011, RT at 1526:6-18.  The agents and prosecutor let Ms. Garza keep her notary book and failed to make a copy of it.  April 14, 2011, RT at 1511:12 – 1512:8, 1518:1-19, 1522:12 – 1523:7, 1526:6-18.  The prosecution was aware of this issue with the notary book, and indeed reviewed the documents reflecting that problem, but delayed/avoided taking custody of those documents and failed to disclose any irregularities to the defense.  April 14, 2011, RT at 1513:2-16; 1531:19 – 1532:2.  When Ms. Garza came to testify at trial, she had added information to her notary book.  *Id.*  It was then the prosecutors made copies of it and provided it to the defense.  April 14, 2011, RT at 1531:9-13.

[8]  The Court described Agent Guernsey's trial testimony as "inept, evasive, self-serving and incomplete."  June 27, 2011, RT at 27:24-25.

- The effort of the government to admit the SBB evidence.  June 27, 2011, RT at 28:13-15.  *See also* April 28, 2011, RT at 3039:14 – 3044:10; Government's Motion to Admit Government Exhibit 1022, April 28, 2011, Docket Entry 483. The Court invited the defendants "to supplement their motion with a fuller picture . . . ." June 27, 2011, RT at 27:2-3.  This brief provides that supplement.

## IV.    THE COURT REPEATEDLY EXPRESSED CONCERN WITH THE GOVERNMENT'S ACTIONS, BOTH BEFORE AND DURING TRIAL

June 27 was not the first time the Court voiced concern about the prosecution's conduct in this case.  At various points, both before and during trial, the Court told the prosecution team what it expected and voiced concerns that the government's investigation and prosecution of this case failed to comport with the Court's expectations or settled rules for prosecutorial conduct:

December 14, 2010 Hearing:

- During the hearing on the Lindsey-Lee Defendants' Motion for a Bill of Particulars, the Court asked Mr. Miller if he "turned over every piece of evidence" to defense counsel.  December 14, 2010, RT at 41:22-23.  Mr. Miller responded that he had produced all such evidence.  December 14, 2010, RT at 41:24.

- The Court warned Mr. Miller that if he attempted "to come in at trial with some piece of . . . bombshell evidence," the Court would be "all over [him] if there [was] a [him] to be all over after the defendants [had] finished working [him] over." December 14, 2010, RT at 42:6-10.  The Court indicated it was "not accusing [Mr. Miller] of any misconduct," and it did not think he was "in the process of committing it," but the Court was merely giving Mr. Miller "fair warning."  December 14, 2010, RT at 42:12-18.

Mr. Miller stated that the government's investigation was ongoing, but as the prosecution obtained new evidence, that evidence would be disclosed.  December

1  14, 2010, RT at 42:19 – 43:2.

2  <u>February 22, 2011 Hearing</u>:

3  •  In response to the government's 78 person (not including custodians of record)

4  witness list, the Court said it did not take this list "seriously," and "there ain't

5  going to be 78 witnesses [at trial]."  February 22, 2011, RT at 31:15-19.

6  <u>March 23, 2011 Hearing (<i>Franks</i> motion)</u>:

7  •  In ruling on the <i>Franks</i> motion, the Court concluded it was a "strong motion, but

8  ultimately not strong enough."  The Court then went on to note that the conduct

9  by the government and affiant Farrell Binder was at the very least "sloppy" and

10  "may be a precursor of a lot of problems that could arise . . . in further

11  proceedings . . . as to whether the government has the goods."  March 23, 2011,

12  RT at 69:10-18; 71:10-14.

13  <u>March 25, 2011 Hearing (electronically stored information ("ESI") search warrant)</u>:

14  •  The Court stated "the government acted reasonably, although with . . .

15  considerable flaws in obtaining" all three LMC search warrants (November 14,

16  2008 and November 20, 2008 search warrants for LMC business premises and

17  August 20, 2010 electronic devices search warrant).  March 25, 2011, RT at

18  50:1 – 52:3.  The Court also noted that the government "attempted in a clumsy

19  way . . . to comply with at least the spirit of the teachings of <i>Tamura</i>" in

20  obtaining a warrant.  March 25, 2011, RT at 50:6-8.

21  <u>March 29, 2011 Hearing (<i>Miranda</i> motion hearing)</u>:

22  •  In granting the motion to suppress Dr. Lindsey's statement, the Court found that

23  Agent Narro's recollection about an encounter with Mrs. Lindsey outside of

24  LMC's office "was either contrived or so irrelevant to his own assessment as to

25  whether or not . . . Dr. Lindsey was in a custodial setting that he didn't even

26  choose to incorporate it into the declaration."  March 29, 2011, RT at 31:4-10.

27  The Court also found that a letter, submitted by the prosecutors, regarding this

28

part of Agent Narro's testimony[9] was an unsuccessful "effort on the part of the government to buttress Agent Narro's testimony."  March 29, 2011, RT at 31:23-25.

- The Court found that the testimony of Agents Narro and Binder regarding whether the agents called Dr. Lindsey "dumb" or "stupid" was flat-out contradictory.  March 29, 2011, RT at 32:19 – 33:6.

March 29, 2011 Hearing

- The Court made certain observations while hearing argument regarding Angela Aguilar's Motion *In Limine* to Exclude Evidence of Recorded Statements (March 17, 2011, Docket Entry 279) and Motion to Dismiss the First Superseding Indictment Based on Prosecutorial Misconduct in Violating Attorney-Client and Marital Privileges (March 24, 2011, Docket Entry 344). These observations related to the government obtaining certain communications in which Mrs. Aguilar participated while in custody at MDC.

- Specifically, the Court observed that "as early as December 10th, the lead prosecutor . . . Mr. Miller, asked the BOP to provide him with e-mail communications, as well as telephonic communications."  March 29, 2011, RT at 105:9-12.  Yet, "no one on behalf of the government asked [the Court] for leave to have a filter team review e-mail communications," and "the application that first came to [the Court's] attention, [which was limited to telephone communications], was more than a month later on January 18."  March 29, 2011, RT at 105:13-18.  Despite this failure, the prosecution team obtained e-mails that "they never got permission to get," nor ever inquired "whether they had a right to get."  March 29, 2011, RT at 105:19-24.  The Court reasoned that "[h]ad there been an application, [the Court] may have been in a position to

_____

[9]   *See* Exhibit C, March 28, 2011 Letter from Mr. Goldberg to Mr. Handzlik (transmitted via email at 2:15 p.m.).

