Jan L. Handzlik  (State Bar No. 47959)
VENABLE LLP
2049 Century Park East, Suite 2100
Los Angeles, California  90067
Telephone:  (310) 229-0378
Fax:  (310) 229-9901
Email:  jhandzlik@venable.com

Attorneys for Defendants Lindsey Manufacturing
Company and Keith E. Lindsey

Janet I. Levine  (State Bar No. 94255)
Martinique E. Busino  (State Bar No. 270795)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California  90071
Telephone:  (213) 622-4750
Fax:  (213) 622-2690
Email:  jlevine@crowell.com
        mbusino@crowell.com

Attorneys for Defendant Steve K. Lee

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 10-1031(A)-AHM |
| Plaintiff, | **REPLY TO GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT; EXHIBITS** |
| v. | |
| ENRIQUE FAUSTINO AGUILAR NORIEGA, ANGELA MARIA GOMEZ AGUILAR, LINDSEY MANUFACTURING COMPANY, KEITH E. LINDSEY and STEVE K. LEE, | |
| Defendants. | Date:  October 17, 2011 Time:  3:00 p.m. Place:  Courtroom 14 |

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ...................................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES .....................................1

I.     INTRODUCTION ..................................................................................1

II.    THE PROSECUTION'S PATTERN OF REPEATED
MISCONDUCT BEGAN WITH ITS INVESTIGATION ......................2

    A.    The November 2008 Search Warrant Contained False
Statements Inserted By The Prosecutors And Did Not Comport
With *Tamura* Principles; The Prosecutors Unfairly And
Improperly Hid Their Knowing Involvement In Both The
False Statements And The *Tamura* Violation..................................2

        1.    The Prosecutors Invented Facts And Inserted Them
Into The Search Warrant Affidavit With No Cause
And Without Consulting The Affiant Or Other Agents,
An Unprecedented Example Of Misconduct........................3

        2.    The ESI Language In The November 20, 2008 Search
Warrant Was Not Just "Clumsy" Language "No One
Caught," But Was Standard United States Attorney
Language Purposefully Included In The Warrant ...............6

    B.    Starting With Agent Guernsey's First Grand Jury Appearance
And Continuing Through The Summation, The Prosecution
Sought To Connect LMC And ABB, So As To Establish A
"Pattern of Bribery" ........................................................................7

    C.    The Prosecution Committed Misconduct Through Its Multiple
Attempts To Keep Agent Guernsey's Grand Jury Testimony
From The Defense...........................................................................10

| | | |
|---|---|---|
| III. | THE PROSECUTION'S INTENTIONAL SHIELDING OF ITS INVESTIGATION FROM SCRUTINY IS PART OF ITS CONTINUING PATTERN OF MISCONDUCT | 14 |
| | A. The Prosecution Used Agent Costley To Shield Its Investigation | 14 |
| | B. Contrary To The Prosecution's Representations, Agent Costley Was Not A Proper "Summary Witness" | 15 |
| | C. The Prosecution's Shielding Of Its Investigation Through Agent Costley Was Prejudicial | 19 |
| | D. The Prosecution's Shielding Of Its Investigation Violated *Brady*, *Kyles* And Their Progeny | 20 |
| IV. | THE PROSECUTION'S ACTIONS WITH RESPECT TO JEAN GUY LAMARCHE ARE MISCONDUCT | 23 |
| | A. The Prosecution Continues To Misrepresent Facts Surrounding Mr. LaMarche | 23 |
| | B. The Prosecution Has Not Sufficiently Addressed Its Interference With Witnesses | 24 |
| | C. The Prosecution Used The LaMarche Emails Substantively, Against All Defendants, In Violation Of The Court's Limiting Instructions | 26 |
| V. | THE PROSECUTION WRONGLY ARGUED WILLFUL BLINDNESS | 29 |
| | A. The Prosecution's Argument | 29 |
| | B. The Prosecution Conflates Willful Blindness/Deliberate Ignorance With Constructive Knowledge To Justify Its Improper Jury Argument | 29 |

C.   The Willful Blindness Argument Was Designed To Convict The
Defendants On A Rejected Theory; It Caused The Exact Prejudice
The Prosecution Intended.............................................................31

VI.   THE PROSECUTION'S *BRADY* AND DUE PROCESS
VIOLATIONS RELATED TO THE MILITARY SCHOOL
PAYMENTS CANNOT BE CONDONED ..........................................31

VII.   THE WITNESS LIST, DISCOVERY AND OTHER
ACTS OF MISCONDUCT ..............................................................33

A.   The Prosecution's Actions Related To Its Witness Lists Are Part
Of The Course Of Misconduct Infecting This Case ....................33

B.   The Prosecution Failed To Comply With Its Obligations
Under *Brady* And This Court's Discovery Orders ......................34

1.   CFE, Rowan And Basurto Interview Reports ...................34

2.   Garza, Serocki, And Zavaleta.........................................34

C.   The Prosecution's Actions Related To The Footers Are Part Of And
Exemplify The Course Of Misconduct ........................................35

D.   Other Misconduct By The Prosecution.........................................35

VIII.   THE CUMULATIVE IMPACT OF THE PROSECUTION'S
MISCONDUCT REQUIRES DISMISSAL............................................36

A.   The Prosecution Seeks To Ignore Its Pattern Of Misconduct.......36

B.   Reviewed Collectively, The Prosecution's Course Of
Misconduct Caused Substantial Prejudice And Requires
Dismissal ....................................................................................39

C.   The Handling Of Agent Guernsey's Transcript, Standing Alone,
Is Flagrant Misconduct...............................................................41

IX.   CONCLUSION ...........................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Berger v. United States,*
   295 U.S. 78 (1935)............................................................6

*Bowen v. Maynard,*
   799 F.2d 593 (10th Cir. 1986)......................................22

*Brady v. Maryland,*
   373 U.S. 83 (1963)............................................................1

*Bullcoming v. New Mexico,*
   131 S.Ct. 2705 (2011)..............................................17, 20

*Hein* v. *Sullivan,*
   601 F.3d 897 (9th Cir. 2010)....................................36, 39

*Jones v. Basinger,*
   635 F.3d 1030 (7th Cir. 2011)......................................22

*Kiley v. United States,*
   260 F. Supp. 2d 248 (D. Mass. 2003)..........................23

*Kyles v. Whitley,*
   514 U.S. 419 (1995)........................................................20

*Lester v. United States,*
   ___A.3d___, 2011 WL 3190469 (D.C. July 28, 2011)............18

*Nat'l Labor Relations Bd. v. First Termite Control Co., Inc.,*
   646 F.2d 424 (9th Cir. 1981)......................................19

*Pursell v. Horn,*
   187 F. Supp. 2d 260 (W.D. Pa. 2002)........................23

*United States v. ABB, Inc.,*
   No. 10-CR-664 (S.D. Tx.)............................................31

*United States v. Baker,*
   10 F.3d 1374 (9th Cir. 1993)......................................19

*United States v. Basurto,*
    497 F.2d 781 (9th Cir. 1974) .................................................................38

*United States v. Basurto,*
    No. 09-CR-325 (S.D. Tx.) ......................................................................31

*United States v. Behrens,*
    689 F.2d 154 (10th Cir. 1982) ...............................................................17

*United States v. Bray,*
    139 F.3d 1104 (6th Cir. 1998) ...............................................................17

*United States v. Campbell,*
    878 F.2d 170 (6th Cir. 1989) ...................................................................5

*United States v. Carona,*
    630 F.3d 917 (9th Cir. 2011) ..................................................................21

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ....................................................40, 41, 43

*United States v. Dukagjini,*
    326 F.3d 45 (2d Cir. 2003) .....................................................................17

*United States v. Fitzgerald,*
    615 F. Supp. 2d 1156 (S.D. Cal. 2009) .................................................43

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir. 1996) ..................................................................41

*United States v. Freeman,*
    498 F.3d 893 (9th Cir. 2007) ..................................................................17

*United States v. Hector,*
    No. 04-CR-860, 2008 WL 2025069 (C.D. Cal. May 8, 2008)..................39, 40

*United States v. Howell,*
    231 F.3d 615 (9th Cir. 2000) ..................................................................22

*United States v. Hozhabri,*
    No. 07-CR-452 (S.D. Tx.) ......................................................................31

*United States v. Johnson,*
    529 F.3d 493 (2d Cir. 2008) ...................................................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Kearns,*
  5 F.3d 1251 (9th Cir. 1993) ............................................................... 42

*United States v. Kojayan,*
  8 F.3d 1315 (9th Cir. 1993) ........................................................... 45, 46

*United States v. Lowe,*
  516 F.3d 580 (7th Cir. 2008) ............................................................... 5

*United States v. Meyers,*
  847 F.2d 1408 (9th Cir. 1988) ........................................................... 19

*United States v. Moon,*
  513 F.3d 527 (6th Cir. 2008) ............................................................. 17

*United States v. Nivica,*
  887 F.2d 1110 (1st Cir. 1989) ........................................................... 17

*United States v. O'Shea,*
  No. 09-CR-629 (S.D. Tx.) ................................................................. 32

*United States v. Olano,*
  62 F.3d 1180 (9th Cir. 1995) ............................................................. 17

*United States v. Quinn,*
  537 F. Supp. 2d 99 (D.D.C. 2008) ..................................................... 21

*United States v. Ramirez,*
  320 Fed. Appx. 7, 2009 WL 909645 (2d Cir. 2009) .......................... 31

*United States v. Regan,*
  103 F.3d 1072 (2d Cir. 1997) ............................................................ 22

*United States v. Reyes,*
  18 F.3d 65 (2d Cir. 1994) .................................................................. 22

*United States v. Ross,*
  372 F.3d 1097 (9th Cir. 2004) ....................................................... 39, 41

*United States v. Sager,*
  227 F.3d 1138 (9th Cir. 2000) ....................................................... 21, 23

*United States v. Scales,*
  594 F.2d 558 (6th Cir. 1979) ............................................................. 17

*United States v. Sitton,*
    968 F.2d 947 (9th Cir. 1992) ................................................................38

*United States v. Tamura,*
    694 F.2d 591 (9th Cir. 1982) ..................................................................7

*United States v. Waters,*
    627 F.3d 345 (9th Cir. 2010) ................................................................22

**OTHER AUTHORITIES**

Fed. R. Evid. 105 ....................................................................................26

Fed. R. Evid. 602 ...............................................................................15, 18

1    Defendants Lindsey Manufacturing Company ("LMC"), Keith E. Lindsey

2  and Steve K. Lee ("Lindsey-Lee Defendants"), by their counsel of record, submit

3  this Reply to the Government's Opposition to the Defendants' Supplemental Brief

4  in Support of Their Motion to Dismiss the Indictment With Prejudice Due to

5  Repeated and Intentional Government Misconduct.

6    This Reply is based on the accompanying Memorandum of Points and

7  Authorities, exhibits, the previously filed moving papers,[1] all files and records in

8  this case, and any arguments and evidence presented at or before the hearing on

9  this motion.

10

11  DATED:  September 25, 2011      Respectfully submitted,

12                                 JANET I. LEVINE
                                   CROWELL & MORING LLP
13

14                                  /s/ Janet I. Levine
                                   By: JANET I. LEVINE
15                                 Attorneys for Defendant
                                   Steve K. Lee
16

17  DATED:  September 25, 2011      JAN L. HANDZLIK
                                   VENABLE LLP
18

19                                  /s/  Jan L. Handzlik
                                   By: JAN L. HANDZLIK
20                                 Attorneys for Defendants
                                   Lindsey Manufacturing Company and
21                                 Keith E. Lindsey

22

23

24

25  ───────────────

[1]    Motion to Dismiss the Indictment With Prejudice Due to Repeated and
26  Intentional Government Misconduct ("Motion to Dismiss"), May 9, 2011 (Docket
   Entry 505); Reply Brief in Support of Motion to Dismiss ("Reply"), June 17, 2011
27  (Docket Entry 614); Supplemental Brief in Support of Motion to Dismiss
   ("Supplemental Brief" or "Supp. Brief"), July 25, 2011 (Docket Entry 632).
28
   REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
                   IN SUPPORT OF MOTION TO DISMISS INDICTMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

From at least October 2008, the prosecution engaged in a course of misconduct that was both flagrant and prejudicial.  Among other things, the prosecutors inserted false factual statements into their agent's search warrant affidavit;[2] failed to bring those statements to the agent's attention; repeatedly used affidavits containing these falsehoods for searches and seizures; changed the contents of proposed search warrant authorizations from language that comported with the Fourth Amendment to language that allowed the case agents to conduct general searches of electronically stored information; allowed false testimony to be presented to the grand jury; shielded that false testimony and other falsehoods and failures in the investigation from disclosure to the grand jury, the Court and the Lindsey-Lee Defendants (hereinafter "defendants"); failed to comply with disclosure orders and with *Brady v. Maryland*, 373 U.S. 83 (1963); failed to comply with this Court's limiting instructions; and improperly and prejudicially argued willful blindness to the jury.  The prosecution's misconduct is detailed in the Motion to Dismiss, filed May 9, 2011, the Reply in Support of the Motion to Dismiss, filed June 17, 2011, and the Supplemental Brief in Support of the Motion to Dismiss, filed July 25, 2011, and is not repeated herein.