1    conclude that the e-mail communications were to be assessed and the request for

2    a filter team to review those and then turn those over should be handled no

3    differently than [the] telephone communications," but "[t]here was no such

4    request."  March 29, 2011, RT at 106:4-8.  The Court then ruled that the lack of

5    permission was "sufficient basis to grant the motion to suppress," which was an

6    alternative remedy sought in the Motion to Dismiss based on the *Brady*

7    violation.  March 29, 2011, RT at 106:9-12.

8    March 30, 2011 (witness list presented during jury selection):

9    •    The government provided an 80 person witness list to be read to the venire

10         during jury selection.  The Court made several comments regarding the

11         government's "revised" witness list.  Specifically, the Court stated that to its

12         "befuddlement," it was given an 80 person witness list to read to the jurors.

13         March 30, 2011, RT at 4:24 – 5:4.

14   •    Mr. Miller assured the Court that for the 80 person witness list, all Jencks

15         statements that he was "aware of" had been turned over.  The Court responded

16         that it was counting on Mr. Miller to be aware of the discovery and it was his

17         duty to produce Jencks and other discovery.  March 29, 2011, RT at 10:1-25.

18   •    Mr. Miller stated again that all Jencks had been turned over, but if he found

19         other materials either "through discussions with witnesses, or some other

20         unforeseen way" he would provide these to the defense.  March 29, 2011, RT at

21         11:8-11.  In response to this statement, the Court ordered Mr. Miller to produce

22         all Jencks by 1:15 p.m. that day.  March 29, 2011, RT at 11:16-17.

23   April 1, 2011 Hearing:

24   •    On April 1, 2011, the government first identified co-conspirators by name.

25         April 1, 2011, RT at 34:9 – 38:8.  The Court asked Mr. Miller if he was "ever

26         asked by any of the defense attorneys to identify the unindicted – or at least

27         unidentified co-conspirators referred to in the Indictment?"  April 1, 2011, RT at

28         39:6-8.  Mr. Miller answered a different question about co-conspirator

CROWELL
& MORING LLP
ATTORNEYS AT LAW

14

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
TO DISMISS INDICTMENT

statements, forcing the Court to re-ask its question:  "Have you [Mr. Miller,] ever, before today, told the defendants who you considered to be unindicted co-conspirators?"  April 1, 2011, RT at 39:9-18.  Mr. Miller answered that he did not recall the defense asking for this information.  April 1, 2011, RT at 39:19-21.  This was untrue – the Motion for a Bill of Particulars, filed in November 2010 requested exactly this information.  *See* Motion for a Bill of Particulars, November 30, 2010, Docket Entry 87, at pp. 2-3, 8, 13-15; Reply to Government's Opposition to Motion for a Bill of Particulars, December 9, 2010, Docket Entry 100, at pp. 3; Hearing on Motion for Bill of Particulars, December 14, 2010, RT at 45:3 – 46:24.

- As defense counsel rose to respond, the Court noted that he would assume that defense counsel would "utterly refute" Mr. Miller's denial.  The Court stated that it would not get into the matter, but that "if it's indeed the case that [Mr. Miller] misstated whether [he was] asked for that, that would be, to say the very least, most regrettable."  April 1, 2011, RT at 39:23 – 40:4.  And, as the Bill of Particulars pleadings reflect, Mr. Miller did indeed misstate the facts.

April 5, 2011 (Jury Trial Day 2):

- During the direct examination of government witness Richard Serocki, Mr. Goldberg attempted to elicit testimony from Mr. Serocki regarding an alleged conversation between Dr. Lindsey and Mr. Lee.  The defense objected to this testimony.  Mr. Goldberg incorrectly claimed that this incident was reflected in Mr. Serocki's 302s.  The Court prohibited Mr. Goldberg from asking questions about information not contained in Mr. Serocki's 302 or to illicit answers that would be based on inferences.  April 5, 2011, RT at 433:15 – 448:14.

- In so ruling, the Court stated:  "Whatever explains what was going on with your preparation for the trial and your interviewing of Mr. Serocki, that March 31st 302, Mr. Goldberg, does not say what you would have it say and it does not, fairly read, reveal to the reader anything close to this pretty important evidence."

1    April 5, 2011, RT at 446:5-9.  The Court commented that "there have been a

2    very disappointing and surprising proliferation of disputes, some of which [it

3    had] not resolved in favor of the defendants, about late-coming, incomplete,

4    supposedly sometimes inconsistent disclosures.  April 5, 2011, RT at 447:4-7.

5    The Court concluded that the 302 should have said what the government thought

6    it said "and it didn't," "[a]nd that's sufficient reason for [the Court] to say, '[n]o

7    fair.'"  April 5, 2011, RT at 447:8-12.

8    • Mr. Goldberg responded that "302s are not always accurate," April 5, 2011, RT

9    at 447:21-22, and "there's been no hiding of the ball here."  April 5, 2011, RT at

10    448:2.

11    • The Court stated it was "not anxious to attribute a deliberate, intentional, and

12    devious motive . . . but in this particular example," the Court did not "have to

13    get into a motive.  April 5, 2011, RT at 448:3-7.  The Court noted that "Special

14    Agent Guernsey, who [had] been the mysterious nonpresence in this case,

15    conducted the interview," that the request was not "fair," and that the

16    government was "bound by the rules."  April 5, 2011, RT at 448:9-14.

17    April 6, 2011 (Jury Trial Day 3):

18    • Cross-examination of Jose Zavaleta revealed that Mr. Zavaleta met with Mr.

19    Miller and Agent Farrell Binder on two (previously undisclosed) occasions for

20    which no FBI 302 Reports of Interview were provided.  April 6, 2011, RT at

21    668:4 – 670:17.

22    • Mr. Handzlik noted that the defense might file a motion regarding this issue and

23    wanted to preserve any objections.  April 6, 2011, RT at 721:18-23.

24    • The Court noted Mr. Handzlik's position and stated:

25        The interruptions in this case and before the trial began that have

26    to do with the government's flow of information are extremely
troubling.

27        Now, I understand you have two paralegals here and I'm not at

28    all attributing any omissions or errors or confusions to them, but I am

instructing you, as the person I deem to be the head of the prosecution team, Mr. Miller, to ask your paralegals or instruct your paralegals, however rewarding I understand it would be for them to sit in on a trial on which they have undoubtedly worked very hard, to go upstairs this afternoon and make an utterly new top to bottom, absolutely thorough, no exceptions whatsoever, review of everything to which the defendants may have a right in discovery or by virtue of agreements that have been reached or orders that I've issued.