This brief addresses the erroneous arguments made, and the inapposite or incorrect legal authorities cited, in the prosecutors' Response to the Defendants'

---

[2]    All three trial prosecutors submitted declarations attached to the prosecution's September 5, 2011 filing.  Mr. Goldberg's declaration sets forth his late entry into this case and disclaims personal responsibility for certain actions. Declaration of Jeffrey A. Goldberg, September 5, 2011 (Docket Entry 642) at ¶ ¶ 2-3.  The Motion to Dismiss, the Reply, the Supplemental Brief, and the Supplemental Reply, significantly, focus on a course of conduct involving the prosecution team and only identify individuals when necessary to the description of a particular action.

Supplemental Brief, filed September 5, 2011 (hereinafter "Supplemental Opposition" or "Supp. Opp.").  For the reasons set forth in the previously filed papers in support of the motion and in this brief, defendants' Motion to Dismiss should be granted.[3]

## II.     THE PROSECUTION'S PATTERN OF REPEATED MISCONDUCT BEGAN WITH ITS INVESTIGATION

### A.     The November 2008 Search Warrant[4] Contained False Statements Inserted By The Prosecutors And Did Not Comport With *Tamura* Principles; The Prosecutors Unfairly And Improperly Hid Their Knowing Involvement In Both The False Statements And The *Tamura* Violation

///

---

[3]     The prosecution begins the introduction to its Supplemental Opposition by trying to justify its errors based on how "complex" this case was.  It notes that this was a "seven-year bribery conspiracy . . . ."  Supp. Opp. at p. 1.  It then notes this was a "complex multi-year grand jury investigation with international dimensions."  *Id.*  Of course, only Agent Guernsey and one other witness testified to the grand jury that returned the First Superseding Indictment.  (And only Agent Guernsey and two other witnesses testified to the earlier grand jury that returned the initial Indictment against the Aguilars).  Both grand juries were provided with very few documents.  And the interviews of significant witnesses actually occurred after indictment – from October 2010 onward.  If there was a complex, multi-year investigation, it was of ABB, an entity completely unrelated to LMC, and was largely conducted by ABB's own attorneys.

[4]     The prosecution's Supplemental Opposition proclaims that the defense no longer finds fault with the warrantless searches conducted of two LMC buildings on November 20, 2008.  Supp. Opp. at p. 8, n. 6.  That is incorrect.  The defense has always argued that the warrantless searches were improper.  The prosecution represented, however, that it found no evidence in these searches (March 25, 2011, RT at 26:13-16, 28:13-23), and, thus, the suppression of evidence would be a moot remedy (March 25, 2011, RT at 29:22 – 30:10).  Significantly, the prosecution never carried its burden by proving the warrantless searches comported with the

1.    **The Prosecutors Invented Facts And Inserted Them Into The Search Warrant Affidavit With No Cause And Without Consulting The Affiant Or Other Agents, An Unprecedented Example Of Misconduct[5]**

There is no dispute that the November 20, 2008 search warrant affidavit contained two *false factual* statements – both of which stated that LMC made several large payments to Sorvill International, S.A. ("Sorvill").[6]  There is no dispute that the prosecutors themselves inserted these *false factual statements* without consulting the affiant and without having a basis for believing these "facts" to be true.[7]  There is no dispute that these false statements appeared in

_____

Fourth Amendment.  March 25, 2011, RT at 23:8 – 30:10.

[5]    The prosecutors *continued* to submit search/seizure warrants and affidavits with the *false facts through October 2010*; this was even after the false factual statements were corrected in another affidavit by the original affiant.  Significantly, the original affiant, Agent Binder, continued using the affidavit with the false facts (*see* August 27, 2010 Dream Seeker Yacht seizure warrant (Farrell Binder affidavit); October 5, 2010 Dream Seeker Yacht seizure warrant (second application) (Farrell Binder affidavit)), as did other case agents (*see, e.g.*, October 5, 2010 Banco Popular Account seizure warrant (Rodolfo Mendoza affidavit)).  Each time the false affidavit was used, one of the prosecutors in this matter submitted the warrant with the false affidavit to a federal court.

[6]    Government Trial Exhibit 30 ("summary" chart of payments connecting LMC to Sorvill with colored lines) (attached hereto as Exhibit A), and Guernsey grand jury Exhibit 1 (chart connecting LMC to Sorvill, used during both the September 8 and October 14, 2010 grand juries) (attached hereto as Exhibit B), reflect how critical this was to the prosecution's theory of the case.  Among other things, it provided a (false) link between LMC and the ABB misconduct regarding Sorvill.

[7]    Even though these statements were untrue and clearly *Brady*, the prosecution refused to acknowledge their falsity until ordered to do so by the Court.  On February 22, 2011, in response to a defense request for this information, the Court ordered the prosecution to disclose "every shred of evidence" that reflected that LMC made payments to Sorvill.  February 22, 2011, RT at 29:2-9.  Not one shred

1   affidavits through October 2010, even after Agent Binder noted the falsity of those

2   statements, and changed them in at least one affidavit in 2010.

3       The prosecution asks the Court to overlook this unique misconduct, since the

4   Court already denied the defendants' *Franks* Motion. Supp. Opp. at pp. 8-9. This

5   argument – a *non sequitur* at best – misses two critical points. First, this is a

6   Motion to Dismiss, not a *Franks* Motion. Here, the focus is on the *prosecutors'*

7   *course of conduct* requiring dismissal. Inserting false facts into a search warrant

8   affidavit without any basis, and then repeatedly using that false affidavit many

9   times during a two-year period is clearly prosecutorial misconduct.

10       Second, when the *Franks* Motion was filed, and before Agent Binder

11   testified at the *Franks* hearing, the prosecutors never acknowledged their personal

12   responsibility for the invention and inclusion of these false statements. In fact, the

13   prosecution completely ignored defendants' *Brady* request for the production of

14   drafts of the search warrant affidavit – disclosing them only *after* the *Franks*

15   hearing, pursuant to a Court order. March 23, 2011, RT at 58:13-18; Order, March

16   23, 2011 (Docket Entry 333). The truth about the prosecutors' role was revealed in

17   the testimony of Agent Binder, during the hearing on the *Franks* Motion.[8] March

18   23, 2011, RT at 13:11 – 21:14; 32:11 – 34:11; 58:22 – 60:8.

19   _____

20   of evidence supporting those facts was produced. This omission was a potent
21   acknowledgment of their falsity. And the implication in the prosecution's
     Supplemental Opposition that it – the prosecution – voluntarily produced this
22   information – is not true. As is clear from the record, the prosecution did not make
23   an affirmative disclosure of this at all. Instead, by virtue of *not* disclosing
     information when ordered by the Court to disclose the evidence it had, the
24   prosecution acknowledged the falsity of the search warrant affidavit.

25   [8]    No one disputes Agent Binder's testimony that the prosecutors inserted these
26   false facts without her knowledge, and without consulting her. Indeed, had Agent
     Binder lied at the *Franks* hearing, that would be *Brady*, and the prosecution would
27   have had to notify the defense of this lie. The prosecutors' silence on this matter
28   confirms the veracity of Binder's testimony on this particular point.

The prosecution seeks to excuse its introduction of false factual statements into the search warrant affidavit,[9] by arguing that "[p]rosecutors are almost always involved in the drafting and editing of agents' search warrant affidavits."  Supp. Opp. at p. 9.  Of course, that is beside the point.  And the cases on which it relies are inapposite.

*United States v. Lowe*, 516 F.3d 580 (7th Cir. 2008), involved a challenge to a search warrant.  In *Lowe*, the Seventh Circuit found that there was no Fourth Amendment violation where the prosecutor incorrectly changed the name of one agent to another throughout the affidavit, when the affiant was changed at the last minute.  *Id*. at 583-86.  But the present case is not a case of sloppy drafting like *Lowe*.[10]  Here, the prosecutors themselves intentionally inserted false facts.

And *United States v. Campbell*, 878 F.2d 170 (6th Cir. 1989), is nothing like the unique situation here.  In *Campbell*, the defense argued that, since the case agent went to law school and a prosecutor helped him with the affidavit, the warrant should be held to a higher standard than other warrants.  *Id*. at 173.  But that is not the case here.  The defense here is not asking that this warrant be held to a higher standard.  Instead, the defendants contend that the actions of one or more of the prosecutors' *inventing facts* without basis, and inserting them into a warrant

---

[9]   The prosecution has cited no case or doctrine (nor could it do so) that allows prosecutors to invent facts and insert them in a search warrant affidavit.

[10]   The prosecution complains that the defense cites no legal authority to support the contention that a prosecutor commits misconduct by "inadvertently" including an "inaccurate statement in a draft of a search warrant affidavit," except for a "fleeting reference" to *Brady*.  Supp. Opp. at p. 10.  Of course, inventing facts that have no basis and including them in a series of affidavits filed with several federal courts is not an "inadvertent" inclusion of an "inaccurate statement in a draft" of a sworn search warrant affidavit.  In any event, the *Brady* reference was a reference to the prosecution's inexplicable failure to timely produce information about its role, something the prosecution never addresses.

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO DISMISS INDICTMENT

5

1  affidavit (without even consulting the affiant), was part of the course of

2  prosecutorial misconduct.

3    Prosecutors cannot invent facts[11] and obtain warrants based on those "facts."

4  That is not striking "hard blows," it is striking "foul ones."  *See Berger v. United*

5  *States*, 295 U.S. 78, 88 (1935).  And contrary to the prosecution's suggestion,

6  securing a conviction does not excuse this misconduct.

7    **2.    The ESI Language In The November 20, 2008 Search**

8    **Warrant Was Not Just "Clumsy" Language "No One**

9    **Caught," But Was Standard United States Attorney**

10   **Language Purposefully Included In The Warrant**

11    The Court found that the provisions of the November 20, 2008 search

12  warrant that permitted the search of electronically stored information ("ESI") did

13  not comport with the Fourth Amendment.  However, the Court concluded that the

14  "good faith" exception applied to the problematic language and did not suppress

15  the evidence.  March 25, 2011, RT at 49:19 – 52:3.  The Court's conclusion

16  followed a colloquy with counsel about a key provision of the warrant that the

17  Court suggested was the product of clumsy drafting, ultimately allowing the case

18  agents to conduct the general ESI search.

19    In colloquy with the Court about the provision, the prosecution quickly

20  adopted the Court's suggestion that the challenged language was just clumsy,

21  echoing the Court's and the defense's comments, and stating that "no one caught"

22  this language.  March 25, 2011, RT at 43:4 – 45:6.  However, the prosecution

23  failed to inform the Court that this challenged language was present in only three

24  versions of the 14 versions of the warrant (versions 10, 13, and 14).

---

26  [11]    Significantly, while both Mr. Miller and Ms. Mrazek submitted declarations
27  in their Supplemental Opposition, neither addressed the insertion of the false facts
    into the agent's sworn affidavit or the repeated use of affidavits with these false
28  facts through October 2010.

In its Supplemental Opposition, filed just three weeks ago – nearly six months after the hearing on the Motion to Suppress – the prosecution now admits that this was *standard language* used by the United States Attorney's Office at the time of the search. *See* Supp. Opp. at pp. 12-13.  The prosecution admits for the first time in its Supplemental Opposition that it purposely replaced the original language, which comported with *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), with the language that did not comport with *Tamura*.

Yet until that time, the prosecution allowed the Court and defense counsel to believe this was just clumsy drafting and not the official policy of the United States Attorney's Office.  This was clearly misconduct.

**B.  Starting With Agent Guernsey's First Grand Jury Appearance And Continuing Through The Summation, The Prosecution Sought To Connect LMC And ABB, So As To Establish A "Pattern Of Bribery"**

During Agent Guernsey's first grand jury appearance on September 8, 2010, and then again during her October 14, 2010 testimony, the prosecution displayed a chart connecting LMC and ABB to Sorvill and Grupo in a single line. *See* Exhibit B, grand jury Exhibit 1 (September 8, 2010)/grand jury Exhibit 1 (October 14, 2010).  While the prosecution states in its Supplemental Opposition that, during its grand jury presentation, it was "simply recount[ing] how the investigation originated," the true intention behind the prosecution's attempts to connect LMC and ABB is clear:  it wanted the grand jurors to equate ABB's illegal conduct with the legitimate conduct of LMC.  Supp. Opp. at p. 14.