I will not brook what I understand to be good faith objections that the defenses are putting on to witness after witness of incomplete disclosure and confusion.

Now, maybe there is nothing else to produce. And I don't even want a response.

I want you to be able to tell me yourself, notwithstanding the difficulty of managing a troika, that there is not going to be any further basis – I can't expect you to say that no defense attorney is going to stand up, but I want you to be able to assure me by tomorrow morning that everything that has ever been asked to which there was an agreement to produce or a duty to produce has been turned over. ***Everything, right to the end of the case. Not piecemeal, not because something was found last night, everything.***

April 6, 2011, RT at 722:7 – 723:10 (emphasis added).

April 6 and 7, 2011 (Jury Trial Days 3 and 4):

- On April 6, 2011, the government called Fernando M. Basurto to testify. Ms. Levine objected to his testimony as irrelevant. April 6, 2011, RT at 717:11-15. After hearing Ms. Mrazek's response to this objection, the Court ordered the government to file an offer of proof regarding Mr. Basurto's testimony and Sorvill's relevance to this case. April 6, 2011, RT at 717:17 – 720:23.

- The next day, before Mr. Basurto resumed his testimony, the Court conducted a colloquy with Ms. Mrazek regarding her offer of proof. The Court concluded:

Without even needing or inviting any objection by any defendant to that aspect of this proffer, I'm ruling it inadmissible.

Your explanation is totally unpersuasive and lacking in merit. You're not going to be permitted, regardless of what [the Court] decide[s] on this overall story that you're telling . . . to ask this witness, Basurto, about questions he had with Rovira – or whatever the

guy's name is – that will then permit you to point to, or your colleagues, as evidence of the conspiracy in this case or the bribe in this case.  It is preposterous.

April 7, 2011, RT at 740:1-11.

- The Court commented that the government's proffer was "so confusing, so remote, parts of it so flatly inadmissible, that so far – in [the Court's] effort with an open mind, honestly, to see where you're going with this . . . [the Court] see[s] nothing that passes muster as being admissible evidence on any of the bases for 404(b)."  April 7, 2011, RT at 742:2-7.

- When the Court inquired why the government did not have a CFE representative testify about that which it was attempting to prove through Mr. Basurto's testimony, Ms. Mrazek stated that Mexican officials cannot testify in United States courts, and there was no time to conduct a Rule 15 (Fed. R. Crim. P. 15) deposition of any of those officials.  In response, the Court commented:

> [T]hat seems to have been what's plaguing the government team throughout.  [The Court has] had some silent views about that for quite awhile.  There may not have been any time, but that doesn't mean there wasn't any opportunity.
>
> So, you want to get around the pressures of time and the rules of evidence by establishing a response to the defendants' position that nothing looked unusual, or phony, or bribe-laden, through Basurto, who will say that he was told the same thing, or managed to get away with the same thing, on two utterly different contracts.  It won't work.

April 7, 2011, RT at 742:15-25.

- The Court continued:

> This is a different case, Ms. Mrazek.  These are different bribers, different bribees, different contracts, different time periods.  If this is the only way that the government can address that part of the defendants' defense, then maybe you and your colleagues should evaluate where you are in this case, because that's not a way you're going to be allowed to use, and that isn't even a way that makes any fundamental sense.
>
> You have to understand that the defendants moved to limit the government's proof on this – and [the Court] reserved a ruling – and

CROWELL
& MORING LLP
ATTORNEYS AT LAW

then all of a sudden Basurto is on the stand, and I was absolutely puzzled, at best, what was going on.  I tried to give you guidance yesterday about how you could get passed [SIC] simple things.

This explanation would permit such a massive level of confusion, delay, likely prejudice, evidentiary objections that almost certainly would be valid and probably sustained.  Under 403 itself there's a very palpable, immediate basis to exclude it.  Under 404(b), I find the same thing is true.

This isn't about this case.  Congratulations to you for securing a conviction for Mr. Basurto, but you're not going to prove your case against his co-conspirators in this case.  And you're certainly not going to prove the case against the people alleged to be co-conspirators and defendants in this case, through that case.  That's not the way it's done.

April 7, 2011, RT at 749:15 – 750:15.

April 15, 2011 (Jury Trial Day 9):

- On ordering the disclosure of all of Agent Guernsey's grand jury testimony, the Court stated:

And I took [the defendant's motion to compel Agent Guernsey's grand jury testimony] under submission.  And ordered that the government file all of that testimony, and started to look at it very – with a lot of misgivings for two reasons.  One is, that I'm not in the best position – acting totally unilaterally, although I now understand a considerable amount about this case – to determine whether there's *Brady* material in there.  Sometimes that's what a judge does, and I've had to do it in this case more than once.

Secondly, it's very voluminous, and there's a lot on my plate.  What I read last night, has persuaded me that all of the grand jury testimony of Guernsey should be turned over.

April 15, 2011, RT at 1698:15 – 1699:2.

- FBI evidence technician Monica Lopez Guerra was not included on any the government's witness lists.  April 15, 2011, RT at 1850:18-25.  According to Mr. Miller, Ms. Guerra was a "key link for the government to establish" the authenticity of certain LMC documents, yet she was only a "custodian of records."  April 15, 2011, RT at 1851:4-23.  The Court responded that a

"[c]ustodian of records is one thing," but "[a]n agent who is going to provide substantive testimony about what was kept where and with what degree of pristine intactness is not the same as custodian of records." April 15, 2011, RT at 1852:5-8. The Court also told Mr. Miller: "[y]ou are not calling her today, and I will think about ***whether I am going to give you yet another pass, "you," meaning, your team. Don't take it personally, but don't try to escape responsibility either.***" April 15, 2011, RT at 1852:13-16 (emphasis added).

- Patricia Alma Cerdan Saavedra, who testified on April 8, 2011, was recalled on April 15, 2011. Mr. Miller, on getting permission to recall Ms. Cerdan, was told to limit his questions to Ms. Cerdan to her knowledge of Jean Guy LaMarche, the reason he gave to recall her. Mr. Miller then asked for permission to use Ms. Cerdan to authenticate Ms. Aguilar's voice on the excerpts of prison calls the government planned on introducing (seemingly the real reason she was recalled). In response, the Court stated: "yesterday [I] allowed you to reopen the testimony based upon your explicit assurance it would be limited in the way that [I] then authorized. Then you came back to [me] almost instantaneously and said, 'But, but, but, how about this additional testimony?'" April 15, 2011, RT at 1854:21-25. The Court also noted that this was "not the first time" Mr. Miller engaged in such behavior. April 15, 2011, RT at 1855:2. In denying Mr. Miller's request, the Court stated it was "not going to change [its] ruling from yesterday. [I] could comment on why not. It's pretty clear. The government has to play by the rules, too. [The Court's] ruling is [the Court's] ruling." April 15, 2011, RT at 1856:22-25.