The prosecutor's questioning of Agent Guernsey and Guernsey's testimony to the grand jury illustrate the prosecution's reliance on this false linkage.  Agent Guernsey described ABB and LMC as "the same type of company."  October 14, 2010, RT at 8:23-24; *see also* Supp. Brief at pp. 33-34, 44-46.  No matter how the prosecution tries to spin this testimony, the intent behind it was clear – guilt by

association. If the prosecutors were truly attempting to "merely explain the origins of the investigation," it would not have created such an exhibit or sought to misrepresent and confuse the relationship between ABB and LMC through Agent Guernsey's testimony.

The prosecution also tries to minimize its attempts to link ABB and LMC through the testimony of Fernando Maya Basurto, arguing that the October 10, 2010 email from Ms. Mrazek to Mr. Basurto's attorney does not support the "accusation" that "Ms. Mrazek 'asked Mr. Basurto to cooperate against [the defendants]' even though 'he knew nothing' about them." *See* Supp. Opp. at p. 15, n. 13 (citation omitted). In fact, the language of this email is unambiguous – it has no other meaning. Moreover, the use of Mr. Basurto's improper testimony about ABB in a case that had nothing to do with ABB further establishes the prosecution's impermissible attempts to make this linkage.

The prosecution gives itself credit, because it did not mention ABB or Mr. Basurto during its opening statement or closing argument. However, this ignores the fact that the Court denied the prosecution's motion *in limine* seeking to introduce ABB evidence at the Lindsey trial. April 1, 2011, RT at 16:3-16 (prosecution's motion denied with leave to renew request to introduce at trial). By closing arguments, the damage had been done – the prosecution had established the improper connection in the minds of the jurors. And, the prosecution's argument overlooks the fact that its rebuttal argument highlighted the linkage again. *See* Supp. Brief at p. 46 (citing May 6, 2011, RT at 4337:10-15).

The prosecution now argues that it made the Basurto-ABB-LMC connection in an appropriate fashion, because the Court's limiting instruction only applied to Mr. Basurto's second day of testimony. This is not true. It misconstrues and misreads the Court's comments. Before Mr. Basurto testified on the second day, the Court stated:

1

2

3

4

5

*I think it's fair to say that in that testimony, Mr. Basurto testified before us about his role in an entirely different conspiracy involving this company known as ABB.* None of the defendants who is in this courtroom have been accused of any involvement in that conspiracy. None of the defendants in this courtroom have been accused of having any role whatsoever in that case. This case, in short, does not involve ABB. That's the other case.

6

7

8

I've instructed the prosecution to go no further in eliciting testimony from this witness about that other case or about his role in the other case, so we're not going to have any further testimony about that.

9

10

11

12

13

The sole basis for allowing further testimony from this witness in answer to questions that the government may pose will be about the role that a company known as Sorvill International allegedly played in this case and whether Enrique Aguilar, who is a defendant in this case, but not here, had anything to do with whatever role that Sorvill International may have played in this case. So that's going to be the limit of the inquiry into the relevance.

14

15

16

17

18

19

20

*Now, this defendant did testify yesterday, and the defense attorneys will have the right, if they choose to, to cross-examine him about his testimony yesterday and whatever remains of his testimony today. But I instruct you now that the only issues that this witness's testimony* may have some bearing on - - and it's up to you to decide how much, if any - - concern the allegations about Sorvill International having played a role in the alleged crimes committed in this case by the defendants in this case and whether Enrique Aguilar is proved to have had any role in the conduct of Sorvill International.

21

April 7, 2011, RT at 784:14 – 785:19 (emphasis added).

22

23

24

The Court permitted the defense to cross-examine Mr. Basurto in an attempt to ameliorate the harm caused by the prosecutors' misconduct.[12] But cross-examination does not relieve the prosecution of its obligations to act fairly and

25

26

27

28

---

[12]     Mr. Basurto was led to the witness stand in front of the jury in jail clothes, handcuffs and shackles. April 6, 2011, RT at 715:25 – 716:9. The indelible image undoubtedly stayed with some jurors. It suggested guilt by association and increased the prejudice to the defendants.

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS INDICTMENT

9

justly.  And it does not excuse the mention of Mr. Basurto's testimony during the prosecution's rebuttal and the use of that testimony against the defendants. Regardless of whether the argument was short or long, it was another of the prosecution's improper actions.

**C.**  **The Prosecution Committed Misconduct Through Its Multiple Attempts To Keep Agent Guernsey's Grand Jury Testimony From The Defense**

The papers previously filed detail the falsity permeating Agent Guernsey's grand jury testimony.  Not only was there misconduct in the presentation of the testimony of Agent Guernsey before the grand jury, but also in the prosecution's purposeful attempts to keep that testimony from both the Court and the defense.[13]

We now know that Agent Guernsey testified in four grand jury sessions.  On June 27, 2011, Mr. Miller revealed he had produced only three of four days of her testimony.  Until June 27th, the defense believed that what the prosecution disclosed on April 15, 2011 under Court order, was Agent Guernsey's complete grand jury testimony.

This is now followed by a new "revelation" in Mr. Miller's September 5, 2011 declaration.

On January 24, 2011, the Court ordered the prosecution to file *in camera* Agent Guernsey's grand jury testimony.  January 24, 2011, RT at 38:7-14.  Mr. Miller now acknowledges in his declaration to the prosecution's Supplemental

---

[13]     The prior briefs discussed the flagrantly false and material testimony of Agent Guernsey before the grand jury. *See* Motion to Dismiss, May 9, 2011 (Docket Entry 505) at pp. 1-16, 21-25; Reply Brief in Support of the Motion to Dismiss, June 17, 2011 (Docket Entry 614) at pp. 4-7, 8-15; Supplemental Brief in Support of Motion to Dismiss Indictment, July 25, 2011 (Docket Entry 632) at pp. 33-35.  This Supplemental Reply focuses only *on the new information* in Mr. Miller's declaration regarding his "mistakes" in producing the Guernsey transcripts.

Opposition filed September 5, 2011, that in response to this order on January 27, 2011, he only filed *two* of the *four* grand jury sessions. Declaration of Douglas M. Miller ("Miller Decl."), September 5, 2011 (Docket Entry 642) at ¶ 5. He now claims that when he filed the two sessions, he failed to recall the appearances on September 15 *and* October 14. *Id.*

On March 25, 2011, Mr. Miller was again ordered to provide Agent Guernsey's grand jury testimony to the Court *in camera*. March 25, 2011, RT at 112:14-16. In complying with that order, Mr. Miller "realized" he had not provided the September 15, 2010 transcript to the Court as previously ordered on January 24, 2011. Miller Decl. at ¶ 7. So, in March 2011, Mr. Miller filed with the Court *three* sessions of the Guernsey grand jury testimony, seemingly without an acknowledgment of his earlier, incomplete filing.

In March 2011, when he "realized" his January production of grand jury testimony had been incomplete, Mr. Miller had good reason to carefully look for all of the Guernsey grand jury testimony (and for all discovery). Clearly, his failure to comply with the January Court order should have been a "wake up" call. Indeed, Mr. Miller assured the Court time and time again that he and his team had complied with the Court's discovery orders, that "top to bottom" reviews for discoverable evidence had been made, and that the prosecution's compliance had been complete. *See, e.g.*, December 14, 2010, RT at 41:22-24, 42:19 – 43:2; April 6, 2011, RT at 722:7 – 723:10; April 7, 2011, RT at 880:23 – 883:5.

The following timeline of Guernsey grand jury events is illustrative:

### TIMELINE OF GUERNSEY GRAND JURY

| Date | Event |
|------|-------|
| September 8, 2010 | **Agent Guernsey testifies before first grand jury. Mr. Miller and Ms. Mrazek present her testimony.** |
| September 15, 2010 | **Agent Guernsey testifies before first grand jury. Mr. Miller presents her testimony.** |

| September 15, 2010 | **Enrique and Angela Aguilar indicted.** |
|---|---|
| October 14, 2010 | **Agent Guernsey testifies before second grand jury.  Mr. Miller and Ms. Mrazek present her testimony.** |
| October 21, 2010 | **Agent Guernsey testifies before second grand jury.  Mr. Miller and Ms. Mrazek present her testimony.** |
| October 21, 2010 | **First Superseding Indictment charging LMC, Dr. Lindsey, and Mr. Lee returned.** |
| November 30, 2010 | Prosecution produces grand jury testimony of Mindy Kwok and Sergio Cortez. |
| December 10, 2010 | Prosecution produces grand jury testimony of Philip Spillane. |
| January 3, 2011 | **Prosecution states at discovery "meet and confer" that it will not call Agent Guernsey because she testified before the grand jury.** |
| January 14, 2011  January 20, 2011 | Defendants' Motion to Compel Discovery Pursuant to *Brady v. Maryland* ("first *Brady* Motion") (Docket Entry 132) and related reply (Docket Entry 150).  In this motion and related reply, defendants again seek the grand jury testimony of Agent Guernsey. |
| January 24, 2011 | Hearing on first *Brady* Motion.  During this hearing, **the Court orders the prosecution to produce *in camera* all grand jury testimony of Agent Guernsey**. |
| January 27, 2011 | **Prosecution files transcripts of Agent Guernsey's testimony before the grand jury on September 8 and October 21.  (Not September 15 or October 14 transcripts.)** |
| March 24, 2011 | Prosecution produces nine heavily redacted pages from Agent Guernsey's October 21 grand jury transcript in connection with Dr. Lindsey's *Miranda* Motion. |
| March 25, 2011 | **Court again orders that all of Agent Guernsey's grand jury testimony be produced again *in camera*.** |

| | |
|---|---|
| March 28, 2011 | **Prosecution provides a second copy, *in camera*, of the September 8 and October 21 transcripts, and produces the September 15 transcript for the first time, but fails to produce the October 14 transcript.** |
| March 30, 2011 | In response to the Court's questions about the witness list, Mr. Miller states again that all Jencks had been produced, but if he found other materials either "through discussions with witnesses, or some other unforeseen way," he would provide these to the defense.  March 30, 2011, RT at 11:8-13.  In response to this statement, the Court orders the prosecution to produce all Jencks by 1:15 p.m. that day.  March 30, 2011, RT at 11:16-17. |
| April 6, 2011 | Court orders the prosecution to "make an utterly new top to bottom, absolutely thorough, no exceptions whatsoever, review of everything to which the defendants may have a right in discovery or by virtue of agreements that have been reached or orders that I've issued."  April 6, 2011, RT at 722:7 – 723:10. |
| April 13, 2011 | Defendants file *Ex Parte* Application to Compel Production of Agent Guernsey's grand jury transcripts (Docket Entry 435). |
| April 15, 2011 | Court grants Defendants' *Ex Parte* Application and orders the prosecution to produce all of Agent Guernsey's grand jury transcripts to the defense (Docket Entry 465).<br><br>**Prosecution provides defendants with copies of the binders provided to the Court on March 28, 2011.  These binders include transcripts for September 8 and 15, 2010 and October 21, 2010.** |
| April 20, 2011<br>April 22, 2011<br>April 26, 2011 | Direct and Cross-Examination of Agent Guernsey. |
| May 9, 2011 | Defendants file Motion to Dismiss Indictment (Docket Entry 505). |
| June 6, 2011 | Prosecution files Opposition to Motion to Dismiss Indictment (Docket Entry 600). |

| June 17, 2011 | Defendants file Reply Brief in Support of the Motion to Dismiss (Docket Entry 614). |
|---|---|
| June 27, 2011 (12:57 p.m.) | **Prosecution produces Agent Guernsey's October 14, 2010 grand jury transcript.** |
| June 27, 2011 (4:00 p.m.) | Hearing on Defendants' Motion to Dismiss the Indictment. |
| September 5, 2011 | **Prosecution reveals, seemingly for the first time, that it failed to produce the September 15 Guernsey grand jury transcript when ordered to do so in January 2011.** |

## III.   THE PROSECUTION'S INTENTIONAL SHIELDING OF ITS INVESTIGATION FROM SCRUTINY IS PART OF ITS CONTINUING PATTERN OF MISCONDUCT

### A.   The Prosecution Used Agent Costley To Shield Its Investigation

Agent Costley testified as a purported "summary witness." This enabled the prosecutors to present a summary witness who had no knowledge about the investigation or the facts, except for what the prosecution team deliberately "spoon fed" him. That way, the summary witness was able to provide the testimony the prosecution needed while the prosecution could continue to shield its investigation by presenting a witness immune to meaningful cross-examination. The prosecution admitted that it wanted to put its actions and its investigation "off-limits." April 15, 2011, RT at 1697:19 – 1698:10. And it worked. Agent Costley's testimony as the summary witness most certainly kept the defense from meaningful inquiry into the investigation.