April 21, 2011 (Jury Trial Day 12 – motion hearings):

- In granting defense counsel's motion to exclude the government's summary exhibit 1013 (summary exhibit of select email communications between Mr. Lee and Jean Guy LaMarche), the Court made the following statements:
  - It was a "heavily edited and annotated summary exhibit." April 21, 2011, RT

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
TO DISMISS INDICTMENT

at 2336:25.

- The exhibit, "no matter what protestations the witness or the government may make, if this were displayed and admitted, it would clearly be designed to – I won't attribute motives.  It would clearly have the effect of proving the truth of the proposition that Nestor Moreno had a corrupt relationship with CFE."  April 21, 2011, RT at 2337:2-7; and

- It went "way beyond evidence of Lee's knowledge" and was "explosive."  April 21, 2011, RT at 2337:8, 15.

- In excluding the government's summary exhibit 28 (summary exhibit focused on Dr. Lindsey and Mr. Lee's compensation), the Court stated it was "very, very misleading;" April 21, 2011, RT at 2348:14-15 and that the government "can make points" and is "welcome to use charts," but exhibit 28 "goes overboard."  April 21, 2011, RT at 2349:8-10.

- Regarding the government's summary exhibits 16 and 30, the Court stated:

> Now, I know that there are overt acts alleged in the indictment about Sorvill, and I don't know what words I used in commenting on this case compared to the ABB case.  I do know that I was very troubled by what happened in the grand jury about the testimony about payments to Sorvill.  And there aren't any.  And this is an exhibit that I find to be very problematical because it has put Sorvill right next to Grupo.

April 21, 2011, RT at 2349:16-23.

- The Court allowed the government to use either exhibit 16 or exhibit 30 (the government selected summary exhibit 30), with a modification, "both in the interest of fairness and in the interest of comprehensibility."  Specifically, the Court required the government to include the month and year information for all payments.  April 21, 2011, RT at 2355:8-19.

April 28, 2011 (Jury Trial Day 16):

- The government moved to admit exhibit 1022, which were certified business records of Acier Profilé S.B.B. Inc. ("SBB").  *See* Government's Motion to

21

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
TO DISMISS INDICTMENT

Admit Government Exhibit 1022, April 28, 2011, Docket Entry 483; April 28, 2011, RT at 3039:20 – 3040:6.  The government argued these records showed that SBB's product complied with the IEEE 1070 standard, and thus the company's product could compete directly with the Lindsey "1070" tower between 2002 and 2008 (the conspiracy period alleged in the Indictment).  *See* Government's Motion to Admit Government Exhibit 1022, April 28, 2011, Docket Entry 483, at p. 1.

- The Court denied the government's motion to admit exhibit 1022.  In so ruling, the Court stated it found it "at best, humorous, that [the government] tried to suggest in [its] motion that there was some level of evasiveness or mistrust . . . or trickiness on the part of the defendants for pursuing a defense when they had reason to know that there was supposedly a competing product."  April 28, 2011, RT at 3040:21-25.  The Court also referred to the government's representations as "preposterous given what [it had] done or failed to do in this case."  April 28, 2011, RT at 3041:6-7.  Furthermore, the Court chastised the government for its delay in attempting to rebut the "no competing product" defense, saying that it "is something [the government knew] about since the opening statement," April 28, 2011, RT at 3041:8-11, and that it was "puzzling" that "the government did not attempt to see whether or not there was a competing product on the market before the case was indicted or before the case was tried . . . ."  April 28, 2011, RT at 3041:11-14.

- The Court later explained:

> [The Court's] ruling on the 1022 request is based in part on the . . . horrendous prejudice that would befall the defense if they, at the last minute, had to deal with this newfound evidence – newfound witness, newfound counter to what has been characterized as an unjustified defense.  Under Rule 403, it's clearly inadmissible to that extent.  If more time were made available, or if this were something that was proposed for rebuttal, it might overcome that problem.
> [The Court] also invite[s] the defense, if they are forced to

respond in writing to this motion, to, with their resources, pull together whatever orders [the Court] issued about discovery, about disclosure of documents, and about management of the case, because that's the second factor. We are way over the estimate the government gave, and gave repeatedly after [the Court] pressed them, to make sure it would be realistic for the duration of the case, and we're nowhere near the end of it. So, in terms of Rule 16, and court management issues, that's a secondary reason to support the ruling [the Court has] already issued.

April 28, 2011, RT at 3043:17 – 3044:10.

May 3, 2011 (Jury Trial Day 18):

Regarding the "summary" charts admitted during Agent Costley's testimony, the Court stated it wanted "the government to be on notice that [it] found that some of the charts that Costley testified to were so ill advised, misleading, shockingly incomplete, that [the Court] attach[ed] relatively little value on those charts as part of the government's case." May 3, 2011, RT at 3603:25 – 3604:3. The Court stated "some, but not all, of the concerns that [the Court] ha[d] about those charts and of Costley's testimony were covered by the cross-examiners – not all of them were," and the Court found the government's summary "very surprising and troublesome," in a case that "wasn't easy for the government to mount." May 3, 2011, RT at 3604:4 – 3604:9. The Court concluded that if that was "going to be the basis for pulling it together and justifying any conviction that might result," the Court would "have to look at it real carefully." May 3, 2011, RT at 3604:9-12.

## IV.   SUMMARY OF INSTANCES OF GOVERNMENT MISCONDUCT

### A.   Instances Discussed In The Motion To Dismiss

The Motion and the Reply describe and discuss in detail several instances of misconduct. For the Court's convenience, and without repeating the Motion and Reply, the following list summarizes the instances of misconduct discussed in the Motion to Dismiss and the Reply:

- False testimony was presented to the grand jury on September 8, September 15,

and October 21, 2010.  Motion to Dismiss, May 9, 2011, Docket Entry 505, at pp. 4-15; Reply Brief In Support of Motion to Dismiss the Indictment with Prejudice Due to Repeated and Intentional Government Misconduct ("Reply"), June 17, 2011, Docket Entry 614, at pp. 1, 4-7.