A motion to exclude Agent Costley's testimony was filed pre-trial. *See* Motion *in Limine* to Exclude Testimony of Special Agent Dane Costley as a Summary Witness, March 28, 2011 (Docket Entry 365); Reply to the Government's Opposition to Defendants' Motion *in Limine* to Exclude Testimony of Special Agent Dane Costley as a Summary Witness, March 31, 2011 (Docket Entry 378). The prosecution represented that "Agent Costley's summary

testimony would be *highly useful* because it would permit the efficient presentation of large amounts of data," and without him, "the government would be forced to needlessly walk the jury through large amounts of detailed documents . . . resulting in a trial that [would] be considerably longer than previously estimated." Government's Response to Defendants' Motion to Exclude Summary Testimony by Special Agent Dane Costley, March 29, 2011 (Docket Entry 368) at p. 3 (emphasis added).  Based on the prosecution's representations, the Court ruled that Agent Costley could testify.  April 20, 2011, RT at 2103:11-13.

But the prosecution never revealed to the Court and defendants how clueless Agent Costley was about this matter.  It was only during cross-examination that it became clear he was unqualified as a witness.[14]  *See* Fed. R. Evid. 602.  The prosecution intentionally misled the defendants and the Court about the extent of Agent Costley's knowledge and ability to serve as a summary witness.[15]

**B.    Contrary To The Prosecution's Representations, Agent Costley Was Not A Proper "Summary Witness"**

The Supplemental Brief details Agent Costley's lack of relevant knowledge and his lack of the qualifications to be a "summary witness."  Supp. Brief at pp. 39-42.[16]

---

[14]    The prosecution is apparently of two minds regarding Agent Costley.  In conflicting statements in its brief, the prosecution argues that it did not select its witnesses "to shield [the] investigation."  Supp. Opp. at p. 53; *see also* p. 67, n. 73.  But on the very next page, it admits that it selected its witnesses "to limit the defendants' ability to cross-examine the agents about the propriety of the investigation."  Supp. Opp. at p. 54.  And it acknowledged as much to the Court.  *See* Supp. Brief at p. 38, n. 1.

[15]    The prosecution ignores how startling Agent Costley's lack of knowledge was to the Court, never addressing this Court's pointed comments about Costley and the charts he introduced.  *See* Supp. Brief at p. 23.

[16]    The prosecution argues that the Court was mistaken in its June 27th statement that the prosecutors had "played games with the inclusion or absence of

In response, the prosecution argues that Agent Costley "*did* have some involvement in the investigation: as a member of the FBI squad that investigated this case, he took part in the search of LMC's offices in 2008, and on occasion, he would discuss the case with one of the lead agents." Supp. Opp. at p. 31 (emphasis in original). Of course, this argument is belied by Agent Costley's own testimony.

Agent Costley testified he was one of more than 20 agents at the November 20, 2008 search, and that he had nothing to do with the investigation. April 29, 2011, RT at 3207:2-10. He was just a "body" securing the premises and items. April 29, 2011, RT at 3207:11-16. He was assigned to secure a warehouse building, which did not contain a lot of documents. April 29, 2011, RT at 3208:4-10.

Moreover, his casual conversations with his fellow squad member, Agent Binder, were of such little importance, he could not recall them. April 29, 2011, RT at 3210:9 – 3211:1. And he acknowledged having no role in the matter until February 2011, when his squad leader asked for a volunteer, he raised his hand to volunteer to be the "summary witness." April 29, 2011, RT at 3212:4-13.

---

Mr. Costley on the witness list." *See* Supp. Opp. at p. 29 (internal quotations omitted). It based this argument on its claim that the March 11, 2011 Joint Submission (Docket Entry 262), in response to this Court's March 9, 2011 minute order, was not a "witness list" but instead a request from the Court to list those individuals and entities related to the pending pretrial motions. *See* Supp. Opp. at p. 29. It argues that, because Agent Costley was not involved in those motions, the prosecution failed to include him on the March 11 joint submission. *See* Supp. Opp. at p. 30. However, the Court's March 9, 2011 order is very clear – it required the parties to "prepare a chart or table listing . . . all entities and individuals referred to in the motion papers . . . *as well as prosecution experts and law enforcement agents who may testify at trial.*" Docket Entry 248 at p. 1 (emphasis added).

The question here is simple: can a witness who knows nothing testify as a "summary" witness?  Agent Costley clearly did not testify on the basis of knowledge gained as a result of his involvement in the investigation.[17]

Agent Costley's role as a summary witness was improper, and the prosecution knew that when it misled the Court about the nature of his proposed testimony.  The "summary agent" cases on which the prosecution now relies do not support its position.  Not one of those cases involved a "summary agent" with anywhere near Agent Costley's lack of knowledge.[18]

Instead, as the cases cited by the prosecution note, summary witnesses are *case agents* (*see, e.g.*, *United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2003); *United States v. Olano*, 62 F.3d 1180, 1203 (9th Cir. 1995)); agents who have studied all the pertinent documents and testimony (*see, e.g.*, *United States v. Bray*, 139 F.3d 1104, 1107 (6th Cir. 1998); *United States v. Nivica*, 887 F.2d 1110, 1125 (1st Cir. 1989); *United States v. Behrens*, 689 F.2d 154, 161 (10th Cir. 1982)); or agents qualified as experts (*see, e.g.*, *United States v. Freeman*, 498 F.3d 893, 902-04 (9th Cir. 2007); *Dukagjini*, 326 F.3d at 51).

The prosecution also attempts to justify this deprivation of the defendants' constitutional right to confront and cross-examine witnesses, first by trying to distinguish the compelling case of *Bullcoming v. New Mexico*, 131 S.Ct. 2705

---

[17]   Agent Costley did not testify as an *expert* witness.  In addition, Agent Costley was present at trial only for his own testimony.

[18]   The prosecution cites several cases in support of the argument that a summary witness does not have to exclusively create or prepare the summary exhibits, and that merely supervising the creation of the charts is sufficient.  But that did not happen in this case.  Unlike the agents in *United States v. Moon*, 513 F.3d 527, 546 (6th Cir. 2008), and *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979), Costley did not *supervise* the creation of the summary exhibits he was called to introduce.  Furthermore, unlike the testifying agents in *United States v. Bray*, 139 F.3d 1104, 1107-08, 1112 (6th Cir. 1998), and *United States v. Behrens*, 689 F.2d 154, 161 (10th Cir. 1982), Costley did not exclusively prepare the charts.

1   (2011), and second, by claiming that, because Agent Costley was subject to cross-

2   examination, there was no problem.  Supp. Opp. at pp. 33-35.  But *Bullcoming* and

3   the body of Confrontation Clause jurisprudence on which it is based compel a

4   contrary conclusion.[19]

5           In *Bullcoming*, the Supreme Court held that the Confrontation Clause was

6   violated, when a report *prepared by one analyst* was *introduced by another*

7   *analyst*.  Here, the charts purportedly summarizing a body of evidence were

8   apparently prepared by unidentified members of the prosecution team, but were

9   introduced by Agent Costley.  He was unable to tell the jury who had prepared the

10  charts, nor was he able to testify about the manner and method used to prepare

11  them.  In addition, Agent Costley was unable to testify about the body of evidence

12  and data upon which the charts had purportedly been prepared, since he was not

13  familiar with it.  Thus, he could not be cross-examined about them.

14          The prosecution's claim that Agent Costley could be cross-examined (Supp.

15  Opp. at pp. 33-35) places form over substance.[20]  *See, e.g.,* Fed. R. Evid. 602 ("A

16  _____

17  [19]     The prosecution tries to distinguish *Bullcoming* by citing to *Lester v. United*

18  *States*, ___ A.3d___, 2011 WL 3190469 (D.C. July 28, 2011).  In fact, *Lester*

18  supports the defense.  In *Lester*, the prosecution introduced "a certificate attesting

19  that Lester did not have a license to carry a pistol . . . ." *Id.* at *1.  This certificate

20  was based on a computer record search.  The detective who requested the search

20  testified.  *Id.*  He was present with the clerk when the computer record was

21  searched; he directed the computer search by stating what he wanted; he saw the

22  computer result from where he was standing; he was present when the certificate

22  was prepared.  *Id.*  In distinguishing *Bullcoming*, the *Lester* court noted that

23  *Bullcoming* held that the Confrontation Clause was not violated when the testifying

24  officer actually directed and observed the test being conducted, as in *Lester*. *Id.* at

24  *5 n.2.  Here, of course, Costley did not see the charts prepared or direct their

25  preparation.  He did not select the underlying data or even review it.  He did not

26  independently review other underlying documents.  He did not even know who

26  prepared the charts.  *Lester* is further support for the defense.

27  [20]     If the prosecution's argument prevails, henceforth all evidence may be

28  admitted by non-percipient testifying witnesses based on what someone told them

witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"); *Nat'l Labor Relations Bd. v. First Termite Control Co., Inc.*, 646 F.2d 424, 427-28 (9th Cir. 1981) (purported custodian of records' insufficient personal knowledge concerning record keeping rendered cross-examination meaningless; document could not be admitted under business records hearsay exception without proper testimony from custodian of record with knowledge).  *Cf. United States v. Baker*, 10 F.3d 1374, 1411-12 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000) (agent who prepared chart was fully subject to cross-examination regarding "her methods of preparing the summaries, her alleged selectivity, and her partiality"); *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (summary chart of phone calls and events observed by a surveillance team admissible where cross-examination of two agents who were "*central participants on the . . . team*" allowed defense to alert jury to any discrepancies in chart) (emphasis added).

The prosecution's attempts to equate what Agent Costley did to cases where the summary agent was central to or intimately involved in supervising the investigation and the preparation of charts are as misguided as Agent Costley was as a witness.

## C.    The Prosecution's Shielding Of Its Investigation Through Agent Costley Was Prejudicial

The prosecution attempts to escape the consequences of its pattern of misconduct, a pattern that included hiding its investigation from scrutiny and presenting an unqualified witness, by claiming its misconduct did not prejudice the

---

or selectively prepared for them as a summary of evidence.  And, so long as there was the chance to ask the non-percipient witness questions, however meaningless the responses, there would be no Sixth Amendment violation.

defense.[21]  In so arguing, the prosecution claims, erroneously, that there was ample opportunity to cross-examine Agent Costley, and so the prosecution's misconduct caused no harm.  In support, it cites to statements this Court made *before* Costley testified, and before it was clear Costley could not, because of a lack of knowledge, be meaningfully cross-examined.  Supp. Opp. at pp. 33-36.

The prosecution also claims that its misconduct caused no prejudice, because the defense could and did use the charts that were admitted through Agent Costley. Just because the defense sought to ameliorate the impact of the prosecution's misconduct does not mean there was no impact on the defendants from the misconduct.  Nor does it mean there should be no consequences to the prosecution for its misconduct.  And the intentional deprivation of the ability to pursue legitimate lines of inquiry by the defense – by using Agent Costley instead of one of its case agents and selecting witnesses so as to deny the production of *Brady* materials – is misconduct.

## D.   The Prosecution's Shielding Of Its Investigation Violated *Brady*, *Kyles* And Their Progeny

The prosecution argues that its decision to "forestall an *improper* attack on [their] investigation" was permissible and a matter of trial strategy.  Supp. Opp. at p. 57 (emphasis in original).  This argument exemplifies the prosecution's fundamental misunderstanding of its obligations under *Brady* and the meaning of *Kyles v. Whitley*, 514 U.S. 419 (1995).  Here, as in *Kyles*, the prosecution purposely withheld *Brady* material that would have permitted the defense to raise legitimate questions about the investigation.

---

[21]    *Bullcoming* notes: "[T]he [Confrontation] Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a *fair enough* opportunity for cross-examination."  131 S.Ct. at 2716. (emphasis added).

To excuse its conduct, the prosecution erroneously attempts to limit *Kyles* to only two situations: "(1) '[w]hen . . . the probative force of evidence depends on the circumstances in which it was obtained,' or (2) when 'the thoroughness and even the good faith of the investigation' is lacking in that the investigators failed to 'even consider' information indicating that the defendant is innocent." Supp. Opp. at pp. 56-57. However, cases following *Kyles*, such as *United States v. Sager*, 227 F.3d 1138 (9th Cir. 2000), confirm that the holding in *Kyles* is broader than that.