- The Court ordered that Agent Guernsey be present as a witness on the *Miranda* motion filed by Keith Lindsey.  The government was then obligated to produce her statements as Jencks materials.  The government understood it had this obligation, but did not produce Agent Guernsey's complete grand jury interview.  Instead, by producing a heavily redacted set of minimal excerpts from it, the government successfully concealed the extent and pervasiveness of Agent Guernsey's false statements.

- Agent Guernsey's false and misleading testimony to the grand jury and the prosecutors' role in presenting that testimony was concealed until partly through trial.[10]  Motion to Dismiss, May 9, 2011, Docket Entry 505, at pp. 15-16; Reply, June 17, 2011, Docket Entry 614, at pp. 13-15.

- The prosecutors failed to disclose the falsities in Agent Binder's Search Warrant Affidavit.  Motion to Dismiss, May 9, 2011, Docket Entry 505, at pp. 16-17; Reply, June 17, 2011, Docket Entry 614, at pp. 15-16.

- The prosecutors committed *Brady* violations, including:

  - the prosecutors filed a motion to admit SBB evidence which was founded on false representations.  Motion to Dismiss, May 9, 2011, Docket Entry 505, at pp. 18-19;

  - the prosecutors delayed production of certain *Brady* and Jencks materials until after it concluded its case-in-chief.  Motion to Dismiss, May 9, 2011,

---

[10]     As previously discussed, one day of Agent Guernsey's grand jury testimony was not produced until after the verdict was returned.  *See* Notice of Regarding Court Ordered Grand Jury Disclosure, June 27, 2011, Docket Entry 617, at Exhibit 1 (List of Grand Jury Proceedings).

Docket Entry 505, at pp. 19-21.

**B.**   **Other Instances Of Government Misconduct**

At the June 27 hearing, after providing its anecdotal list, the Court invited the parties to supplement the record with other instances of misconduct, noting that the parties have "a daily transcript" and the "people power and time to review the tortured history of this prosecution."  June 27, 2011, RT at 27:2-7.

The defense review of the transcript has revealed scores of other instances of misconduct, some of which are obvious and others which become apparent only when the full record of events – including motions and extrinsic documents such as drafts of the November 14, 2008 search warrant and the indictment and other materials from *United States v. O'Shea*, No. 09-CR-629 (S.D. Tex.) are reviewed. These are listed below and described in further detail in the body of this supplemental pleading.

- Issues related to the testimony of Special Agent Dane Costley, and the so-called "summary exhibits" introduced through Agent Costley, including:

  - using Agent Costley as the "summary witness" instead of one of the case agents (Susan Guernsey, Farrell Binder, and/or Rodolfo Mendoza) in order to hide the inadequacies in the government's investigation and to keep this potential defense from the jury, declaring, contrary to law, that issues regarding its investigation were irrelevant to the jury.

  - misrepresenting Agent Costley's knowledge of the case and the "voluminous documents," omitting mention of Agent Costley's absolute lack of knowledge of and involvement in this case, instead misrepresenting him as a "summary witness" who could summarize voluminous documents, and proffering him to testify in contravention of the Confrontation Clause and the Rules of Evidence.

  - adding an improper and prejudicial subscript on the computer demonstration tool used by the prosecutors to publish slides (of exhibits) during the course of Agent Costley's "narration," and then misrepresenting its origin to the Court.

- using Agent Costley's "testimony" to shield inquiry into the prosecution's evidence and witnesses, such as Jean Guy LaMarche.

• Failing to obtain and produce *Henthorn* material before the witness (or witnesses) with *Henthorn* issues testified during a motion hearing and misrepresenting that *Henthorn* inquiries were made by January 3, 2011.  *See infra* at p. 36.

• Purposely hiding flaws in the investigation.  *See infra* at pp. 37-39.

• Falsely representing compliance with discovery obligations,[11] including:

  - that "top-to-bottom reviews" ordered by the Court had been completed;

  - that witness statements and *Brady* had been produced;

  - that the complete Guernsey transcript was produced to the Court *in camera*

  - that its discovery obligations were satisfied.

• Late production of Jencks and *Brady* materials,[12] including:

  - the Guernsey grand jury transcripts;

  - the IRS Memorandum of Interview of certain CFE officials, including the general counsel of CFE, Abel Huitron;

  - emails from Nicola Mrazek to Fernando Maya Basurto's attorney, William Rosch, setting forth inducements for Mr. Basurto's testimony in this case;

  - Serocki, Zavaleta, Garza and Basurto witness statements.

• Non-production of *Brady*, including:

  - evidence showing that the military school payments for the tuition for Nestor Moreno's son, made from the Sorvill account on April 1, 2004 and June 3, 2004[13] and included on government's Exhibit 30 as bribe payments for which

---

[11]    *See infra* at pp. 35-37.

[12]    *See infra* at *id*.

[13]    *See* Exhibit D, Government's Trial Exhibit 646 (April 1, 2004 payment); Exhibit E, Government's Trial Exhibit 647 (June 3, 2004 payment)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
TO DISMISS INDICTMENT

LMC was responsible as coming from the funds paid by LMC to Grupo to Sorvill, is also set forth in the indictment in the case of *United States v. O'Shea* as an overt act,[14] and is represented there as bribes paid by ABB.

- That Mr. Basurto would be released from custody on bond after his testimony in this case. *See* Exhibit G, *United States v. Basurto*, No. 09-CR-325 (S.D. Tex.), Agreed Motion to Set Bail, June 20, 2011, Docket Entry 60; Exhibit H, Order Setting Conditions of Release, July 8, 2011, Docket Entry 65.

- Misuse of the Jean Guy LaMarche emails, including using all of them as substantive evidence against all of the defendants in this case, despite their being admitted for a limited purpose. *See infra* at pp. 42-44.

- Interfering with the defense access to Jean Guy LaMarche. *See infra* at pp. 46-49.

- Misrepresentations and incomplete representations of LaMarche's status as a witness. *See infra* at *id*.

- Improperly obtaining a protective order for witness statements and identity by misrepresenting facts about danger to witnesses. *See infra* at p. 46.

- Improper introduction and use of the ABB evidence, admitted during the testimony of Fernando Maya Basurto. *See infra* at pp. 44-46.