The prosecution unsuccessfully tries to distinguish *United States v. Sager*. Supp. Opp. at p. 58, n. 66. In *Sager*, the Ninth Circuit found that the district court improperly barred the jury from considering the "quality of the investigation." 227 F.3d at 1145. *Sager* held that details of the investigatory process potentially affected the credibility of the prosecution's investigator and were properly part of a defense. *Id.* Thus, the prosecution's intentional withholding of *Brady* materials limited inquiry into its investigation and the credibility of its agents, a line of inquiry permitted by *Kyles*.[22] *See also United States v. Quinn*, 537 F. Supp. 2d 99, 114-16 (D.D.C. 2008) (finding *Brady* violation and prejudice from failure to disclose to defense false information obtained from a key witness; information would have allowed defense to attack the credibility of a testifying agent who relied on the information; agent's credibility could have been impugned by revealing his "investment in the case and his motivation to have a successful prosecution" despite investigatory errors and by allowing defense theme and

---

[22]    The prosecution also cites *United States v. Carona*, 630 F.3d 917 (9th Cir. 2011), which upheld the district court's decision to prevent the defendant from introducing evidence of the lead prosecutor's misconduct. But in *Carona*, the evidence excluded was an *ethical* violation by the *prosecutors* of the "no-contact" rule (contained in the California Rules of Professional Conduct), not evidence of investigative failures or factual issues. *Id.* at 919-20. The Ninth Circuit found that such a violation did not have any bearing on the credibility of any witness at trial. *Id.* at 924.

strategy "*attacking the integrity of the government's investigation*" pursuant to *Kyles*) (emphasis added); *United States v. Howell*, 231 F.3d 615, 625-26 (9th Cir. 2000) (even if evidence seems inculpatory, it must be disclosed under *Kyles*, if it shows a "flawed police investigation;" finding *Brady* violation for failure to disclose errors in police reports, though affirming conviction because, unlike here, no prejudice shown).

The other cases cited by the prosecution are also inapposite. *See, e.g.*, *United States v. Waters*, 627 F.3d 345, 352-53 (9th Cir. 2010) (affirming decision limiting defendant's argument that "she was the victim of government misconduct or a conspiracy to conceal exculpatory evidence," since the evidence of such a conspiracy was limited only to a discrepancy between an FBI 302 report and the agent notes for that interview, and little would be gained "in encouraging the jury to speculate based upon such a small omission."); *United States v. Regan*, 103 F.3d 1072, 1081-82 (2d Cir. 1997) (affirming the district court's ruling in a perjury prosecution that the defendant police officer was barred from presenting evidence that his lies before the grand jury were not "material," because the government staged the investigation in order to elicit his lies; *Kyles* not cited); *see also Jones v. Basinger*, 635 F.3d 1030, 1045 (7th Cir. 2011) (issue was whether the "course of investigation" hearsay exception was applicable when *prosecution offered statement*); *United States v. Johnson*, 529 F.3d 493, 501 (2d Cir. 2008) (same); *United States v. Reyes*, 18 F.3d 65, 70-71 (2d Cir. 1994) (same).

The prosecution also, without basis, tries to limit *Kyles* only to cases just like *Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986), a case cited in *Kyles*. In *Bowen*, the prosecution violated *Brady* by suppressing evidence of an alternative suspect. *Id.* at 610-14. The prosecution suggests that *Kyles* is limited to the exact type of *Brady* violation that occurred in *Bowen*. Supp. Opp. at p. 57, n. 65. However, as *Kyles* and its progeny make clear, the defense can question the

prosecution's investigation beyond instances involving evidence of alternative suspects. *See Sager*, 227 F.3d at 1145.[23]

## IV. THE PROSECUTION'S ACTIONS WITH RESPECT TO JEAN GUY LAMARCHE ARE MISCONDUCT

### A. The Prosecution Continues To Misrepresent Facts Surrounding Mr. LaMarche

The prosecution's misrepresentations and misstatements about Jean Guy LaMarche are discussed in prior pleadings. *See* Defendants' Opposition to Government's Pretrial Motion to Admit Various Written Correspondence of Protective Order Witness, March 7, 2011 (Docket Entry 235); Motion for Reconsideration of Court's Order Granting the Limited Admission of Jean Guy LaMarche Correspondence Based on Changed Circumstances, April 4, 2011 (Docket Entry 404); Supplemental Submission of Facts re Jean Guy LaMarche and Related Correspondence, April 14, 2011 (Docket Entry 450). This Supplemental Reply addresses only the prosecution's failure to address its overblown claims that Mr. LaMarche had "safety concerns" and the evidence that shows the prosecution interfered with access to Mr. LaMarche.

The prosecution claims that Mr. LaMarche's safety concerns (set forth in the 302 Report of Mr. LaMarche's December 21, 2011 interview) were corroborated

---

[23] The other cases cited by the prosecution in its attempt to limit the application of *Kyles* to *Brady* violations concerning undisclosed information about possible alternative suspects are similarly inapposite. *See* Supp. Opp. at p. 57, n. 65 (citing *Kiley v. United States*, 260 F. Supp. 2d 248, 268-74 (D. Mass. 2003) (denying the defendant's *Brady* claims because the undisclosed information concerning alternate suspects was insufficient to support such claims); *Pursell v. Horn*, 187 F. Supp. 2d. 260, 326-29 (W.D. Pa. 2002) (denying the defendant's *Brady* claims because the withheld evidence of an alternative suspect did little to undermine the strong evidence introduced against the defendant at trial)).

1  by trial witness Alma Patricia Cerdan Saavedra.  *See* Supp. Opp. at p. 21.[24]

2  According to the prosecution, "[Ms.] Cerdan confirmed that LaMarche had sued

3  Enrique Aguilar and that in retaliation for that suit Aguilar, 'had [LaMarche] put in

4  jail for almost a month.'"  Supp. Opp. at p. 21.  The prosecution cites to a

5  December 8, 2010 "302 of Ms. Cerdan."  *Id.* (citing Exhibit 7).

6        In fact, the "302" does not say that.  It says that Mr. LaMarche sued Aguilar.

7  It also says, "Aguilar had him put in jail."  But it does not say that the jailing was

8  in retaliation for the lawsuit, nor does it say whether the jailing was justified and

9  for cause.  And while the prosecution had information-sharing with Mexican law

10  enforcement officials in this case, *see, e.g.*, April 26, 2011, RT at 2783:13 – 2784:1

11  (joint efforts in Mexico to seize the *Dream Seeker* yacht), there is no evidence that

12  the prosecution ever bothered to confirm statements made by Mr. LaMarche on the

13  danger issue.[25]

14  **B.**    **The Prosecution Has Not Sufficiently Addressed Its Interference**

15        **With Witnesses**

16        Jean Guy LaMarche told the defense investigator not to contact him

17  anymore, because an agent expressed that he/she was furious with him for talking

18  to the defense.  In response, the prosecution claims:

---

[24]    Relying on Ms. Cerdan here is at odds with the prosecutors' claim in its
Supplemental Opposition that Ms. Cerdan was "only relevant to the case against
Angela Aguilar." *See* Supp. Opp. at p. 8, n. 6.  And it never adduced this evidence
at trial, despite that it specifically called Ms. Cerdan to testify about Mr. LaMarche
and his relationship with Aguilar.  April 14, 2011, RT at 1686:10 – 1687:25.

[25]    Of course, as pleadings submitted by the defense show, Mr. LaMarche has a
history of prevarication and stealing from employers. *See* Supplemental
Submission of Facts re Jean Guy LaMarche and Related Correspondence, April 14,
2011 (Docket Entry 450).  Nothing corroborates Jean Guy LaMarche's claimed
safety concerns.

1)     that Mr. LaMarche is lying, since its agents aver (in identical language) that they never expressed "fury or anger" toward him;[26]

2)     that because Mr. LaMarche talked to the defense investigator once before, it could not be true that the agents, after finding that out, were furious with Mr. LaMarche; and

3)     the defense did not mention this interference with witnesses in their May 9, 2011 pleading (a pleading that largely dealt with the false and misleading Guernsey grand jury testimony and the prosecutors' role in presenting that testimony), so it must not be true.

These arguments do not address the issue.  While the agents – in identical language – state they never expressed "fury or anger," they do not state what in fact they, or any of them, did say to Mr. LaMarche.  In particular, the agent's declarations do not state what they said to him about speaking with the defense. Instead, they completely avoid the issue.  And nothing is submitted from Mr. LaMarche.

––––––––––––––––––

[26]  *See* Declaration of Olivier N. Farache, September 5, 2011 at ¶ 3 ("During my contacts with LaMarche, I never expressed 'fury' or anger towards him."); Declaration of Farrell Binder, September 5, 2011 at ¶ 3 ("During my contacts with LaMarche, I never expressed 'fury' or anger towards him."); Declaration of Carlos Narro, September 5, 2011 at ¶ 7 ("During my contacts with LaMarche, I never expressed 'fury' or anger towards him."); Declaration of Susan Guernsey, September 5, 2011 at ¶ 3 ("I never expressed 'fury' or anger towards him."). Significantly, of the four agents who provided declarations, three are known to have previously provided false statements under oath in connection with the investigation of Lindsey Manufacturing Company, Keith E. Lindsey, and Steve K. Lee.

Neither agents Guernsey nor Binder allegedly had any contact with Mr. LaMarche after March 23, 2011, so their declarations are irrelevant anyway.

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS INDICTMENT

25

Nor does the prosecution's argument that Mr. LaMarche talked with the defense on March 23, 2011 excuse this subsequent conduct. The very point is that, as a result of this conduct, Mr. LaMarche refused to speak to the defense again. It is clear that the agents, or one of them, being furious with a witness can discourage a once-willing witness from subsequently talking to the defense. And not mentioning the issue in a pleading focused on different issues, namely, Agent Guernsey's prevarications and the prosecution's role in hiding them, is not relevant or meaningful.

## C. The Prosecution Used The LaMarche Emails Substantively, Against All Defendants, In Violation Of The Court's Limiting Instructions

The prosecution argues that it did not commit misconduct in its use of the LaMarche emails[27] because:

1)     the writings had been admitted into evidence;

2)     the prosecution's paraphrase of the limiting instruction was fair; and

3)     the prosecution's use of the LaMarche exhibits was in conformity with the instruction.

The prosecution is wrong on all three points.

While the challenged writings were admitted into evidence, the Court limited their use. Some were admitted for a limited purpose against Mr. Lee; none were admitted against the other defendants. A writing admitted for a limited purpose cannot be used for all purposes. Fed. R. Evid. 105. But, as set forth in

---

[27]     The prosecution also argues that the defense did not "contemporaneously object." But the defense did object, the objections were preserved, and the Court told the defense that it need not keep objecting. April 26, 2011, RT at 2810:18 – 2812:4.

defendants' Supplemental Brief and below, that is exactly what the prosecution did.[28]

Contrary to the prosecution's claim, the Court never found that the prosecution had fairly followed the limiting instruction.  Instead, the Court found that the prosecution had overreached in its use of the LaMarche emails in closing argument.  On pages 26-28 of the Supplemental Opposition, the prosecution defends its use of the LaMarche emails and its lack of adherence to the limits placed by the Court on the use of those exhibits by Court Instructions D and E.  The prosecution claims that the Court specifically found that "the government's paraphrasing of exhibit D was 'fair.'"  Supp. Opp. at p. 27.  The prosecution's brief selectively quotes the Court:

> The Court: Mr. Goldberg said something about Court Exhibit D . . . .  He referred to the instruction that the jurors may not assume from the exhibits that were specified in that exhibit that the facts and statements they contain are necessarily true or accurate, and then he said something to the effect . . . that, "But they could still find them to be true."  *I think that's a fair paraphrase.*

Supp. Opp. at p. 27 (citing May 6, 2011, RT at 4233:12-21) (emphasis in original).

In citing to this statement, the prosecution erroneously argues that the Court found Mr. Goldberg's paraphrase of Exhibit D and argument were fair.  What the Court referred to as fair, and what Mr. Goldberg agreed was fair, was *the Court's paraphrase of what Mr. Goldberg said*.  The rest of the colloquy, omitted in the prosecution's Supplemental Opposition, is as follows:

---

[28]     Remarkably, notwithstanding the Court's rulings during trial, the prosecution now argues that these documents admitted for a limited purpose could be used by the jury against *all* defendants for *all* purposes.  Supp. Opp. at p. 28, n. 29.  It also argues that Mr. Lee's statement to FBI agents is evidence against Dr. Lindsey.  *Id.* at p. 71.