- Improper summation,[15] including:
  - improper use of the willful blindness/deliberate ignorance theory of culpability as a basis for arguing the Lindsey-Lee Defendants' guilt;
  - improper use of ABB evidence;
  - improper use of LaMarche emails.

- Misrepresentations as to the identity of potential trial witnesses on witness lists

---

[14]    *See* Exhibit F,*United States v. O'Shea*, No. 09-CR-629 (S.D. Tex.), Indictment, Docket Entry 1, at p. 20.

[15]    *See infra* at pp. 42-46, 50-53.

1    and in the joint submission filed on March 11, 2011.  *See infra* at pp. 49-50.

2    • Failure to produce, in a timely manner, all prior drafts of the search warrant

3      executed on November 20, 2008, which contained *Brady*,[16] including:

4      - failure to produce, until after the motions to suppress were heard, the drafts

5        of the affidavit in support of the search warrant revealing that the language used

6        to justify the Court's finding that the case agents' search of the electronically

7        stored information (ESI) was a result of artful drafting done to evade the

8        requirements of *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), not

9        "clumsy" drafting reflecting a "misplaced . . . attempt to comply with it." March

10       25, 2011, RT at 50:6, 19-20, and that the "clumsy" language which upheld the

11       search was added to the 10th version of the search warrant and appeared only in

12       the 10th, 13th and 14th versions of the search warrant.  *See infra* at pp. 31-33.

13       The 1st through 9th versions, and the 11th and 12th versions of the challenged

14       search warrant comported with *Tamura* by restricting the searches to computer

15       personnel and did not contain the language allowing the case agents to search

16       ESI.  *See infra* at *id.*

17   **VI.   GOVERNMENT MISCONDUCT PERMEATES THIS CASE**

18       The government's "'obligation to govern impartially is as compelling as its

19   obligation to govern at all; and [its] interest, therefore, in a criminal prosecution is

20   not that it shall win a case, but that, justice shall be done.'"  *Strickler v. Green*, 527

21   U.S. 263, 281 (1999) (*quoting Berger v. United States*, 295 U.S. 78, 88 (1935)).

22

23

24

25

26

27   _____
     [16]     *See infra* at pp. 29-31.

28

Apparently reacting to the weakness of its evidence,[17] the inadequacy of its investigation, and the falsities that permeated the case agents' sworn statements to Magistrate Judges and to the grand jury, the government prosecutors in this case lost their way, forgetting their unique duty to do justice. Instead, they adopted a "win at all costs" strategy. The misconduct attendant to that strategy permeates this case from beginning to end. It cannot be condoned, and it is time for this Court to say "enough."

A.      **The Investigation, Including The Drafting And Execution Of The Affidavits In Support Of The Search And Seizure Warrants And The Presentation To Both Of The Grand Juries, Was Permeated With Misconduct**[18]

   1.      **The Searches**

      a.      **The False Sorvill Statement**

As the motion reflects, the affidavit used to support the search of Lindsey Manufacturing Company on November 20, 2008, and reused for other searches and

_____

[17]      As the Court noted before trial, "all of the defendants may have a very triable case here." December 14, 2010, RT at 40:5-6; *see also* December 14, 2010, RT at 42:5-6 ("we'll see whether or not [the government will] carry the day at trial"); January 24, 2011, RT at 28:7-9 ("I think it's a very triable case, and I think you (Mr. Miller) got your work cut out for you, but we'll see what you come up with."). Similarly, during the *Franks* hearing, the Court, while commenting on Agent Binder's "sloppy" affidavit, stated that the issues with the affidavit could be a "precursor" of problems that could arise at trial "as to whether or not the government" has the goods. March 23, 2011, RT at 69:15-18; *see also supra* at p. 23.

[18]      The moving papers and the reply include those details which will not be repeated here.

seizures,[19] falsely states that Lindsey Manufacturing Company made several large payments to Sorvill.  *See* Motion to Dismiss, May 9, 2011, Docket Entry 505, at pp. 2, 16-17; *see also* Motion for Evidentiary Hearing Pursuant to *Franks v. Delaware*, February 28, 2011, Docket Entry 222, at p. 3.  That falsehood – which appears twice in the sworn affidavits – was inserted in the affidavit by an unidentified prosecutor (or prosecutors).[20]  March 23, 2011, RT at 15:3-14; 58:22 – 59:1. Significantly, this falsehood did not appear until the 13th version of the search warrant affidavit.  *See* Levine Decl. at ¶ 6.

The prosecutor(s) who inserted this false statement did not consult with case Agent Binder to check the veracity of the statement before inserting it, and did not bring to the attention of the agent who signed the affidavit the fact that this statement had been inserted in the affidavit.  March 23, 2011, RT at 59:2 – 60:8. No facts support this statement.

In discovery, defense counsel requested copies of all drafts of the search warrant and affidavit.  *See* Exhibit I, November 17, 2010 Letter from Janet I. Levine to Mr. Miller and Ms. Mrazek requesting discovery, at p. 5, ¶ 16.  *Cf.* Motion to Compel Discovery Pursuant to *Brady v. Maryland* (Second *Brady* Motion), February 10, 2011, Docket Entry 195, at pp. 8-11.  The government refused to provide drafts.  It was not until midway through the hearings on the

---

[19]     The warrants that contain the false statement about Sorvill include:  1) November 14, 2008 search warrant (Farrell Binder affidavit); 2) November 20, 2008 "follow on" search warrant (Farrell Binder affidavit); 3) December 1, 2008 Bluffview Securities Account seizure warrant (Susan Guernsey affidavit); 4) August 27, 2010 Dream Seeker Yacht seizure warrant (Farrell Binder affidavit); 5) October 5, 2010 Dream Seeker Yacht seizure warrant (second application) (Farrell Binder affidavit); and 6) The October 5, 2010 Banco Popular Account seizure warrant (Rodolfo Mendoza affidavit).

[20]     The two prosecutors known to be involved then were Nicola J. Mrazek and Douglas M. Miller.

1   motions to suppress evidence that the Court ordered the drafts disclosed.  The draft

2   warrants (604 pages) were produced without tabs or description.  Exhibit J, Draft

3   Versions of Search Warrant Affidavits.

4       Agent Binder testified that there were "five or six maybe – seven" drafts of

5   the affidavit.  March 23, 2011, RT at 33:23-25.  In fact, 14 different drafts were

6   produced.  *See* Levine Decl. at ¶ 5.