1    Mr. Goldberg: That is right.  I think I added *based on all* the evidence.

2    The Court: Okay.  It may not have been artfully written in this Court

3    Exhibit D, but I would entertain a motion to supplement it with an
     instruction to the jury that they cannot find that the facts and

4    statements are necessarily true or accurate based on just the contents

5    of those exhibits.

6    May 6, 2011, RT at 4233:22 – 4234:3 (emphasis in original).

7        Contrary to the prosecution's current argument, the prosecution had clearly

8    overstepped, and the Court so instructed the jury.

9        Finally, the prosecution used the emails in a manner beyond what had been

10   permitted by the Court.  The LaMarche emails were displayed on a PowerPoint

11   during the prosecution's closing *without* any suggestion of limited use.  The

12   prosecution's argument *assumed* the truth of the emails authored by Mr. LaMarche

13   and so argued to the jury.  *See* May 6, 2011, RT at 4097:18 – 4108:11.  For

14   example, in reference to Government Exhibit 959, which was subject to the

15   limiting instruction in Court's Exhibit E and contained statements authored by Mr.

16   LaMarche, Mr. Goldberg stated "These documents you can consider for the truth,

17   standing by themselves."  May 6, 2011, RT at 4106:13-14.  Yet he failed to remind

18   the jury that the statements from Mr. LaMarche could only be used as evidence of

19   Mr. Lee's knowledge and intent.[29]

---

21   [29]     This Supplemental Reply is not the place to reargue the prosecutors' myriad,

22   inappropriate actions with respect to Mr. LaMarche.  They are the subject of

23   substantial briefing.  *See* Defendants' Opposition To Government's Pretrial Motion
     To Admit Various Written Correspondence Of Protective Order Witness, March 7,

24   2011 (Docket Entry 235); Motion For Reconsideration Of Court's Order Granting

25   The Limited Admission of Jean Guy LaMarche Correspondence Based On
     Changed Circumstances, April 4, 2011 (Docket Entry 404); and Supplemental

26   Submission Of Facts Re Jean Guy LaMarche And Related Correspondence, April

27   14, 2011 (Docket Entry 450).  *But it is worth noting that, despite anchoring its*
     *case on Mr. LaMarche, when it comes to allegations of misconduct, the*

28   *prosecution will freely accuse Mr. LaMarche of lying in order to protect itself.  See*

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO DISMISS INDICTMENT
28

## V.   THE PROSECUTION WRONGLY ARGUED WILLFUL BLINDNESS

### A.   The Prosecution's Argument

In closing argument, the prosecution urged the jury to find the defendants guilty on a willful blindness/deliberate ignorance theory.  Mr. Goldberg went so far as to say, "you can't turn a blind eye," *and covered his eyes with his hands to emphasize the argument.*  May 6, 2011, RT at 4154:1-12.  The use of these arguments and this gesture was the culmination of a series of rhetorical "how could they not know" questions.  Supp. Brief at pp. 51-52.  This, despite the Court unequivocally denying the prosecution's proffered willful blindness/deliberate ignorance instruction.  May 5, 2011, RT at 3833:17-23.[30]

### B.   The Prosecution Conflates Willful Blindness/Deliberate Ignorance With Constructive Knowledge To Justify Its Improper Jury Argument

The willful blindness/deliberate ignorance instruction *proposed by the prosecution and rejected by the Court* stated that the jury could find a defendant acted knowingly if the defendant:

  1)   was aware of a high probability that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official; *and*

---

Supp. Opp. at p. 22.

[30]   The prosecution tries to excuse its conduct by stating there was no "order" prohibiting it from arguing "constructive knowledge."  As set forth below, the prosecution conveniently conflates these two theories in its Supplemental Opposition, so that it can argue it was permitted to present a willful blindness/deliberate ignorance theory to the jury.  But the Court rejected a willful blindness instruction, saying it did not apply to any defendant.  May 5, 2011, RT at 3833:17-23.  Despite that, the prosecution argued the defendants could be convicted on a willful blindness theory.  What type of "order" the prosecution needed to prevent it from arguing a theory of culpability not allowed by the Court is a mystery.

2)      deliberately avoided knowing the truth.[31]

The instruction actually given by the Court included constructive knowledge like the first prong of the instruction that the Court had rejected (awareness of a high probability of the existence of some circumstance).  Significantly, the instruction given by the Court *omitted* the "deliberately avoided knowing the truth" prong.  The jury was not instructed on willful blindness.

Instead of acknowledging that key obvious difference, the prosecution again seeks to conflate the two instructions[32] in its argument here.  *See* Supp. Opp. at pp.

_____

[31]      The prosecution's proposed instructions included both a willful blindness instruction and an FCPA constructive knowledge instruction containing the "high probability" language:

Proposed Instruction No. 28, p. 34, lines 14-17:

> A person is deemed to have such knowledge if the evidence shows that he was aware of a high probability of the existence of such circumstance, unless he actually believes such that the circumstance does not exist.

Proposed Instruction No. 30, p. 39:

> You may find that a defendant acted knowingly if you find beyond a reasonable doubt that the defendant
>
> (1) was aware of a high probability that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official, and
>
> (2) deliberately avoided learning the truth.
>
> You may not find such knowledge, however, if you find that the defendant actually believed that none of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official, or if you find that the defendant was simply careless.

Government's Proposed Jury Instructions (Annotated), March 23, 2011 (Docket Entry 319).

[32]      Of course, if as the prosecution now claims the two instructions were the

1    37-41.  But they are different, and the instruction given to the jury by the Court did

2    not include *the deliberate ignorance/willful blindness* prong.[33]

3    **C.    The Willful Blindness Argument Was Designed To Convict The**

4    **Defendants On A Rejected Theory; It Caused The Exact**

5    **Prejudice The Prosecution Intended**

6         While acknowledging that it argued a willful blindness theory of culpability

7    to the jury, the prosecution now claims that its deliberate ignorance/willful

8    blindness argument did not prejudice the defendants.  Supp. Opp. at p. 41.  That

9    simply is not so.  It was a terribly prejudicial argument, since it invited the jury to

10   find the element of knowledge and convict based on a theory of culpability that

11   was not supported by the evidence or justified.  This argument is part of the

12   prosecution's pattern of misconduct; that pattern mandates dismissal.

13   **VI.   THE PROSECUTION'S *BRADY* AND DUE PROCESS VIOLATIONS**

14   **RELATING TO THE MILITARY SCHOOL PAYMENTS CANNOT**

15   **BE CONDONED**

16        Prosecutor Nicola Mrazek has been assigned to matters related to ABB since

17   at least 2007.  She is the lead prosecutor in *United States v. Hozhabri*, No. 07-CR-

18   452 (S.D. Tx.), a case involving theft from ABB, *United States v. ABB, Inc.*, No.

19   10-CR-664 (S.D. Tx.), a case involving FCPA violations by ABB, *United States v.*

20

21

---

22   same, why did it proffer both instructions to the Court?

23   [33]    The prosecution cites to *United States v. Ramirez*, 320 Fed. Appx. 7, 2009
     WL 909645 (2d Cir. 2009), to claim it could argue actual knowledge and willful

24   blindness/deliberate ignorance in the alternative to the jury.  Supp. Opp. at pp. 38-
     39.  In *Ramirez*, arguing actual knowledge and conscious avoidance in the

25   alternative was proper, because the evidence supported both theories of culpability.
     2009 WL 909645 at *3.  Moreover, the court in *Ramirez* gave a deliberate

26   ignorance willful blindness instruction to the jury.  *Id.* at *1-3.  That was not the

27   case here, where the Court refused an instruction on deliberate ignorance, because
     the evidence failed to support one.  May 5, 2011, RT at 3833: 17-23.

28

*Basurto*, No. 09-CR-325 (S.D. Tx.), a case involving FCPA violations by Mr.

Basurto related to ABB, and *United States v. O'Shea*, No. 09-CR-629 (S.D. Tx.), a

case involving FCPA violations by Mr. O'Shea related to ABB.  She has acted as

co-lead prosecutor in the Lindsey-Lee matter since before the 2008 issuance of

search warrants.  Ms. Mrazek is a ubiquitous presence in each case with a complete

body of knowledge in all of these cases.

One of the charts admitted through Agent Costley, Government Exhibit 30,

(*see* Exhibit A), represents that money was paid by LMC to Grupo to Sorvill, and

was eventually used to make payments to a military school for Nestor Moreno's

son.  As the Supplemental Brief sets forth, that *exact payment* – attributed to LMC

in the instant case – is attributed to ABB as a payment in *United States v. O'Shea*.

In its Supplemental Opposition, the prosecution *does not deny* it attributed

the same payment for military school expenses to both LMC and ABB.  Instead,

the prosecution seeks to ignore and obfuscate the issue, by arguing that the defense

has no right to the *O'Shea* secret grand jury material.  Supp. Opp. at pp. 48-49.

The argument is both wrong and irrelevant.

The *O'Shea* indictment alleges, as an overt act, the military school payment

that the prosecution sought to attribute to the defendants here.  *See* Supp. Brief,

Exhibit F, p. 20 (overt act 16(o) of *O'Shea* indictment).  *The O'Shea indictment is

not sealed.*  And all of the grand jury testimony and other information that supports

that portion of the *O'Shea* indictment should have been (and still could be)

produced to the defendants here as *Brady*.

The prosecution's suggestion that it did not claim LMC made the military

school payment is belied by Government Exhibit 30 (the summary "flowchart").

Indeed, to justify the admission of the supporting military school payment exhibits,

Ms. Mrazek highlighted Exhibit 30 and the "money trail" to support the "overall

theory that everything that Lindsey paid to Grupo, beginning with the creation of

their relationship, or at least a big chunk of it, went to Moreno."  *See* April 27,

2011, RT at 2852:1 – 2854:15; *see also* April 27, 2011, RT at 2848:16 – 2858:25 (Ms. Mrazek argued that there was a clear linkage between the military school payments and LMC).  This theory is belied by the *O'Shea* indictment.  At no time did Ms. Mrazek reveal that she (herself) was attributing the same illicit payment to ABB in another case where she was lead counsel.  April 7, 2011, RT at 733:11 – 735:3.

In short, an illegal payment was attributed to LMC in this case.  What could be more exculpatory than evidence showing that someone else was responsible for the payment.

## VII.   THE WITNESS LIST, DISCOVERY AND OTHER ACTS OF MISCONDUCT

### A.   The Prosecution's Actions Related To Its Witness Lists Are Part Of The Course Of Misconduct Infecting This Case

The prosecution again downplays its gamesmanship with its witness lists.  The issue is not that the prosecution called a "relatively small subset" of the individuals on its witness lists, but that it purposely failed to provide the defendants with a realistic list of witnesses, in order to hamper the defense efforts to prepare for trial.

CFE official Abel Huitron is the perfect example.  The prosecution knew it could not present him as a trial witness (a fact they concealed until trial), but they included him on witness lists anyway.  April 7, 2011, RT at 742:8-14; Supp. Opp. at p. 19.

The prosecution also claims that it was over-inclusive in the names read to the prospective jurors on March 30, 2011, including Jean Guy LaMarche, even though it knew he was not testifying, in order "to determine if jurors might know either a potential witness or someone whose name might be frequently mentioned during the trial."  *See* Supp. Opp. at p. 24, n. 25.  This is clearly an "after-the-fact"

1  justification.  Non-witnesses were not to be included in this witness list, and given

2  what the prosecution knew, Jean Guy LaMarche should not have been included.

3  **B.**     **The Prosecution Failed To Comply With Its Obligations Under**

4  ***Brady* And This Court's Discovery Orders**

5  **1.**     **CFE, Rowan and Basurto Interview Reports**

6  While the prosecution argues that it did not "delay" the production of the

7  IRS memorandum concerning the February 10, 2011 meeting with CFE officials, it

8  is inconceivable that the four-week plus period between the interview and the

9  production of the memorandum about a week before trial can be characterized as

10  anything but a delay.  *See* Supp. Opp. at pp. 45-46.  And if the prosecution took its

11  discovery obligations as seriously as it repeatedly stated it did, it would have

12  known that it had failed to produce the Rowan and Basurto interview reports much

13  earlier than the day before the defense began presenting its case.  *See* Supp. Opp. at

14  pp. 47-48.