7       What was produced does not reveal who authored or reviewed any draft, but

8   one thing is clear.[21]

9       The first reference to large payments from Lindsey Manufacturing Company

10   to Sorvill appears in version 13 of the 14 draft versions of the search warrant

11   affidavit.

12       The warrant was challenged under *Franks v. Delaware* 438 U.S. 154 (1978),

13   because it was infected by false statements, particularly the false statements

14   regarding LMC payments to Sorvill.  *See* Motion for Evidentiary Hearing Pursuant

15   to *Franks v. Delaware*, February 28, 2011, Docket Entry 222, at pp. 2-4.  A *Franks*

16   hearing was ordered.  At that hearing, the prosecution never addressed why the

17   prosecutors included this false language.  Significantly, they never acknowledged

18   that the first 12 drafts of the warrant did not contain this falsity.  *Cf.* Motion to

19   Dismiss, May 9, 2011, Docket Entry 505, at pp. 16-17.

20         b.   The ESI Search

21       The November 14, 2008 search warrant had provisions for the seizure and

22   search of digital data (electronically stored information ("ESI").  The warrant was

23   challenged because it allowed the case agents (as opposed to computer personnel or

24   another taint team) to search the ESI, contrary to *United States v. Tamura* 694 F.2d

25   

26   [21]    The government should be ordered to produce, at least *in camera*, all

27   communications between the prosecutors and agents about the warrant and affidavit
   from drafting to execution.

28

1    591 (9th Cir. 1982).  *See* Motion to Suppress Evidence Obtained in Searches and

2    Seizures of Digital Devices and Data (Suppression Motion Three), February 28,

3    2011, Docket Entry 211, at pp. 7-11.  The argument, essentially, was that the

4    government did not use a taint team to search when it should have.  At the hearing

5    on the Motion to Suppress the evidence obtained in the searches of ESI, the Court

6    found the language which allowed the case agents to conduct the ESI search

7    violated *Tamura*.  However, the Court also found that the government did not act in

8    *bad faith* in searching the ESI, because the language of the warrant, which the

9    Court described as clumsily drafted, allowed the case agents to conduct the ESI

10   search.  Thus, the Court held that suppression was not required.  The Court

11   specifically noted that the search warrant language was imprecise, but seemed to

12   permit the case agents to search the ESI:  "[I]t's highly likely that what Guernsey

13   and Binder were doing in [Agent Moon's] presence was two things, one of which

14   was permissible and the other should not have been done if there had been more

15   exacting and grammatically precise compliance with *Tamura*."  March 25, 2011,

16   RT at 50:23 – 51:2.

17        At the Motion to Suppress hearing, the Court asked the government questions

18   directed to the bad faith question.  The government argued, in essence, that the

19   inclusion of this language was just sloppy, and that the language allowing the case

20   agents to search the ESI was something "no one caught."  March 25, 2011, RT at

21   43:4-9.  The government was arguing an innocent mistake in wording.  March 25,

22   2011, RT at 43:10 – 45:6.

23        In fact, that was not true – this was not just a case of clumsy drafting.  This

24   wording change allowing the case agents to conduct the ESI search was *purposely*

25   *inserted in the search warrant*.  Eleven of the 14 drafts (including the first nine

26   versions) limited searches of ESI to computer personnel.  *See* Levine Decl. at ¶ 7;

27

28

1   Exhibit K, Chart tracking ESI search language.[22]  Only versions 10, 13 and 14

2   permitted the case agents to search ESI.  To argue this language was just something

3   that was not "caught," when in fact it was the product of a deliberate wording

4   change, is another example of bad faith and purposeful concealment.

5              **2.    The Grand Jury**

6         Other misconduct in the investigation phase largely involved the grand jury.

7   The moving papers and reply brief detail Agent Guernsey's false statements to the

8   September 8, September 15, and October 21, 2010 grand juries.

9         The October 14 transcript, recently produced, reveals that Mr. Miller and Ms.

10   Mrazek were both present at the grand jury that day.  Mr. Miller, Ms. Mrazek, and

11   Agent Guernsey, in keeping with the government's misguided theory of this case,

12   presented evidence and argument on October 14 that connected the wrongdoing of

13   ABB to the allegations against the Lindsey-Lee Defendants.

14         The government's attempt to link Lindsey Manufacturing Company with

15   ABB – and the importance of that linkage to the prosecution – are apparent in

16   communications between Ms. Mrazek and William Rosch, Fernando Maya

17   Basurto's attorney.

18         Fernando Maya Basurto was a "cooperator" in the ABB case.

19         ABB paid its bribes to CFE employees through a business owned by

20   Fernando Maya Basurto and his father, Fernando G. Basurto.  Fernando Maya

21   Basurto pled guilty to FCPA-related violations.  April 6, 2011, RT at 688:5 –

22   689:22, 705:4 – 713:21.  Fernando G. Basurto received a "pass" for his misconduct.

23   April 7, 2011, RT at 815:12-17.  Neither ABB nor either of the Basurtos had any

24   dealings or relationship with Lindsey Manufacturing Company, Keith Lindsey or

---

[22]      Regarding Exhibit K, for filing purposes, the Defendants have had to shrink the chart to fit an 8 ½ by 11 inch piece of paper.  However, for the ease of the Court's review, the courtesy copy delivered to chambers will include a larger version of this exhibit.

Steve Lee.  Fernando Maya Basurto knew nothing about Lindsey Manufacturing

Company, Keith Lindsey or Steve Lee.  *See* Exhibit L,October 10, 2010 email from

Nicole J. Mrazek to William Rosch.

In addition, ABB had no relationship with Dr. or Mrs. Aguilar.  The *only*

connection between the Aguilars and ABB is that the Aguilars owned Sorvill, a

Panamanian company, and Sorvill *once* or *twice* facilitated a payment made by the

Basurtos on behalf of ABB to CFE employees (or for the benefit of CFE

employees).  This was completely unrelated to the Lindsey-Lee Defendants.

On April 25, 2009, Mr. Basurto was arrested while transiting through the

United States.   Facing 262 to 327 months in custody, he entered into a cooperation

agreement with the United States, originally agreeing to cooperate in the ABB

prosecutions, especially the *O'Shea* case.  *See* April 7, 2011, RT at 807:6 – 816:13;

*see also* November 30, 2010 hearing, RT at 12:19 – 13:14.  Although he knew

nothing about Lindsey Manufacturing Company, Keith Lindsey or Steve Lee on

October 10, 2010 – just before the instant indictment – the prosecution asked Mr.