15  **2.**     **Garza, Serocki and Zavaleta**

16  With respect to Laura Garza's notary book, the prosecution seeks to excuse

17  its misconduct by noting that Ms. Garza was "aggressively cross-examined."  Even

18  if she was "aggressively cross-examined" as the prosecution states, Ms. Garza's

19  answers are clear: she showed the agents and a prosecutor her incomplete notary

20  book on September 23, 2010.  Significantly, these members of the prosecution

21  team did not take custody of her notary book or even request a copy of it.  Instead,

22  they let Ms. Garza keep it.  April 14, 2011, RT at 1526:6-18.  When Ms. Garza

23  traveled to Los Angeles for trial testimony over six months later, she provided the

24  prosecution team with her notary book.  At that point, the missing entries had been

25  added to the book by Ms. Garza.  April 14, 2011, RT at 1531:5-13.  Yet the

26  prosecution did not disclose this information to the defense until well into trial, just

27  before Ms. Garza testified.  April 14, 2011, RT at 1528:18 – 1532:15.

28

1   As for the issues related to Richard Serocki and Jose Zavaleta, if the
2   prosecution had been forthright in all its discovery obligations related to these two
3   individuals, the Court would not have ordered "an utterly new top to bottom"
4   review of all discovery to which the defendants were entitled immediately after the
5   cross-examination of Mr. Zavaleta.

6   **C.**   **The Prosecution's Actions Related To The Footers Are Part Of**
7   **And Exemplify The Course Of Misconduct**

8   The prosecution attempts to excuse its insertion of footers in a visual
9   demonstration used during Agent Costley's testimony, by describing the footers as
10  "innocuous." Supp. Opp. at p. 36, n. 39. The footers, which appeared on each
11  slide, were the prosecution's descriptive categorization of items of evidence, such
12  as "the tip." As inappropriate as the inclusion of the footers was, the prosecution's
13  response to the objection to the footers at trial was more egregious misconduct.

14  In response to a defense objection to the footers, a prosecutor told the Court
15  that the footers were just a "banner" that was part of the "Sanction" program.
16  April 27, 2011, RT at 2891:25 – 2892:2. The second time an objection was made,
17  the prosecutor claimed the footers could not be removed. April 27, 2011, RT at
18  2969:7 – 2970:15. Since the prosecutors had inserted the information into the
19  exhibit footers, they could have removed it as well.

20  And the prosecution's defense of the footers – there was no problem with
21  them, because the Court did not initially notice them – is hardly a defense to
22  misleading the Court about the origin of the footers and including them in its
23  presentation to the jury.

24  **D.**   **Other Misconduct By The Prosecution**

25  The prosecution gives short shrift to a variety of other, less dramatic, yet no
26  less important, instances of misconduct. Regarding the prosecution obtaining
27  Angela Aguilar's prison emails without authorization, the Court suggested
28  addressing this issue at the June 27th hearing. In response, the prosecution

1   provides another non-answer: it merely states this allegation has no relevance,

2   because Angela Aguilar is not a party to the present dispute.  While Ms. Aguilar

3   may be back home in Mexico, her absence does not absolve the prosecution of its

4   pattern of misconduct in this case.

5        The Court also suggested that the post-June 27 briefing should address the

6   warrantless search of two LMC buildings.  The defense did so and cited to the

7   prior suppression motions regarding those warrantless searches.  The prosecution

8   inexplicably now argues that the defendants conceded that the prosecution

9   obtained lawful consent to search those two buildings.  As set forth herein, that is

10  just not so.  *See supra* at n. 4.

11  **VIII. THE CUMULATIVE IMPACT OF THE PROSECUTION'S**

12  **MISCONDUCT REQUIRES DISMISSAL**

13       The prosecution urges the Court to consider each of the numerous instances

14  of misconduct identified by the defense in isolation.  This approach minimizes the

15  cumulative impact of its misconduct, and is inconsistent with controlling Ninth

16  Circuit law, which requires the Court to "review each instance of non-disclosure or

17  prosecutorial misconduct . . . collectively in light of the entire record."  *Hein* v.

18  *Sullivan*, 601 F.3d 897, 905 n.4 (9th Cir. 2010).  When the record is examined as a

19  whole, it is evident that the prosecution engaged in a sustained pattern of

20  misconduct designed to win the case, not abide by the constitutional guarantee of a

21  fair trial.

22  **A.      The Prosecution Seeks To Ignore Its Pattern Of Misconduct**

23       Defendants' Motion to Dismiss the Indictment, filed May 9, 2011, Reply

24  Brief, filed June 17, 2011, and Supplemental Brief in Support of Their Motion to

25  Dismiss the Indictment, filed July 25, 2011, establish that the prosecution engaged

26  in a repeated course of misconduct.  As discussed in this Supplemental Reply

27  Brief, the prosecution's misconduct included, but was not limited to:  (1) the

28  presentation of Special Agent Guernsey's false and misleading testimony to the

grand jury; (2) purposefully revealing only a small fraction of this testimony in conjunction with Keith Lindsey's *Miranda* hearing; (3) further concealing that testimony from the defense until jeopardy had attached; (4) inserting false statements into the affidavits of federal agents for searches and seizures, and then concealing that misconduct until the *Franks* hearing; (5) purposefully misleading the Court with respect to the insertion of language, designed to circumvent *Tamura*, into the affidavit for the search of ESI; (6) withholding certain discoverable witness statements until the conclusion of the prosecution's case-in-chief and, in some other cases, until after trial; and (7) misrepresentations and misuse of evidence and witnesses during all phases of the trial. *See supra* pp. at 1-36.

Defendants' Motion to Dismiss (Docket Entry 505) and Reply Brief (Docket Entry 614) set forth the standards to be met for dismissal with prejudice and establish that the prosecution's misconduct meets those standards. Defendants' Supplemental Brief (Docket Entry 632) addresses the full scope of the prosecution's misconduct (at least that which is now known to the defense), from the outset of the investigation, through trial and continuing after trial, and establishes that this course of misconduct infected every phase of this case. This pattern of misconduct requires dismissal.

In its Supplemental Opposition, the prosecution continues to argue that dismissal is inappropriate. Notably, the prosecution still does not accept responsibility for the numerous instances of misconduct. Instead, it argues that no misconduct occurred or, if it did, that no prejudice has been shown, cumulative or otherwise. Finally, the prosecution again claims the jury's guilty verdict cured any misconduct related to Agent Guernsey's false and misleading grand jury testimony.[34]

---

[34] Even though the law remains the same, the prosecution's position on the

1      The prosecution's premise, which is wrong, is that it made just one

2 "innocent mistake" – failing to produce the October 14, 2010 Guernsey grand jury

3 testimony.  According to the prosecution, all other acts it committed – from

4 inserting false facts into multiple search and seizure warrants to using false and

5 misleading testimony to get the indictment, to explaining that the *Tamura* violation

6 was just "clumsy language" that "no one caught," to misleading the Court about

7 the nature of Special Agent Costley's testimony, to arguing culpability based on

8 willful blindness despite the Court's statement that this was not a willful blindness

9 case and its refusal to give a willful blindness instruction, to the misuse of the

10

11

---

12 consequences of the presentation and use of false and misleading testimony at the
13 grand jury has changed from its June 6, 2011 Opposition.  Docket Entry 600.  The
prosecution's original Opposition acknowledged that *United States v. Basurto*, 497
14 F.2d 781 (9th Cir. 1974), is the controlling authority and that *Basurto* mandates
15 dismissal when an indictment is secured by material, perjurious testimony,
notwithstanding a subsequent conviction.  *See* Opp. at pp. 2-4.  The Supplemental
16 Opposition now urges the Court to disregard that binding Ninth Circuit precedent,
17 instead citing to cases in other circuits (*see* Supp. Opp. at p. 78, n. 89).  The
government also misconstrues the holding in *United States v. Sitton*, 968 F.2d 947,
18 953-54 (9th Cir. 1992), *abrogated on other grounds as recognized by United States*
19 *v. Williams*, 282 F.3d 679, 681 (9th Cir. 2002), claiming that the defendants'
conviction cured Agent Guernsey's false and misleading grand jury testimony used
20 to procure the First Superseding Indictment.  *See* Supp. Opp. at p. 78:4-13, 24-27.
21 These arguments fail, both because *Basurto* controls and because the cases cited do
not support the prosecution's latest position.  The holding in *Sitton* was expressly
22 limited to perjured testimony "*not material* to the defendant's indictment" and
23 affecting "only the witness' credibility."  *Sitton*, 968 F.2d at 953-54 (emphasis
24 added).  Moreover, the prosecution's new argument ignores the ultimate (and
binding) holding in *Basurto*:  convictions secured after the prosecution knowingly
25 allows the defendants to stand trial on indictments obtained, in part, by "material"
26 perjured testimony, cannot stand.  497 F.2d at 787 ("Because the prosecuting
attorney did not take appropriate action to cure the indictment upon discovery of
27 the perjured grand jury testimony, we *reverse* appellants' convictions.") (emphasis
28 added).

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO DISMISS INDICTMENT
38

1   LaMarche material, to its numerous violations of Jencks and *Brady*, and on and on

2   – were both justified and harmless.

3        On the contrary, defendants' briefs establish that the prosecution committed

4   flagrant misconduct at every stage of this case.  That misconduct, when considered

5   "collectively" under the applicable legal standards, requires dismissal.  *Hein*, 601

6   F.3d at 905 n.4 ("[W]e cannot review each instance of non-disclosure or

7   prosecutorial misconduct in isolation, but rather must view them collectively in

8   light of the entire record.").

9       **B.**    **Reviewed Collectively, The Prosecution's Course Of Misconduct**

10              **Caused Substantial Prejudice And Requires Dismissal**

11        The Ninth Circuit has expressly held that the prejudice threshold in a motion

12   to dismiss for prosecutorial misconduct "is a less stringent standard than the *Brady*

13   materiality standard" and "the proper prejudice inquiry is whether the government

14   conduct 'had *at least some impact* on the verdict and thus redounded to [the

15   defendant's] prejudice.'"  *United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir.

16   2004) (citation omitted) (emphasis added).  Despite this clear law on point, the

17   Supplemental Opposition accuses the defense of "cleverly attempt[ing] to lower

18   their burden" of prejudice, by "misleadingly" quoting from *United States v.*

19   *Hector*, No. 04-CR-860, 2008 WL 2025069 (C.D. Cal. May 8, 2008).  Supp. Opp.

20   at p. 68, n. 74.  But it is the prosecution, not the defense, that misconstrues *Hector*.

21        The prosecution argues first that the holding in *Hector* regarding the "low"

22   prejudice standard applies only to cases involving "egregious" prosecutorial

23   misconduct, as opposed to "flagrant" misconduct.  The prosecution then accuses

24   the defense of misquoting the holding in *Hector* to hide this.  The prosecution is

25   wrong.

26        Defendants' fully quoted the very language the prosecution accuses them of

27   "omit[ting]."  *See* Supp. Brief at p. 59.  More importantly, the defendants' briefs

28   show that, whatever word is used, the prosecution violated the misconduct rules.

*Hector* does not distinguish between "egregious" and "flagrant" misconduct, but instead uses the two terms interchangeably when construing the *Ross* prejudice standard:

> Once egregious government conduct has been established, the prejudice standard is low; Defendant must show only that the Government's ***flagrant*** conduct had "at least some impact on the verdict." *Ross,* 372 F.3d at 1110 (internal quotation marks omitted). This prejudice standard is "a less stringent standard than the *Brady* materiality standard," *id.,* which requires a showing that the "suppressed evidence would have created a 'reasonable probability' of a different result," *United States v. Jernigan*, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc) (internal quotation marks omitted).  A 'reasonable probability' of a different result does not mean that a defendant would more likely than not have received a different verdict; "[i]nstead, [a defendant] must show only that the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).  Because the standard for egregious government conduct is lower than that required to show prejudice under *Brady,* Mr. Hector does not even need to demonstrate that the misconduct undermines confidence in the trial.  Any impact on the trial at all will suffice.

*Hector*, 2008 WL 2025069 at * 18 (emphasis added).[35]  Clearly, this standard has been satisfied by the defendants.

---

[35]     The Ninth Circuit has likewise used the term "egregious" when referring to "reckless" prosecutorial misconduct. *See United States v. Chapman*, 524 F.3d 1073, 1085, 1090 (9th Cir. 2008) (referring to prosecutors' "reckless disregard" for their discovery obligations as "egregiously fail[ing] to meet its constitutional obligations").

1    To excuse this course of misconduct, the prosecution limits its prejudice

2  analysis to its handling of Agent Guernsey's missing grand jury transcript.