Basurto to cooperate against Lindsey Manufacturing Company, Keith Lindsey and

Steve Lee.

In the October 10, 2010 email to William Rosch, Mr. Basurto's attorney,

DOJ Senior Trial Attorney Nicola J. Mrazek wrote:

> [I]n my case in LA, we've decided that we are going to call Fernando
> Maya Basurto to testify as to what he understands Sorvill is and, as
> 404(b) evidence, the ABB bribery scheme, including the corrupt
> actions of Enrique Aguilar and Nestor Moreno.  *He doesn't know
> anything directly about the corrupt company directly involved in the
> LA case (Lindsey Manufacturing)*.  But the defense has raised the
> argument that the yacht, Ferrari, and AmEx payments were innocent
> gifts to a friend.  We're going to put forth evidence *about the pattern
> of bribery*.  Can you let Fernando know?  Trial in the LA case is set for
> November 9, but it is possible it will get moved if we charge some
> additional people.  This would obviously be counted as cooperation
> credit for your client.  (Btw, in case Fernando doesn't know, both
> Nestor Moreno and Gustavo Salvador Torres have been force[d] to

resign, and we just got Mexico to seize Nestor's yacht.  Your comment about the tide coming in is coming true.)

*See* Exhibit L (emphasis added).

Four days later, on October 14, 2010, Agent Guernsey testified to the grand jury, emphasizing the connection between ABB and Lindsey Manufacturing Company – indeed using a chart connecting the companies through Sorvill and Grupo.  This was, as the prosecutor described, evidence of a supposed "pattern of bribery."  This, despite that there is no LMC-ABB linkage.

### B.    The Government's Discovery And *Brady* Abuses Were Misconduct

The government is constitutionally obligated to disclose all "information in the possession of the prosecutor *and* his investigating officers that is helpful to the defendant . . . ."  *United States v. Price*, 566 F.3d 900, 903 (9th Cir. 2009) (emphasis in original).  Prosecutors also have "the duty as required by *Giglio* to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility."  *Benn v. Lambert*, 283 F.3d 1040, 1062 (9th Cir. 2002).

Throughout this case, the government repeatedly assured the Court and the defense that it had fully complied with its discovery obligations.  *See, e.g.,* December 14, 2011, RT at 41:22-24 (responding affirmatively to Court inquiry as to whether it had "turned over every piece of evidence"); March 30, 2011, RT at 10:1-25 (assuring the Court that all Jencks statements that prosecutors were "aware of" had been produced); April 7, 2011, RT at 880:21 – 881:22 (assuring the Court that the government has done what they "believe not only meets [its discovery] obligation, but exceeds it").

In truth, however, discovery and *Brady* abuses continued from pre-trial to post-trial.  In the months leading up to trial, the prosecutors: (1)

delayed disclosing false representations in Agent Binder's search warrant affidavit until the *Franks* hearing (February 22, 2011, RT at 28:1 – 29:9); (2) delayed producing the drafts of search warrants and related affidavits until after the *Franks* hearing, thereby concealing the prosecutors' role in inserting false representations into affidavits and their affirmative modifications of warrants to specifically circumvent the requirements of *Tamura*, (March 23, 2011, RT at 58:12-18); (3) delayed production of the IRS Memorandum of Interview of CFE officials which revealed no irregularities in the contracts secured by LMC (Motion to Dismiss Case for Violations of *Brady v. Maryland* or, in the Alternative, for Sanctions, March 22, 2011, Docket Entry 317, at pp. 2-3); and (4) delayed notifying the Court and the defense of the possibility of a *Henthorn* issue with a witness until after the witness had already testified in opposition to the Motion to Suppress. *See Ex Parte* Application for Disclosure of *Henthorn* Materials, April 7, 2011, Docket Entry 416.[23]

Moreover, throughout the entire course of pretrial discovery, the prosecutors actively concealed flaws in the investigation by keeping Agent Guernsey off the witness list and using that as an excuse to refuse to disclose Guernsey's patently false grand jury testimony. This testimony was only produced mid-trial pursuant to a Court order once the Court reviewed three

---

[23] The government even delayed producing things as clearly exculpatory as the Mrazek-Rosch October 10, 2010 email. Mr. Miller even claimed that it was not *Brady* or *Giglio* material without even having reviewed the document himself. February 22, 2011, RT at 14:23 – 16:18. The government was ordered to produce the Mrazek-Rosch communications *in camera* on February 22, 2011. February 22, 2011, RT at 16:21 – 17:8. It did not produce them to the Court until March 23, 2011, a month later. *Ex Parte*, *In Camera* Response to Court Order Regarding Email, March 23, 2011, Docket Entry 329. The Court immediately ordered the email disclosed to the defense. Minutes of In Chambers Order, March 23, 2011, Docket Entry 337.

1   transcripts of Agent Guernsey's testimony and found them to be "troubling."

2   *See* Motion to Dismiss, May 9, 2011, Docket Entry 505, at p. 1.  But even

3   then, the production was not complete.  In direct violation of the Court's

4   order, an entire session of Guernsey's testimony was not produced until a

5   month *after* trial, and only in response to a further inquiry by defense

6   counsel.

7        The prosecutors also delayed production of certain Jencks statements

8   of Mr. Basurto and a potentially exculpatory FBI 302 statement by Patrick

9   Rowan until after the close of their case-in-chief.

10       Even today, review of other cases reveals that exculpatory material

11   has yet to be produced.  For instance, it has recently come to defense

12   counsel's attention that the prosecutors never produced evidence underlying

13   their theory in the *O'Shea* prosecution that the 2004 military school

14   payments for the tuition for Nestor Moreno's son made from the Sorvill

15   account came from funds provided by ABB, not LMC.  This, despite

16   prosecutors in the Lindsey-Lee case presenting the jury with an exhibit

17   linking this payment to funds received from LMC and using Agent Costley

18   to also link these payments to the Lindsey-Lee Defendants.  *See* Exhibit M,

19   Government's Trial Summary Exhibit 30 (reflecting that the payment for

20   military school came from LMC payments).  The testimony that supports the

21   *O'Shea* indictment obviously contradicts Agent Costley's claims.  But this

22   testimony has yet to be produced.

23       This history of untimely and incomplete disclosures begs the question

24   of what other evidence helpful to the defense has not been produced.

25   **C.    The Government's Intent To Shield Its Investigation From**

26   **The Light of Day And Its Actions Doing So Are**

27   **Misconduct**

28   Under close questioning by the Court, the government admitted that it called