3  Disregarding the applicable *Hein* v. *Sullivan* standard, the prosecution does not

4  analyze whether its misconduct throughout this case, in the aggregate, had "some

5  impact" on the verdict. The prosecution's approach is wrong. As stated in *United*

6  *States v. Frederick*, 78 F.3d 1370 (9th Cir. 1996), "a balkanized, issue-by-issue

7  harmless error review is far less effective than analyzing the overall effect of all

8  the errors in the context of the evidence introduced at trial against the defendant."

9  *Id.* at 1381 (internal quotations and citation omitted).

10    The prejudice caused by the prosecution's misconduct, as set forth in earlier

11  pleadings and detailed above, whether it is viewed individually or in the aggregate,

12  is demonstrable and undoubtedly had "at least some impact on the verdict." *Ross*,

13  372 F.3d at 1110. As a result, the First Superseding Indictment must be dismissed.

14    **C.    The Handling Of Agent Guernsey's Transcript, Standing Alone,**

15       **Is Flagrant Misconduct**

16    The prosecution improperly attempts to confine the Court's analysis of

17  whether it engaged in "flagrant" misconduct *only* to the violation of the Court's

18  order requiring full disclosure of Agent Guernsey's grand jury transcripts. But

19  even the prosecution's handling of the Guernsey grand jury transcripts shows a

20  reckless disregard for both constitutional obligations and court orders. *Chapman*,

21  524 F.3d at 1085 ("'[F]lagrant misbehavior'" includes "reckless disregard for the

22  prosecution's constitutional obligations.").

23    The prosecution argues that it "unintentionally did not comply with a court

24  order" requiring the production of all of Agent Guernsey's grand jury testimony,

25  because the October 14, 2010 "transcript was inadvertently placed with materials

26  from another case." Supp. Opp. at pp. 60, 62. It stresses that, upon discovering the

27  transcript, it "immediately disclosed it to the defendants and notified the Court."

28  Supp. Opp. at p. 62, n. 69. The prosecution then submits this "weighs against a

1  finding of flagrant misbehavior."[36]  *Id.*  Finally, it contends that its (false)

2  assertions to the Court of full discovery compliance on April 7, 2011 "[u]ndercuts

3  the [d]efendants' [c]laim of [r]eckless [d]isregard."  Supp. Opp. at pp. 64-65.  In

4  addition, according to the prosecution, Mr. Miller's earlier "comments" made

5  during the "April 7 [o]ral [d]iscovery [r]eport" actually "demonstrates that the

6  government took its discovery obligations seriously."  Supp. Opp at pp. 64-65.  In

7  reality, the prosecution's actions speak louder than its words, and they establish

8  just the opposite.

9          When the Court ordered that all of Agent Guernsey's grand jury testimony

10  be produced to it *in camera* on January 27, 2011, the prosecution provided the

11  Court with *only two of the four days* of her testimony.  In addition, before the

12  March 28-29, 2011 hearing on Dr. Lindsey's *Miranda* Motion, the prosecution

13  purposefully provided the defendants with a carefully and heavily redacted version

14  of Agents Guernsey's grand jury testimony, consisting of snippets from only one

15  of her grand jury appearances.  The prosecution thereby purposefully concealed

16  most of her false and misleading testimony.

17          This extremely limited production of Jencks material for the *Miranda*

18  Motion nevertheless revealed several false representations by Agent Guernsey to

19  _____

20  [36]     The prosecution's reliance on *United States v. Kearns*, 5 F.3d 1251 (9th Cir.

21  1993), is misplaced; in fact, *Kearns* supports the defense.  *Kearns* found no

22  flagrant misconduct by federal prosecutors in failing to locate and disclose an
    informant's written cooperation agreement maintained by a police department (as

23  opposed to the prosecution), because "a written copy of the agreement was turned

24  over to [the defense] before the end of trial and within hours of the prosecution's
    receipt of it."  *Id.* at 1254.  In contrast, the prosecutors here have always been

25  aware of Agent Guernsey's October 14, 2010 grand jury testimony.  They

26  presented the testimony to the grand jury at the time, stored that transcript in Mr.
    Miller's own office, did not locate and disclose it despite a Court order requiring

27  them to do so, and only produced it *after trial* following a further, pointed inquiry

28  by defense counsel.

the grand jury.  In response, on March 25, 2011, the defense renewed its request for Agent Guernsey's entire grand jury transcript.  March 25, 2011, RT at 111:15 – 112:6.  The Court again ordered the prosecution to produce the entire transcript *in camera*, this time by the next court day.  March 25, 2011, RT at 112:14-16.

In complying with that order, Mr. Miller states that he "realized" he had not included the September 15, 2010 transcript in his prior *in camera* production.  Miller Decl. at ¶ 7.  Mr. Miller complied with the Court's March 25th order on March 28th, filing three sessions of the Guernsey grand jury transcript, seemingly without acknowledging he had previously filed just two sessions.  He did not produce the October 14, 2010 grand jury transcript of Agent Guernsey's testimony.

On April, 7, 2011, the prosecution assured this Court that it had conducted a "top-to-bottom review of the discovery" and claimed that it had "exceed[ed]" its discovery obligations.  April 7, 2011, RT at 880:23 – 883:5.  At that time, however, the prosecution was still withholding from the defense: (1) Agent Guernsey's patently false grand jury testimony; (2) an FBI 302 statement by Fernando M. Basurto (*a witness who testified the same day the prosecution assured the Court of their discovery compliance*); (3) a potentially exculpatory FBI 302 statement by former LMC employee Patrick Rowan; and (4) evidence linking the military school payments for Nestor Moreno to ABB as opposed to LMC.

In response to the April 15, 2011 Court order requiring the prosecution to disclose to the defense *all* of Agent Guernsey's grand jury testimony, the prosecution produced only three of her four days of testimony.  The October 14, 2010 session of Agent Guernsey's testimony apparently remained in Mr. Miller's office.  It was not produced until after trial and only in response to a further inquiry by defense counsel.  This course of conduct alone establishes the prosecution's reckless approach to its obligations.

The prosecution's attempt to distinguish this case from *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), and *United States v. Fitzgerald*, 615 F.

1   Supp. 2d 1156 (S.D. Cal. 2009), falls flat.  In fact, their arguments highlight the

2   striking similarities between the conduct here and the conduct at issue in those

3   cases.

4        Similar to those cases, the facts here establish that the prosecution (1) did

5   not keep an accurate production log (if it even kept one at all);[37] (2) repeatedly

6   assured the Court on December 14, 2010, March 30, 2010, and April 7, 2011, that

7   it had fully complied with its discovery obligations and even exceeded them,

8   despite its failure to do so; (3) still refuses to concede the relevance and

9   exculpatory nature of Agent Guernsey's grand jury testimony; (4) withheld

10  discoverable information, despite several indications from the defense and the

11  Court that there were discovery problems;[38] and (5) still refuses to accept

12

13

_____

14  [37]   The prosecution clearly did not keep accurate records enabling them to

15  verify they had timely disclosed all of Agent Guernsey's grand jury testimony, all

16  of Mr. Basurto's FBI 302 statements, and all of the LMC employee FBI 302

    statements.

17  [38]   The prosecution attempts to excuse its misconduct, claiming the Court never

18  provided it with "warnings" about discovery production concerns.  Supp. Opp. at

19  pp. 63-64.  Federal prosecutors do not need warnings from the Court to comply

    with *Brady*, Jencks and Rule 16.  In any event, the record reflects that the Court

20  repeatedly warned the prosecution about the need for it to comply with its

21  discovery obligations.  The prosecution received more than a "fair warning" on

    numerous occasions.  *See, e.g.*, December 14, 2010, RT at 41:22 – 42:18 (The

22  Court cautioned Mr. Miller that it was giving him "fair warning" of the need to

23  timely produce all discoverable information); March 30, 2011, RT at 10:1-25 (The

    Court cautioned Mr. Miller that it was counting on him to be aware of discovery

24  and it was his duty to produce Jencks statement and other discovery); April 6,

25  2011, RT at 722:7 – 723:10 (The Court ordered the prosecution to "make an utterly

    new top to bottom, absolutely thorough, no exceptions whatsoever, review of

26  everything to which the defendants may have a right in discovery or by virtue of

27  agreements that have been reached or orders that I've issued" and assure the Court

    that "everything that has ever been asked to which there was an agreement to

28  produce or a duty to produce has been turned over.")

1    responsibility for the vast majority of its misconduct throughout the course of this

2    case.

3           In short, the prosecution's misconduct with respect to the Guernsey grand

4    jury transcript issue, was, at the very least, reckless.  When this misconduct is

5    considered in conjunction with the numerous other instances of misconduct set

6    forth in defendants' papers, it adds to a pattern of prosecutorial misconduct, a

7    sustained course of flagrant misbehavior throughout the entire case.

8    **IX.    CONCLUSION**

9           Regardless of what terms are used to describe the prosecution's actions –

10   "mistake," "misconduct," "error" – and regardless of whether the prosecution acted

11   willfully or not, one thing is clear:  the prosecution, at the very least, recklessly and

12   continuously disregarded its obligations to the Court, the defendants and the

13   Constitution.  The cumulative effect of this misconduct substantially prejudiced the

14   defendants' ability to secure a fair trial.

15          If anything, the prosecution's Supplemental Opposition serves as a potent

16   reminder that the prosecution neither appreciates nor acknowledges the magnitude

17   of the numerous instances of misconduct in this case, nor does it accept

18   responsibility for them.  *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir.

19   1993) ("In determining the proper remedy, [a court] must consider the

20   government's willfulness in committing the misconduct and its willingness to own

21   up to it.").

22   ///

23

24   ///

25

26   ///

27

28   ///

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO DISMISS INDICTMENT
45

1    Cross-examination, delayed and inadequate disclosures, and "robust"

2  cautionary instructions are not remedies for this misconduct. *See* Supp. Opp. at pp.

3  37, 58-69, 77.  Rather, the pattern of prosecutorial misconduct evident at every

4  phase of this case – from the searches, to the investigation, to the grand jury, to

5  *Brady* and Jencks violations, to misrepresentations about the prosecution's

6  compliance with *Tamura* and about discovery compliance, to misuse of evidence

7  and improper argument – establishes that defendants were deprived of their right to

8  fair grand jury proceedings and a fair trial.  This pattern of misconduct requires

9  dismissal with prejudice.[39]

10  DATED:  September 25, 2011        Respectfully submitted,

11                                   JANET I. LEVINE
                                     CROWELL & MORING LLP
12

13                                    /s/ Janet I. Levine
                                     _____
14                                   By: JANET I. LEVINE
                                     Attorneys for Defendant
15                                   Steve K. Lee

16  DATED:  September 25, 2011        JAN L. HANDZLIK
                                     VENABLE LLP
17

18                                    /s/  Jan L. Handzlik
                                     _____
19                                   By: JAN L. HANDZLIK
                                     Attorneys for Defendants
20                                   Lindsey Manufacturing Company and
                                     Keith E. Lindsey

21

22

23

24

25

26  _____

27  [39]    While there are alternative remedies (*see Kojayan*, 8 F.3d at 1325), the facts
     here are so egregious and continuous that dismissal with prejudice is the
28  appropriate remedy.

REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO DISMISS INDICTMENT
46

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, at Crowell & Moring LLP at 515 S. Flower Street, 40th Floor, Los Angeles, California 90071. I am over the age of 18 and not a party to the within action.

On **September 25, 2011**, I served the foregoing document described as **REPLY TO GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT; EXHIBITS** on the parties in this action by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies the following:

Douglas M. Miller (Assistant United States Attorney)
Email: doug.miller@usdoj.gov

Jennifer M. Resnik (Assistant United States Attorney)
Email: jennifer.resnik@usdoj.gov

Nicola J. Mrazek (United States Department of Justice Senior Trial Attorney)
Email: nicola.mrazek@usdoj.gov

Jeffrey Goldberg (United States Department of Justice Senior Trial Attorney)
Email: jeffrey.goldberg2@ usdoj.gov

Jan L. Handzlik (Attorney for Defendants Lindsey Manufacturing Company and Keith E. Lindsey)
Email: jhandzlik@venable.com
Email: mhayes@helpcounsel.com

Stephen G. Larson (Attorney for Defendant Angela Maria Gomez Aguilar)
Email: stephen.g.larson@gmail.com

1    Robert L. Corbin (Attorney for Lela Lindsey)
2    Email: rlcorb@corbfitzlaw.com

3    Stephen G. Larson (Attorney for Defendant Angela Maria Gomez Aguilar)
4    Email: larson.stephen@arentfox.com

5        I declare under penalty of perjury under the laws of the State of California
6    that the above is true and correct.

7        Executed on **September 25, 2011**, at Los Angeles, California.

8                         /s/ D. Garlow
9                         D. Garlow

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28